IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

vs.                                                                             No. CR 23-0346 JB

FAYE JANZAD,

     Defendant.

## MEMORANDUM OPINION AND ORDER[1]

**THIS MATTER** comes before the Court on the United States' Motion in Limine, filed December 4, 2023 (Doc. 28)("Motion"). The Court held a hearing on March 5, 2024. See Clerk's Minutes, filed March 5, 2024 (Doc. 41). The primary issues are: (i) the proper mens rea requirement of 38 U.S.C. § 6101, and what are the essential elements of the crime which the statute creates; (ii) whether the following evidence is relevant: (a) evidence that on prior occasions Defendant Faye Janzad commingled other veterans' benefits in the accounts of Veterans Independent Living of Albuquerque ("VILA"), the organization Janzad founded and operates; (b) evidence that alleged victim Thomas Hubshman's expressed his wishes that Janzad commingle

---

[1]On July 18, 2024, the Court issued a draft of this Memorandum Opinion and Order to appraise the parties of the Court's intended disposition of the issues. See Draft Memorandum Opinion and Order, filed July 18, 2024 (Doc. 70). The Court now issues this full Memorandum Opinion and Order. The most important changes are that the Court now includes analysis whether the United States must prove that Janzad personally benefited from her conduct, see Section I.F., infra, at 52-57; the Court also analyzes the admissibility of the personal-benefit evidence, see Section II.E., infra, at 75-83. The Court revises some other portions of its analysis. In particular, the Court now construes 38 U.S.C. § 6101's misappropriation theory and its except-as-authorized theory as coextensive, rather than the latter theory as the more capacious one. See Section I.D.2.b-c., infra, at 37-48. The Court, moreover, concludes that § 6101(b)'s prima-facie provision applies to the except-as-authorized theory, as well as to the embezzlement and misappropriation theories. See n.7, infra, at 25. The Court also updates its rule 403 analysis of the evidence of Hubshman's express wishes, but reaches substantively the same conclusions therein. See Section II.B., infra, at 61-73.

his funds; (c) evidence that Hubshman ratified Janzad's conduct after the fact; (d) evidence that the costs of Hubshman's care were high; and (e) evidence that Janzad did not personally benefit from her use of Hubshman's money; (iii) whether Hubshman's statements to Janzad are inadmissible hearsay; (iv) whether evidence of Janzad's prior good deeds is admissible; (v) whether evidence attacking the United States' investigation's quality is admissible; and (vi) whether evidence of the consequences of Janzad's conviction is admissible.  The Court concludes that: (i) as the Court indicates in its Court's First Proposed Preliminary Jury Instructions at 4, filed July 12, 2024 (Doc. 63)("Prelim. Instr."), § 6101's elements require a knowledge mens rea, generally stated as knowledge of wrongfulness, and specifically that the United States must prove that Janzad "knowingly" embezzled, "knowingly" misappropriated, or used Hubshman's money "knowing" that the manner in which she did so was not "authorized by law"; (ii) the Court makes conclusions about the following evidence's admissibility: (a) the Court will admit evidence of Janzad's commingling on prior occasions, because it goes to her knowledge of wrongfulness; (b) the Court will admit Hubshman's expressed wishes, because Janzad could mistakenly have believed Hubshman's assent rendered her conduct permissible, although the Court will exclude that Hubshman "consented to" Janzad's conduct; (c) the Court will exclude evidence of the purported ratification, because it postdates the alleged crimes and so cannot inform mens rea; (d) the Court will admit in limited form evidence of the costs of Hubshman's care, because it explains Hubshman's expressed wishes, but will exclude most details and all pertinent numerical figures; and (e) the Court will admit evidence that Janzad did not personally benefit from using Hubshman's money, because it is directly relevant to an embezzlement theory, and because under a misappropriation theory and an except-as-authorized theory, it goes to knowledge-of-wrongfulness; (iii) the Court will not exclude Hubshman's statements as inadmissible hearsay,

because they are non-hearsay offered for their effect on Janzad;  (iv) the Court will admit evidence that Janzad and VILA have had success helping veterans, as part of introducing her background to the jury, but will not permit any extensive evidence on the subject, which would solely be sympathy-garnering; (v) the Court will admit evidence roughing up the United States' investigation of the case and evidence attacking as ambiguous the questions posed to Janzad that underly the 18 U.S.C. § 1001 charges; and (vi) the Court will exclude evidence of the indirect consequences of Janzad's criminal conviction, because it is merely sympathy-garnering under rule 403.  Accordingly, the Court grants in part and denies in part the Motion.

## **FACTUAL BACKGROUND**

The Court takes its facts from Motion and from the following filings: the Indictment, filed March 21, 2023 (Doc. 2)("Indictment"); Defendant Faye Janzad's Response to the United States' Motions in Limine, filed December 18, 2023 (Doc. 29)("Response"); the United States' Reply in Support of Motions in Limine, filed January 8, 2024 (Doc. 31)("Reply"); Defendant Faye Janzad's Supplemental Brief in Response to United States' Motions in Limine [Doc. 28], filed March 13, 2023 (Doc. 38)("Suppl. Br."); and from the parties' representations during the hearing, see Transcript of Hearing, taken March 5, 2024 ("Tr.").[2]  The Court takes as true the facts in these filings for purposes of deciding the Motion.  Nevertheless, Janzad is presumed innocent until proven guilty, a burden which remains with the United States.

Janzad is the founder, owner and director of VILA, a nonprofit organization that provides housing and services to veterans in the Albuquerque, New Mexico metro area.  See Indictment ¶ 1, at 1.  Hubshman was a disabled veteran who lived for a number of years at VILA.  See Indictment

---

[2]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

¶ 2, at 1.  Since 2001, Hubshman was considered disabled, and, also since then, a fiduciary that the Department of Veterans Affairs ("VA") appointed handled his finances.  Indictment ¶ 2, at 1. In 2018, Hubshman's fiduciary, who had been based in California and managed Hubshman's money in California, died.  See Response at 5.  Hubshman asked Janzad to serve as his fiduciary. See Suppl. Br. at 1-2.  According to Janzad, Hubshman told her that he "'thought Ms. Janzad was already in charge of me'" during the six years Hubshman had already resided at VILA.  Suppl. Br. at 1-2 (no citation given for quoted material).

Janzad was appointed Hubshman's fiduciary.  See Indictment ¶ 3, at 1.  Janzad executed a fiduciary agreement with the VA.  See Indictment ¶ 3, at 1; Fiduciary Agreement, filed January 8, 2024 (Doc. 31-1)("Agreement").[3]  The Agreement provides the following:

> 2.      I understand that funds are to be used for the beneficiary and his/her recognized dependent, if appliable.  I understand that I cannot borrow, loan or gift funds belonging to the beneficiary.
>
> . . .
>
> 4.      I understand that I must establish a properly titled bank account as follows: beneficiary's name by your name, federal fiduciary.
>
> 5.      I understand that in no instance shall the beneficiary's funds be commingled with either my or anyone else's funds.
>
> . . .
>
> 7.      I understand that I must keep accurate, complete records and receipts, regardless if I am required to submit periodic accountings.

---

[3]The parties have not explained explicitly to the Court the provenance of the Agreement's terms.  The United States' filing, however, suggests that the Agreement's terms embody VA regulations prohibiting commingling of beneficiary funds.  See United States' Requested Jury Instruction for Fiduciary Misappropriation at 3, filed June 21, 2024 (Doc. 52)(citing 38 C.F.R. § 13.200(a) ("[A] fiduciary must establish and maintain a separate financial institution account for each VA beneficiary that the fiduciary serves. The fiduciary must not commingle a beneficiary's funds with the fiduciary's funds or any other beneficiary's funds, either upon or after receipt.")).

8.      I understand that [I am] required to complete periodic accountings. . . .

9.      I understand that I must strictly adhere to the "fund usage agreement" on page 3 of this form.  Any deviation must be approved in writing by the fiduciary activity.

. . .

12.     I understand that I will be held responsible for misuse of the beneficiary's funds or for not adhering to these requirements.

Agreement ¶¶ 2-12, at 2.

Pursuant to the Agreement's requirements, Janzad established a segregated bank account solely for Hubshman's benefit.  See Tr. at 38:13-39:9 (Peña).  Hubshman's regular VA payments were deposited directly into the segregated account that Janzad had set up.  See Tr. at 38:17-22 (Peña).  After the California fiduciary died, the California account's balance was redirected on March 20, 2018, to Janzad in two cashier check disbursements -- one for $20,360.26 and another for $143,002.77 -- for a total of $ 163,363.03.  See Indictment ¶ 4, at 2; Tr. at 38:13-39:9 (Peña).  The two checks thus transferred the corpus of the California accounts to Janzad.  See Tr. at 38:13-39:9 (Peña).

According to Janzad, she had asked Hubshman what he wanted done with his benefits and how he wanted them used.  See Suppl. Br. at 1-2.[4]  Hubshman told Janzad that he wanted what

---

[4]It is not clear whether Janzad asked Hubshman what he wanted done with his money only as to the preexisting, California funds, or whether Janzad also asked Hubshman what he wanted done with the benefits that the VA sent regularly and continuously to him.  See Suppl. Br at 1-2.  If the consent was sought only for the California funds, Janzad does not make clear why she only obtained Hubshman's consent as to the California sums, but not Hubshman's consent to redirect to VILA's accounts the ongoing VA benefits receipts.  As noted, the VA's regular disbursements to Hubshman directly were deposited into the segregated account that Janzad set up on Hubshman's behalf.  See Tr. at 38:17-22 (Peña).

was best for the facilities and that he wanted to continue living at the facility.  See Suppl. Br. at 2 ("Ms. Janzad will testify that she specifically asked Mr. Hubshman what he wanted done with his fiduciary funds and Mr. Hubshman replied, 'I want what is best for VILA and for me to stay here.'").  Janzad informed Hubshman that she would temporarily pool his VA benefits with those of other veterans in the facilities care, but that ultimately this commingling was for his benefit because it would cover his room and board and all his expenses during his residence at VILA regardless of the ultimate cost of his care.  See Suppl. Br. at 2.  Hubshman told Janzad that he was grateful for her.  See Suppl. Br. at 2 ("Ms. Janzad will testify that Mr. Hubshman specifically 'agreed to that fiduciary arrangement' and she recalls Mr. Hubshman saying, 'I am so grateful to you, you just don't know.'").  According to Janzad, Hubshman also expressed to his son that these were his wishes for the use of his benefits.[5]  According to Hubshman's expressed wishes, Janzad deposited the $163,363.03 into VILA's general operating business accounts, where it was commingled with other funds, instead of depositing the California funds into the segregated account for Hubshman.  See Indictment ¶ 4, at 2; Tr. at 38:13-39:9 (Peña).  The United States does not allege that Janzad spent Hubshman's money on herself, e.g., by purchasing a car for herself or by remodeling her home.  See Tr. at 39:2-9 (Peña)("No one is alleging that she bought herself a new car with it.  No one is alleging that she remodeled her home with it.  She just used it for the rest of the business.").

---

[5]Janzad indicates that Hubshman's son will testify that Hubshman expressed such wishes for the use of his funds.  See Tr. at 68:2-18 (Gorence).  Janzad has not made a proffer of proof as to what statements Hubshman's son will testify that Hubshman made.  Because hearsay determinations turn often on the precise wording of the alleged hearsay, Janzad should proffer those statements to which Hubshman's son will testify, so that the Court can evaluate their admissibility.

At the time, Hubshman -- a drug user -- was a high-cost resident of the facility.  <u>See</u> Response at 6-7; Letter from Robert J. Gorence, Gorence Law Firm, LLC, to Jeremy Peña, United States Attorney's Office at 15 (dated January 12, 2023), filed September 11, 2023 (Doc. 21-1)("Gorence-Peña Letter").  His outstanding expenses at VILA amounted to $193,699.98.  <u>See</u> Response at 7.  Hubshman's regular VA benefits were significantly less than that figure, as was the total California funds of $163,363.03.  <u>See</u> Response at 6-7.  According to Janzad, the arrangement she made with Hubshman, would permit Hubshman to remain in residence at VILA rather than be turned out on the street, because his care's cost exceeded what Hubshman received in VA benefits.  <u>See</u> Response at 6-7; Tr. at 66:24-67:15 (Gorence).

In October, 2018, and November, 2018, VA investigators inquired of Janzad as to the use of Hubshman's money.  <u>See</u> Indictment ¶ 5, at 2.  Janzad explained that the money -- with Hubshman's consent -- had been exchanged for a mortgage on a property that the facility owned, which Janzad told VA investigators carried a five percent interest rate.  <u>See</u> Indictment ¶ 5, at 2.  This statement, the United States alleges, was false, and Janzad knew it was false, because no mortgage had been recorded at the time.  <u>See</u> Indictment ¶ 5-6, at 2; <u>id.</u> ¶ 3, at 4.

On December 7, 2018, after this conversation about the purported mortgage, Janzad had a mortgage recorded on a property that purported to grant Hubshman an interest on a property in exchange for $163,363.03.  <u>See</u> Indictment ¶ 6, at 2.  The mortgage instrument, however, referred to a property that VILA did not own, instead granting an interest in property that a different disabled veteran resident of the facility owned.  <u>See</u> Indictment ¶ 6, at 2.  No interest payments were ever made on the mortgage to Hubshman.  <u>See</u> Indictment ¶ 8, at 3.

Janzad drafted, and Hubshman signed, a separate instrument, which purports to instantiate an agreement for an annuity-like agreement between VILA and Hubshman.  <u>See</u> Tr. at 40:15-23

(Peña); id. at 60:6-61:20 (Gorence).  The contract purports to exchange the $163,363.03 from the California funds in exchange for lifetime care that VILA would provide Hubshman: VILA would provide care to Hubshman and allow him to reside at VILA for the remainder of his life.  See Tr. at 40:15-23 (Peña); id. at 60:6-61:20 (Gorence).  Both the purported mortgage instrument and the life-time care agreement, the United States argues, represent after-the-fact rationalizations and attempts at a cover-up for Janzad's allegedly unlawful use of Hubshman's funds.  See Tr. at 40:15-23 (Peña).

Later, the VA terminated Janzad's fiduciary relationship with Hubshman.  See Indictment ¶ 7, at 2.  Within several months of depositing the California funds in VILA's accounts, the money was gone.  See Tr. at 67:17-68:1 (Peña, Court).[6]  Hubshman died in July, 2023.  See Motion at 7; Tr. at 65:23-24 (Gorence).

## PROCEDURAL BACKGROUND

A Federal Grand Jury indicted Janzad for two counts of the fiduciary misappropriation statute, in violation of 38 U.S.C. § 6101, and two counts for false statements made to government investigators, in violation of 18 U.S.C. § 1001.  See Indictment at 1.  The two counts under § 6101 correspond to the two checks disposing of the sums of the California beneficiary account made to Janzad, namely, the cashier's check of $20,360.26.00 on March 21, 2018, and the cashier's check of $143,002.77 on March 26, 2018.  See Indictment ¶¶ 9-12, at 3.  The two counts under § 1001

---

[6]The parties have not informed the Court precisely how the money was emptied from VILA's accounts, e.g., whether VILA used up all the money on expenditures, and, if VILA used the money, on what expenditures, or whether Janzad personally withdrew the money.  The United States represents, however, that the money was spent on normal operating expenses.  See Tr. at 39:2-8 (Peña)("She deposited it into her general business operating account and within several months that money was gone, just used for other purposes, business purposes . . . .  She just used it for the rest of the business.").

correspond to two sets of statements made to VA investigators.  In the first statement, underlying Count 3, Janzad stated on or about November 7, 2018, that "[a]s [Hubshman's] power of attorney, at the time, VILA felt it was best to secure his money via a recorded mortgage at 5% interest with a monthly payment of $1,291.86," allegedly fraudulent because Janzad knew that no mortgage had been recorded.  Indictment ¶ 14, at 4.  In the second statement, underlying Count 4, Janzad on January 3, 2019, sent a Fiduciary Statement of Account stating that, in the December 10, 2017, to December 15, 2018, period, Hubshman had zero assets, which is allegedly false because Janzad knew that Hubshman had received the $163,363.03 from the California accounts.  See Indictment ¶ 16, at 4-5.

The United States filed its Motion in which it urges the Court to exclude five categories of evidence.  See Motion at 1.  The United States seeks to exclude evidence of any past good conduct and beneficence that Janzad demonstrated to other disabled veterans.  See Motion at 4-6.  The United States seeks to exclude evidence that Hubshman consented to or ratified Janzad's use of his VA benefits, on the basis that consent is not a defense to the charges under § 6101.  See Motion at 6-7.  The United States argues that the Court should exclude evidence of the consequences of Janzad's possible conviction, specifically any evidence that VILA facilities will close if she is convicted.  See Motion at 7-9.  Fourth, the United States seeks to exclude evidence of the costs of caring for Hubshman.  See Motion at 10.  Fifth, the United States also seeks to exclude evidence about the quality of its investigation.  See Motion at 10-11.  In support of these arguments, the United States argues significantly that evidence of Hubshman's consent/ratification, the costs of his care, and good deeds done for veterans is irrelevant to the elements of § 6101; originally, the United States' proposed elements read thus:

*First:* that the defendant was a fiduciary for the benefit of a minor, incompetent, or other beneficiary under laws administered by the Secretary of Veterans Affairs;

*Second:* that money or property came into the defendant's control in any manner whatever in the execution of his fiduciary trust, or under color of his fiduciary office or service as a fiduciary;

*Third:* that the defendant lent, borrowed, pledged, hypothecated, used, or exchanged for other funds or property, embezzled, or misappropriated that money or property in whole or in part;

*Fourth:* that the defendant did so willfully and intentionally, and not by inadvertence or negligence.

Motion at 3.

Janzad responds that she concedes some issues the United States raises, but contests others. Specifically, Janzad does not contest the United States' consequences-of-conviction argument. See Response at 1-2. Janzad also does not contest vigorously the United States' quality of investigation, argument, except Janzad argues she should be permitted to provide context, critiquing the events underlying the § 1001 counts, i.e., Janzad seeks to introduce evidence that the questions asked to her were misleading. See Response at 1-2. As to the three remaining evidentiary issues -- Hubshman's consent/ratification, her past services as a fiduciary when she commingled funds, and the costs of Hubshman's care -- she argues she should be allowed to introduce such evidence to negate the proposed willfulness mens rea. See Response at 2-8. Janzad argues that she should be permitted to introduce evidence that she served as a fiduciary in the past for other disabled veterans, and that in the past, she had also pooled their benefits for the mutual benefit of all veterans under her care. See Response at 4-5 ("Ms. Janzad's testimony will establish how veteran funds were pooled and used for the mutual benefit of all veterans in order to upgrade property for the facilities and to achieve the mutually beneficial outcome of all veterans being

taken care of."). Janzad also argues that she should be permitted to introduce evidence that the alleged victim consented to the pooling of his benefits. See Response at 5-6. She also argues that she should be permitted to introduce evidence that she did not use the alleged victim's money for her own personal benefit. See Response at 4. Last, she argues that she should be allowed to introduce evidence of his care's cost, because that information goes to whether the use to which she put his benefits was for his benefit; her position is that the exorbitant cost of his care, which exceeded the value of his VA benefits, demonstrates that the pooling of his resources was for his benefit, i.e., that he would not be put out on the street because of his care's cost. See Response at 6-7.

The United States replies that, because Janzad agrees to its consequences-of-conviction argument, there is no dispute on that subject. See Reply at 6. The United States does not dispute the limited purpose of any quality-of-investigation evidence that Janzad may introduce to provide context about the VA investigators questions to Janzad, i.e., to show that they were allegedly misleading, so as to negate the mental state requirement under § 1001. See Reply at 7. As to Janzad's prior conduct with other disabled veterans, the United States points out that the evidence that Janzad seeks to introduce -- namely, that in the past, Janzad had pooled her beneficiaries benefits for mutual aid -- if proven, would constitute a violation of § 6101. See Reply at 3 ("If the evidence in fact shows that Ms. Janzad pooled the victim's money and used it in this manner, then she is in fact guilty of violating § 6101 as charged."). The United States insists moreover that it need not establish Janzad's personal use or benefit, which is not an element of § 6101. See Reply at 2. The United States again insists that the Court should exclude evidence that Hubshman consented to Janzad's pooling of his money, because consent is not a defense to § 6101, and because that statute is a general intent offense. See Reply at 3-5. Thus, interpreting its own

proposed instructions, it argues the offense is a general intent crime, because "willfully" can take various meanings, including general intent alone.  See Reply at 5 ("Because the state of mind of knowing assumption of a legal duty is supplied by proof of the defendant's status as a fiduciary, willfulness as knowledge of the facts that make the conduct illegal is sufficient.").  Last the United States insists again that the Court exclude evidence of the cost of caring for the alleged victim, arguing that Janzad must have used the funds directly for the beneficiary's benefit.  See Reply at 7.  In so arguing, the United States urges the Court to draw on a related statute, 38 U.S.C. § 6106, which addresses fiduciaries' "misuse of benefits," to inform the Court's construction of § 6101's scienter element.  See Reply at 2 ("Under the law, if the use of the veteran's funds was not for the exclusive use of the veteran, the funds were misappropriated.  A related provision, 38 U.S.C. § 6106, makes that clear . . . .").

The Court held a hearing on the Motion, where it became clear that the three contested evidentiary issues turned on the mens rea requirement in the § 6101 statute, which rarely has been prosecuted, and which has no pattern jury instructions in any federal Circuit.  See Tr. at 11:14-18 (Court, Peña).  It also became clear that the United States' position on the statute's mens rea requirement had shifted: where the United States before had suggested that the statute carried a willfulness mental state requirement, at the hearing the United States suggested that the statute be construed as a strict liability offense.  See Tr. at 14:7-16 (Peña).  Indeed, the United States backtracked from the Motion's proposed § 6101 elements, noting that those elements had been suggested by prosecutors in another case, and that the United States would be proposing jury instructions on § 6101 different from those its Motion proposed.  See Tr. at 11:18-12:8 (Peña).  After argument, the Court indicated that it viewed the disputed evidence as relevant to establishing that Janzad believed she was acting in Hubshman's interests, because his expressed wishes, his

care's cost, and her past practices with other veterans indicating she might have believed she was acting in Hubshman's interests.  See Tr. at 54:23-55:10 (Court).  The Court thus concluded provisionally that it would draw on § 6106 to inform its construction of § 6101's elements.  See Tr. at 54:24-55:10 (Court).  The Court indicated that Janzad should proffer the statements Hubshman made to her, and the United States should file a brief indicating what the temporal parameters of the offense are.  See Tr. at 30:1-22 (Court).

After the hearing, Janzad submitted a supplemental brief in which she proffers the statements of Hubshman's she will testify that he made to her:

> Ms. Janzad will testify that Mr. Hubshman stated that he "thought Ms. Janzad was already in charge of me" during the six years he had lived at the VILA Georgene Campus.  Ms. Janzad will testify that she specifically asked Mr. Hubshman what he wanted done with his fiduciary funds and Mr. Hubshman replied, "I want what is best for VILA and for me to stay here."
>
> Ms. Janzad then told Mr. Hubshman that his money would be temporarily pooled for his benefit and for the assistance of his fellow veterans.  Ms. Janzad specifically told Mr. Hubshman that all of his fiduciary funds would ultimately be used for his benefit because all of those funds would be used to cover his room and board, and other expenses for as long as he lived and was a resident of VILA whatever the cost of his care.  Ms. Janzad will testify that Mr. Hubshman specifically "agreed to that fiduciary arrangement" and she recalls Mr. Hubshman saying, "I am so grateful to you, you just don't know."

Suppl. Br. at 1-2.  The United States did not file a supplemental brief in which it describes the relevant time parameters of the crimes charged, i.e., when it alleges the crime began and was completed.

The United States filed a set of proposed jury instructions, including proposed instructions for § 6101.  See United States' Requested Jury Instruction for Fiduciary Misappropriation at 1, filed June 21, 2024 (Doc. 52)("U.S. Instr.").  The United States notes that it conferred with Janzad, who disputes only the mens rea element in the United States' proposed § 6101 instruction.  See

U.S. Instr. at 1 n.1.  The United States' § 6101 instructions backtrack from the position taken at the hearing that § 6101 may be construed as a strict liability offense, but the proposed instructions feature a lesser mens rea demand than the Motion's proposed willfulness element: the United States now proposes to the Court that § 6101 turn on a "knowingly" requirement, rather than a "willfully" requirement.  <u>See</u> U.S. Instr. at 2.  The United States imports some language from § 6106's misuse of benefits provision.  <u>See</u> U.S. Instr. at 2.  In relevant part the proposed instruction reads thus:

> The defendant is charged in counts 1 and 2 with a violation of 38 U.S.C. § 6101.
>
> That law makes it a crime to misuse, embezzle, or misappropriate funds received while a fiduciary.
>
> To find the defendant guilty of this crime, you must be convinced that the government has proven each of the following beyond a reasonable doubt:
>
> . . .
>
> ***Third:*** knowing that she was a fiduciary, the defendant knowingly lent, borrowed, pledged, hypothecated, used, or exchanged for other funds or property, except as authorized by law, or embezzled, or misappropriated that money or property in whole or in part.
>
> . . .
>
> Misuse of benefits by a fiduciary occurs in any case in which the fiduciary receives payment, under any of laws administered by the Secretary, for the use and benefit of a beneficiary and uses such payment, or any part thereof, for a use other than for the use and benefit of such beneficiary or that beneficiary's dependents.
>
> For the "use and benefit" of a beneficiary means any expenditure reasonably intended for the care, support, or maintenance of the beneficiary or the beneficiary's dependents.  Such expenditures may include the fiduciary's efforts to improve the beneficiary's standard of living.

U.S. Instr. at 2-3.  In support, the United States, abandoning its strict liability position, argues that where a criminal statute is silent as to mens rea, courts should read in a mens rea requirement sufficient to separate innocent from wrongful conduct.  <u>See</u> United States' Brief in Support of Its Jury Instruction for Counts 1 & 2 of the Indictment at 2-4, filed June 21, 2024 (Doc. 53)("U.S. Instr. Br.").  Here, the United States argues that a "knowingly" requirement is sufficient to separate wrongful from innocent conduct.  <u>See</u> U.S. Instr. Br. at 5 ("[A]n action done 'knowingly' means 'that the act was done voluntarily and intentionally, and not because of mistake or accident.' Knowingly lending, borrowing, or using a beneficiary's funds contrary to her fiduciary obligations is enough to separate innocent conduct from wrongful conduct." (quoting 10th Circuit Pattern Jury Inst. § 1.37 (2021))).

Janzad proposes a jury instruction that essentially reiterates the proposed elements in the Motion:

> To prove a violation of 38 U.S.C. § 6101, the United States must prove the following elements at trial:
>
> ***First:***        that the defendant was a fiduciary for the benefit of a minor, incompetent, or other beneficiary under laws administered by the Secretary of Veterans Affairs;
>
> ***Second:***        that money or property came into the defendant's control in any manner whatever in the execution of her fiduciary trust, or under color of her fiduciary office or service as a fiduciary;
>
> ***Third:***        that the defendant lent, borrowed, pledged, hypothecated, used, or exchanged for other funds or property, embezzled, or misappropriated that money or property in whole or in part; and
>
> ***Fourth:***        that the defendant did so willfully and intentionally, and not by inadvertence or negligence.

Defendant Faye Janzad's Requested Jury Instruction at 3, filed June 23, 2024 (Doc. 54)("Janzad Instr.").  <u>See</u> Motion at 3 (providing that the United States must prove that "the defendant lent,

borrowed, pledged, hypothecated, used, or exchanged for other funds or property, embezzled, or misappropriated that money or property in whole or in part . . . [and] that the defendant did so willfully and intentionally, and not by inadvertence or negligence").

## LAW REGARDING RELEVANT EVIDENCE

The threshold issue in determining the admissibility of evidence is relevance.  As a baseline, under the Federal Rules of Evidence, all evidence that is relevant is admissible -- unless another law or rule excludes the evidence -- and any evidence that is not relevant is not admissible. See Fed. R. Evid. 402.  The standard for relevance is very liberal.  See United States v. Leonard, 439 F.3d 648, 651 (10th Cir. 2006)("Rule 401 is a liberal standard.")(citing United States v. McVeigh, 153 F.3d 1166, 1190 (10th Cir. 1998)).  The evidence need have only "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401.  See United States v. Leonard, 439 F.3d at 651.  "[A] fact is 'of consequence' when its existence would provide the fact-finder with a basis for making some inference, or chain of inferences, about an issue that is necessary to a verdict," but it only needs to have "any tendency" to do so.  United States v. Jordan, 485 F.3d 1214, 1218 (10th Cir. 2007).  See United States v. Leonard, 439 F.3d at 651. Although the threshold burden is low, the rules do "not sanction the carte blanche admission of whatever evidence a defendant would like.  The trial judge is the gatekeeper under the Rules of Evidence." United States v. Jordan, 485 F.3d at 1218.

## LAW REGARDING RULES 401 AND 402 OF THE FEDERAL RULES OF EVIDENCE

"The rules of evidence contemplate the admission of relevant evidence, and the exclusion of irrelevant and potentially prejudicial evidence." Train v. City of Albuquerque, 629 F. Supp. 2d 1243, 1247 (D.N.M. 2009)(Browning, J.)(citing Fed. R. Evid. 401, 402 & 403). "Relevant

evidence is evidence that has a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." United States v. Gutierrez-Castro, No. CR 10-2072 JB, 2011 WL 3503321, at *3 (D.N.M. Aug. 6, 2011)(Browning, J.)(citing Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.")).  "The standard for relevancy is particularly loose under rule 401, because '[a]ny more stringent requirement is unworkable and unrealistic.'" United States v. Ganadonegro, 854 F. Supp. 2d 1088, 1127 (D.N.M. 2012)(Browning, J.)(quoting Fed. R. Evid. 401 advisory committee's note). Irrelevant evidence, or that evidence which does not make a fact of consequence more or less probable, however, is inadmissible. See Fed. R. Evid. 402 ("Irrelevant evidence is not admissible.").

## LAW REGARDING RULE 403

Rule 403 provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.  Under rule 403, the trial court must weigh the proffered evidence's probative value against its potential for unfair prejudice. See United States v. Record, 873 F.2d 1363, 1375 (10th Cir. 1989).  "[I]t is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter [under rule 403]." United States v. Pettigrew, 468 F.3d 626, 638 (10th Cir. 2006)(quoting United States v. Sides, 944 F.2d 1554, 1563 (10th Cir. 1991)(interpolation the Court's).  The Tenth Circuit has reminded district courts that they should be "mindful" that "exclusion of evidence under Rule 403 that is otherwise admissible under the

other rules is an extraordinary remedy and should be used sparingly."  United States v. Smalls,

605 F.3d at 787.

The decision to admit or exclude evidence pursuant to rule 403 is within the trial court's

discretion, see United States v. Lugo, 170 F.3d 996, 1005 (10th Cir. 1999), and the trial court's

discretion to balance possible unfair prejudice against probative value is broad, see United States

v. Bice-Bey, 701 F.2d 1086, 1089 (4th Cir. 1983); United States v. Masters, 622 F.2d 83, 87-88

(4th Cir. 1980).  The Supreme Court has noted:

> In deference to a district court's familiarity with the details of the case and
> its greater experience in evidentiary matters, courts of appeals afford broad
> discretion to a district court's evidentiary rulings . . . . This is particularly true with
> respect to Rule 403 since it requires an "on-the-spot balancing of probative value
> and prejudice, potentially to exclude as unduly prejudicial some evidence that
> already has been found to be factually relevant."

Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 384 (2008)(quoting 1 Steven Alan

Childress & Martha S. Davis, Fed. Standards of Review § 4.02, at 4-16 (3d ed. 1999)).  See United

States v. Abel, 469 U.S. 45, 54 (1984)("Assessing the probative value of [proffered evidence], and

weighing any factors counseling against admissibility is a matter first for the district court's sound

judgment under Rules 401 and 403 . . . .").

Evidence may be unfairly prejudicial if it will likely provoke an emotional response from

the jury or otherwise tends to affect adversely the jury's attitude toward a particular matter.  See

United States v. Rodriguez, 192 F.3d 946, 951 (10th Cir. 1999).  Evidence is not unfairly

prejudicial merely because it damages a party's case.  See United States v. Caraway, 534 F.3d

1290, 1301 (10th Cir. 2008); United States v. Curtis, 344 F.3d 1057, 1067 (10th Cir. 2003); United

States v. Martinez, 938 F.2d 1078, 1082 (10th Cir. 1991).  Rather, "[t]o be unfairly prejudicial, the

evidence must have 'an undue tendency to suggest decision on an improper basis, commonly,

though not necessarily, an emotional one.'" United States v. Caraway, 534 F.3d at 1301 (quoting

Fed. R. Evid. 403 advisory committee note). See Leon v. FedEx Ground Package Sys., Inc., No.

CV 13-1005, 2016 WL 836978, at *9 (D.N.M. February 11, 2016)(Browning, J.)("E. Leon has

demonstrated that the photographs here are relevant to a live issue -- M. Leon's possible pain and

suffering. . . . E. Leon should have the opportunity to present her case as she sees fit.  The Court

will, upon request, instruct the jury to view the photographs dispassionately."); United States v.

Aranda-Diaz, 31 F. Supp. 3d 1285, 1290 (D.N.M. 2014)(Browning, J.)("[B]ecause the jury might

use gang membership to conclude Aranda-Diaz intended to distribute drugs because of his gang

association -- rather than consider the United States' evidence against him -- the danger of unfair

prejudice that this evidence presents to him substantially outweighs its probative value.").

## ANALYSIS

Because the Motion's relevance challenges hinge on identifying what facts are

consequential to the case, see Fed. R. Evid. 401(b), the Court concludes, as its proposed jury

instructions indicate, see Prelim. Instr. at 4, that 38 U.S.C. § 6101's elements require the United

States to prove a mental state element defined by knowledge.  More specifically, the Court

concludes that the United States must prove that Janzad knowingly embezzled, knowingly

misappropriated, or that Janzad -- knowing that the manner in which she did so was unauthorized

by law -- used Hubshman's VA benefits.  In short, the Court holds that § 6101 is not a strict liability

offense, and that it is defined primarily by Janzad's knowledge of her conduct's prohibited

character.  The Court explains at greater length that ruling here.  The Court rules, moreover, on the

admissibility of evidence under those elements.  Because the Court concludes that the United

States must prove that Janzad had a knowledge mental state, evidence of Hubshman's expressed

wishes, Janzad's prior commingling actions vis-à-vis other veterans, limited evidence of the cost

of Hubshman's care, and that Janzad did not personally benefit from Hubshman's money all is evidence relevant for Janzad to dispute the conclusion that she knew her conduct was prohibited. Stated differently, the evidence could suggest to a jury that Janzad believed that what she was doing was permissible.  The Court, however, will not admit evidence of Hubshman's purported ratification of Janzad's conduct, because it postdates the alleged crime.  The Court also concludes that Hubshman's statements to Janzad are not hearsay and are not inadmissible on that basis.  The Court will admit evidence that Janzad has had success helping veterans, for the purpose of introducing her and VILA to the jury, but will not admit extensive evidence of prior good deeds as merely sympathy-garnering.  The Court will admit to some extent the evidence roughing up the United States' investigation, specifically that evidence calling into question as misleading the events underlying the § 1001 charges. The Court will, however, exclude evidence of the indirect consequences of Janzad's potential conviction.  Accordingly, the Court grants in part and denies in part the Motion.

## I.    THE COURT CONSTRUES 38 U.S.C. § 6101 AS POSSESSING FOUR ELEMENTS, DEFINED BY A KNOWLEDGE SCIENTER REQUIREMENT.

The Court concludes that § 6101 has four elements, and that § 6101 is not a strict liability offense and is instead defined by a knowledge requirement.  Importantly, the knowledge requirement extends to the fact that Janzad's use of Hubshman's money was not "authorized by law": the United States therefore must prove -- if it proceeds under what the Court calls the except-as-authorized theory -- that Janzad knew that her conduct was not "authorized by law."  The Court, as it indicates in its preliminary proposed jury instructions, concludes that § 6101's elements read thus:

*First:* Ms. Janzad was a fiduciary for the benefit of a minor, incompetent, or other beneficiary under laws administered by the Secretary of Veteran Affairs;

*Second:* money or property came into Ms. Janzad's control in any manner whatever in the execution of her fiduciary trust, or under color of her fiduciary office or service as a fiduciary;

*Third:* Ms. Janzad knew that she was a fiduciary; and

*Fourth:* Ms. Janzad knowingly embezzled, knowingly misappropriated, or -- knowing that the manner in which she did so was unauthorized by law -- lent, borrowed, pledged, hypothecated, used, or exchanged for other funds or property that money or property in whole or in part.

Prelim. Instr. at 4. The parties agree on the first two elements, so the Court will not discuss them further, as it sees no reason not to adopt those as elements. See U.S. Instr. at 2; Janzad Instr. at 3. In identifying § 6101's elements, the Court's analysis proceeds thus: (a) the Court first analyzes § 6101's text and identifies in it three theories of liability; (b) the Court then determines that the statute is not a strict liability offense, although it lacks a mens rea term; (c) the Court concludes that a knowledge requirement describes the applicable mens rea; (d) the Court identifies what precisely Janzad must know under each § 6101 theory; (e) the Court concludes that the related § 6106 provision should not be grafted onto § 6101; and (f) the Court concludes that the United States does not need to prove that Janzad benefited personally from her conduct, although under an embezzlement theory the United States must prove that Janzad converted Hubshman's property.

## A.     SECTION 6101 FEATURES THREE THEORIES OF LIABILITY.

The Court adopts the above as its elements based on its reading of the statute. 38 U.S.C. § 6101 reads in full thus:

**(a)**     Whoever, being a fiduciary (as defined in section 5506 of this title) for the benefit of a minor, incompetent, or other beneficiary under laws administered by the Secretary, shall lend, borrow, pledge, hypothecate, use, or exchange for other funds or property, except as authorized by law, or embezzle or

in any manner misappropriate any such money or property derived therefrom in whole or in part and coming into such fiduciary's control in any manner whatever in the execution of such fiduciary's trust, or under color of such fiduciary's office or service as such fiduciary, shall be fined in accordance with title 18, or imprisoned not more than five years, or both.

**(b)**     Any willful neglect or refusal to make and file proper accountings or reports concerning such money or property as required by law shall be taken to be sufficient evidence prima facie of such embezzlement or misappropriation.

38 U.S.C. § 6101.  In construing the statute, the Court notes that Congress here opts for a belt-and-suspenders approach, as the statute already has built into it redundancies: as discussed below, embezzlement and misappropriation are on many definitions synonymous, and there is significant overlap among the action verb list from "lend" through "exchange."  Evidently, Congress seeks to ensure that no VA fiduciary's wrongful, misappropriation-type conduct escapes the statute's reach.

The Court interprets § 6101 as having three theories of liability: an embezzlement theory, a misappropriation theory, and an except-as-authorized theory.  The first theory makes it a crime to "embezzle . . . any [beneficiary's] money or property."  38 U.S.C. § 6101(a).  The second theory makes it a crime to "in any manner misappropriate any [beneficiary's] money or property."  38 U.S.C. § 6101(a).  The third theory makes it a crime to "except as authorized by law . . . use . . . any [beneficiary's] money or property."  38 U.S.C. § 6101(a).

The Court identifies "use" as the operative verb in this last theory, because that verb is sufficiently general to encompass the other verbs in the list, i.e., "lend" through "exchange."  Cf. Use, Oxford English Dictionary, https://www.oed.com/dictionary/use_v?tab=meaning_and_use#16016145 ("To put to practical or effective use; to make use of, employ, esp. habitually.")(last visited July 23, 2024); Use, Merriam-Webster, https://www.merriam-webster.com/dictionary/use ("[T]o put into action or service : avail oneself of.")(last visited July 23, 2024).  Although the except-as-authorized theory appears first in the statute's text, the Court places it last in the Court's

statement of § 6101's crucial fourth element, see Section I, supra, at 21, because, on its face, that theory's language is the most capacious.

Embezzlement is the narrowest category of conduct, because it always requires some guilty knowledge or fraudulent intent.  See Pattern Crim. Jury Instr. 10th Cir. 2.32 (2023)("To 'embezzle' means the wrongful, intentional taking of money or property of another after the money or property has lawfully come within the possession or control of the person taking it."); Embezzlement, Black's Law Dictionary (11th ed. 2019)("The fraudulent taking of personal property with which one has been entrusted, esp. as a fiduciary."); Embezzle, Oxford English Dictionary, https://www.oed.com/dictionary/embezzle_v?tab=meaning_and_use #5685543 ("To divert to one's own use (money, etc.) in violation of trust or official duty.")(last visited July 23, 2024); Embezzle, Merriam-Webster, https://www.merriam-webster.com/dictionary/embezzle ("[T]o appropriate (something, such as property entrusted to one's care) fraudulently to one's own use.")(last visited July 23, 2024).  Misappropriation, according to most definitions of that word, also requires a guilty mind; indeed, many definitions make it a synonym of embezzlement.  See Misappropriation, Black's Law Dictionary (11th ed. 2019)("The application of another's property or money dishonestly to one's own use. See embezzlement."); Misappropriate, Oxford English Dictionary,  https://www.oed.com/dictionary/misappropriate_v?tab=meaningand_use#36618926 ("To appropriate or assign wrongly; esp. to apply dishonestly (money belonging to another) to one's own use; to embezzle.")(last visited July 23, 2024); Misappropriate, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/misappropriate ("[T]o steal something that you have been trusted to take care of and use it for your own good . . . Synonym: embezzle")(last visited July 23, 2024); id. ("[T]o steal something that you have been trusted to manage and use it for your own benefit.").  The United States suggested at the hearing that, in addition to the

embezzlement-synonym meaning, misappropriation also has a meaning closer to "use . . . [un]authorized by law" -- i.e., misappropriation meaning simply uses of funds for which they were not intended, without the suggestion of an evil mind behind the conduct.

> I think probably every definition that we'd be able to find in a legal dictionary would break down into one of two categories.  One category would be to convert for your own use.  That would be a potential definition of the word misappropriate.  The other category of definition would say to misuse, to misallocate, to use in other than the intended use of the property, and we think that that would be the category of definition that would be appropriate in this statutory scheme.

Tr. at 34:17-35:4 (Peña).  The Court identifies some dictionary definitions that track this definition, although these entries suggest that the word's thrust is toward embezzlement.  Compare Misappropriate, Merriam-Webster, https://www.merriam-webster.com/dictionary/misappropriate ("to appropriate wrongly")(last visited July 23, 2024), with id. ("(as by theft or embezzlement)") (last visited July 23, 2024).  Compare Misappropriate, Oxford English Dictionary, https://www.oed.com/dictionary/misappropriate_v?tab=meaningand_use#36618926  ("To appropriate or assign wrongly")(last visited July 23, 2024), with id. ("[E]sp. to apply dishonestly (money belonging to another) to one's own use; to embezzle.")(last visited July 23, 2024).  On this reading, the embezzlement-synonymous meaning represents the most prominent genus within misappropriation conduct overall.  With the appellation that the misappropriation can occur "in any manner," 38 U.S.C. § 6101(a), however, the Court sees misappropriation as synonymous with the except-as-authorized end of the spectrum.  The "in any manner" appellation pushes the interpretation out of the prominent embezzlement-synonym genus, so that "misappropriate[ion] . . . in any manner" encompasses all misappropriation conduct, including the application of

- 24 -

beneficiary money simply for purposes for which it is not intended.  The misappropriation theory thus is coextensive with the except-as-authorized theory.[7]

"[U]se . . . [un]authorized by law" thus is coextensive with the misappropriation theory as more general than embezzlement, because, based on its language alone, it is not so narrow, apparently, as to encompass only intentional, dishonest conduct.  38 U.S.C. § 6101(a).  On its phrasing alone, a "use . . . [un]authorized by law" may occur without the actor's knowledge of the use's unauthorized quality.  38 U.S.C. § 6101(a).  At the hearing, the parties recognized this as the

---

[7]Some language in § 6101(a)'s sibling provision, § 6101(b) might suggest that the Court should construe misappropriation as coextensive with embezzlement rather than as coextensive with except-as-authorized.  Section 6101(b) provides that a defendant's willful failure to comply with reporting and accounting obligations may be prima facie evidence of "such embezzlement or misappropriation."  38 U.S.C. § 6101(b).  The provision reads in full: "Any willful neglect or refusal to make and file proper accountings or reports concerning such money or property as required by law shall be taken to be sufficient evidence prima facie of such embezzlement or misappropriation."  38 U.S.C. § 6101(b).  The provision, by its plain terms, does not reference the except-as-authorized theory's language.  That the prima-facie provision arguably treats embezzlement and misappropriation alike might suggest that, for purposes of § 6101, they ought to be construed as equivalent, or at least that misappropriation is closer in terms of generality to the embezzlement theory than it is to the except-as-authorized theory.

Two considerations, however, cut against that conclusion.  First, § 6106(b) uses the disjunctive "or," suggesting that embezzlement and misappropriation are not the precise same.  Second, the use of the word "such" suggests ultimately that misappropriation is a synonym for the except-as-authorized theory.  Subsection (b)'s reference to "such embezzlement or misappropriation" suggests that it is referring to the conduct described in subsection (a).  See Such, Merriam-Webster,  https://www.merriam-webster.com/dictionary/such  (last  visited  July  24, 2024)("[O]f the character, quality, or extent previously indicated or implied. . . .").  The phrasing suggests that it is referring not to only some of the conduct described in subsection (a), but to all the conduct described in subsection (a), i.e., the embezzlement theory, the misappropriation theory, as well as the except-as-authorized theory.  On this reading then, in subsection (b), the word "misappropriation" stands in as a synecdoche for the language of the except-as-authorized provision, i.e., misappropriation in subsection (b) stands in for "[un]authorized by law . . . us[ing], exchang[ing], lend[ing]," etc.  Read thus, subsection (b) further implies that misappropriation in subsection (a) is equivalent to the except-as-authorized theory.

The upshot of this reading is that the prima facie rule in subsection (b) also applies to the except-as-authorized theory.  That is, a willful failure to report or account as obligated by law also can supply prima facie evidence for except-as-authorized liability, and not only to embezzlement liability or misappropriation liability.  The Court will instruct the jury to this effect.

most general theory.   See Tr. at 32:8-33:5 (Court, Peña)(indicating United States' theory encompasses all words in § 6101(a)); id. at 33:19-34:4 (Court)("[T]hat word misappropriate sure seems to me to incorporate a mens rea into it. . . . [R]egardless of whether you call it a mens rea issue or not, it seems to me the consent evidence is going to be relevant if one of the theories . . . is misappropriation."); id. at 42:4-23 (Court)("[I]f [the United States is] going to drop . . . the theory of misappropriation, . . . then I guess I am struggling a little bit to see how the consent would be relevant. . . . [If] they're going to try . . . [a] use or exchange [theory] . . . , then the consent . . . doesn't seem to me to be relevant.").

Accordingly, the Court reads § 6101 as having three theories of ability in ascending order of generality: the embezzlement theory first, and then together the misappropriation theory and the except-as-authorized theory as coextensive.   It is for this reason -- the theories' ascending generality -- that in the Court's preliminary instructions, the Court re-orders § 6101's language, so that the embezzlement theory appears first, the misappropriation theory appears second, and the except-as-authorized theory appears last.   See Section I, supra, at 21; Prelim. Instr. at 4.

### B.      SECTION 6101 IS NOT A STRICT LIABILITY OFFENSE.

There is no mens rea language in 38 U.S.C. § 6101, but the Court concludes that § 6101 contains an implicit mental state requirement and is not a strict liability offense; the Court will thus read in a mens rea requirement.   Although the United States suggested at the hearing that § 6101 could be read as a strict liability offense, the United States wisely has abandoned that position. Compare Tr. at 14:8-16 (Peña)("[I]f there is ever going to be a case for a strict liability felony and I'm not saying that that is going to be our position, but [when] . . . a person has specifically undertaken the heightened responsibilities of a fiduciary, . . . [then t]his would be the most applicable situation for such a strict  liability felony."), with U.S. Instr. at 2 ("Third: knowing that

she was a fiduciary, the defendant knowingly lent, borrowed, pledged, hypothecated, used, or exchanged for other funds or property, except as authorized by law, or embezzled, or misappropriated that money or property in whole or in part."). Even statutes that do not contain a mental state requirement are presumed to have one, unless Congress makes clear that it intended otherwise; it thus is no large interpretive leap to read a mens rea requirement into a statute that lacks one, and the more aggressive move is to conclude that a criminal statute is strict liability. See Elonis v. United States, 575 U.S. 723, 734 (2015)("Elonis")("The fact that the statute does not specify any required mental state, however, does not mean that none exists. We have repeatedly held that 'mere omission from a criminal enactment of any mention of criminal intent' should not be read 'as dispensing with it.'" (quoting Morissette v. United States, 342 U.S. 246, 250 (1952))). Strict liability felonies are exceedingly rare and arise only in extraordinary circumstances, such as part of a regulatory or public welfare program, for crimes where the danger to the public is exceedingly high, and where the penalties are relatively minor. See Rehaif v. United States, 588 U.S. 225, 232 (2019)("Rehaif")("[T]he presumption in favor of scienter . . . [may not apply to] provisions that form part of a 'regulatory' or 'public welfare' program and carry only minor penalties. . . . The firearms provisions before us are not part of a regulatory or public welfare program, and they carry a potential penalty of 10 years in prison that we have previously described as 'harsh.'" (quoting United States v. X-Citement Video, Inc., 513 U.S. 64, 72 (1994)(" X-Citement Video"))).

Section 6101 does not fit under that schema, because it is not a public welfare offense, the threat to the public is not very great, and the possible five-year penalty is not insubstantial. See 38 U.S.C. § 6101(a). Indeed, some of its terms by their very nature cannot be read as strict liability offenses: "strict liability embezzlement" would be a contradiction in terms, because embezzlement

on its own, requires some intentional wrongfulness or dishonesty.  <u>See</u> Pattern Crim. Jury Instr. 10th Cir. 2.32 ("To 'embezzle' means the wrongful, intentional taking of money or property of another after the money or property has lawfully come within the possession or control of the person taking it."); <u>Embezzlement</u>, Black's Law Dictionary (11th ed. 2019)("The fraudulent taking of personal property with which one has been entrusted, esp. as a fiduciary.").  Although the Court adopts the most general reading of the misappropriation theory, the Court notes that, on the prominent embezzlement-synonymous genus of the word, there is per se some mental state.  <u>See</u> <u>Misappropriation</u>, Black's Law Dictionary (11th ed. 2019)("The application of another's property or money dishonestly to one's own use. See embezzlement."); <u>Misappropriate</u>, Oxford English Dictionary, https://www.oed.com/dictionary/misappropriate_v?tab=meaningand_use#36618926 ("To appropriate or assign wrongly; esp. to apply dishonestly (money belonging to another) to one's own use; to embezzle.")(last visited July 23, 2024).  Such facts too suggest that § 6101, of its own force, cannot be read as strict liability.  <u>See</u> Section I.B <u>supra</u>, at 26-29.  To the extent, however, that the Court construes the misappropriation theory and the except-as-authorized theories as mental-state-agnostic, they are capable of a strict liability reading.  For the reasons just stated, however -- § 6101 is not a public welfare offense, violations pose no great danger to the public, and it carries large penalties -- no theory of § 6101 liability permits a strict liability reading.  Accordingly, § 6101 is not a strict liability offense, and the Court will read in a mens rea requirement.[8]

---

[8]The United States argued that the Fiduciary Agreement defined the bounds of what constitutes "authorized by law" for beneficiary funds' uses.  <u>See</u> Fiduciary Agreement ¶ 5, at 2, filed January 8, 2024 (Doc. 31-1)("I understand that in no instance shall the beneficiary's funds be commingled with either my or anyone else's funds."); Tr. at 50:18-52:6 (Peña)("The agreement defines 'authorized by law.' . . . [T]here is the provision 'except as authorized by law,' and so we need to look at surrounding law to understand what use is prohibited and what use is not. And the

## C.   SECTION 6101 IS DEFINED BY A KNOWLEDGE REQUIREMENT, NOT A WILLFULNESS AND INTENTIONALITY REQUIREMENT.

The Court concludes that knowledge constitutes § 6101's mens rea element.  Typically, courts read into a statute that is silent on the subject the mens rea sufficient to separate innocent from guilty conduct.  See Elonis, 575 U.S. at 736 ("When interpreting federal criminal statutes that are silent on the required mental state, we read into the statute 'only that *mens rea* which is necessary to separate wrongful conduct from 'otherwise innocent conduct.'" (quoting Carter v. United States, 530 U.S. 255, 269 (2000)(in turn quoting entirely X-Citement Video, 513 U.S. at 72)(emphasis in Elonis, but not in Carter v. United States or in X-Citement Video))).  Knowledge or intent is often sufficient.  See Ruan v. United States, 597 U.S. 450, 458 (2022)("Ruan")("Unsurprisingly, given the meaning of scienter, the *mens rea* we have read into such statutes is often that of knowledge or intent."); Elonis, 575 U.S. at 736 ("In some cases, a general requirement that a defendant *act* knowingly is itself an adequate safeguard.").

Here, the Court concludes that knowledge is sufficient.  The Court, therefore, does not adopt Janzad's proposed mens rea element, which mirrors the United States' original position on

---

surrounding law is the [fiduciary agreement].").  At the time, the United States had not made explicit to the Court that the no-commingling rule arises not only from the Fiduciary Agreement's terms but, more importantly, also from VA regulation.  The United States subsequently has adduced research making evident that the no-commingling rule is regulatory, and not only contractual, in character.  See U.S. Instr. at 3 (citing 38 C.F.R. § 13.200(a) ("Except as prescribed [in] this section, a fiduciary must establish and maintain a separate financial institution account for each VA beneficiary that the fiduciary serves. The fiduciary must not commingle a beneficiary's funds with the fiduciary's funds or any other beneficiary's funds, either upon or after receipt.")).  Accordingly, recognizing the regulatory source of the no-commingling rule at least obviates concerns that reading § 6101 as strict liability would make for federal criminal liability out of a mere contractual breach of the Fiduciary Agreement.  Nevertheless, for the reasons discussed above, there exist multiple other, independent reasons to conclude that § 6101 is not a strict liability offense.

the mental state requirement: this proposed element defines § 6101 by a willfulness and intentionality requirement, and that the United States must show that the conduct was not negligent or inadvertent. See Janzad Instr. at 3 ("[T]he defendant [acted] willfully and intentionally, and not by inadvertence or negligence."); Motion at 3 ("[T]he defendant [acted] willfully and intentionally, and not by inadvertence or negligence."). The Court need not read into § 6101 a willfulness and intentionality requirement, because knowledge is sufficient. Willfulness is capable of many different interpretations, and it will not necessarily aid the jury in ascertaining liability or innocence. Indeed, the word is capable of so many meanings that the Tenth Circuit urges courts not to instruct juries on willfulness generally. See Pattern Crim. Jury Instr. 10th Cir. 1.38 (2023)(recognizing the "confusion in the law regarding the meaning of the word 'willful,'" and thus "not recommend[ing] any general instruction defining the term 'willfully' because no single instruction can accurately encompass the different meanings this term has in federal criminal law" (no citation given for quotation)). Nor is it necessary to read in a willfulness and intentionality requirement, because Janzad's knowledge of her conduct and, as the Court explains next, her conduct's impropriety is sufficient to separate out guilty from innocent conduct.

### D. THE KNOWLEDGE REQUIREMENT TAKES AS ITS OBJECTS "EMBEZZLE," "MISAPPROPRIATE," AND "EXCEPT AS AUTHORIZED".

The Court concludes that "knowingly" applies to that Janzad is a fiduciary, and to the words "embezzle," "misappropriate," and -- significantly -- to the phrase "authorized by law." The Court states again the elements it identifies:

> *Third:*    Ms. Janzad knew that she was a fiduciary; and

> *Fourth:*    Ms. Janzad knowingly embezzled, knowingly misappropriated, or -- knowing that the manner in which she did so was

> unauthorized by law -- lent, borrowed, pledged, hypothecated, used, or exchanged
> for other funds or property that money or property in whole or in part.

Prelim. Instr. at 4.  The interpretive move above -- reading into the otherwise silent § 6101 a mens

rea requirement -- extends also to construing the distribution of that mens rea across § 6101's

individual words: the Supreme Court thus counsels that courts address on a nitty-gritty textualist

level how a statute's mens rea requirement distributes across statutory language.  See Rehaif, 588

U.S. at 229 ("We apply the presumption in favor of scienter even when Congress does not specify

any scienter in the statutory text. . . .  But the presumption applies with equal or greater force when

Congress includes a general scienter provision in the statute itself."); Rehaif, 588 U.S. at 229

("[W]hen a statute 'prescribes the kind of culpability that is sufficient for the commission of an

offense, without distinguishing among the material elements thereof, such provision shall apply to

all the material elements of the offense, unless a contrary purpose plainly appears.'" (quoting ALI,

Model Penal Code § 2.02(4), p. 22 (1985))).  Indeed, a single statute's mens rea requirement may

apply differently across the statute's various component words:

> The required mental state may of course be different for different elements
> of a crime. . . . [B]oth parties agree [here] that petitioner must have known that he
> acquired and possessed food stamps. They disagree over whether any mental
> element at all is required with respect to the unauthorized nature of that acquisition
> or possession.

Liparota v. United States, 471 U.S. 419, 423 n.5 (1985)("Liparota"); 1 Wayne R. LaFave,

Substantive Criminal Law § 5.1(d) (3d ed. 2023)("[T]he mental ingredients of a particular crime

may differ with regard to the different elements of the crime. . . . [W]hether the old common law

crimes or the newer statutory crimes not known to the common law[,] it must be recognized that

there may be different *mens rea* requirements as to the different physical elements that go to make

up these crimes.").  The question for § 6101 thus is "how far down the sentence the word

'knowingly' is intended to travel." Liparota, 471 U.S. at 425 n.7 (quoting Wayne R. LaFave & Austin W. Scott, Criminal Law § 27 (1972)).

Courts are supposed to attend particularly to ensuring that a criminal statute's mens rea applies to the statute's material elements, i.e., that the statute should not be mental-culpability-agnostic, or apply strict liability, to the statute's most important provisions. See Rehaif, 588 U.S. at 231 ("[B]y specifying that a defendant may be convicted only if he 'knowingly violates' § 922(g), Congress intended to require the Government to establish that the defendant knew he violated the material elements of § 922(g).").  Thus, whatever mens rea requirement a statute carries should directly apply to what is essentially criminal, wrongful or criminalizable about the conduct that the statute targets.  See Rehaif, 588 U.S. at 233 ("In the provisions at issue here, the defendant's status is the 'crucial element' separating innocent from wrongful conduct." (quoting X-Citement Video, 513 U.S. at 73)); Elonis, 575 U.S. at 737 ("[C]ommunicating *something* is not what makes the conduct 'wrongful.' Here 'the crucial element separating legal innocence from wrongful conduct' is the threatening nature of the communication. . . .  The mental state requirement must therefore apply to the fact that the communication contains a threat." (quoting X-Citement Video, 513 U.S. at 73)).  The Supreme Court in X-Citement Video explains thus:

> [T]he presumption in favor of a scienter requirement should apply to each of the statutory elements that criminalize otherwise innocent conduct. *Staples* held that the features of a gun as technically described by the firearm registration Act was such an element.  Its holding rested upon "the nature of the particular device or substance Congress has subjected to regulation and the expectations that individuals may legitimately have in dealing with the regulated items." [Staples v. United States, 511 U.S. 600, 619 (1994)].  Age of minority in § 2252 indisputably possesses the same status as an elemental fact because nonobscene, sexually explicit materials involving persons over the age of 17 are protected by the First Amendment. . . . In the light of these decisions, one would reasonably expect to be free from regulation when trafficking in sexually explicit, though not obscene, materials involving adults.  Therefore, the age of the performers is the crucial element separating legal innocence from wrongful conduct.

X-Citement Video, 513 U.S. at 72-73.  Although some statutory components are not objects of a statute's mens rea requirement, such as facts that supply a basis for federal jurisdiction, see United States v. Yermian, 468 U.S. 63, 68-69 (1984)("Jurisdictional language need not contain the same culpability requirement as other elements of the offense. . . .  [T]he terms 'knowingly and willfully' . . . [do] not [modify] the predicate circumstance that those statements be made in a matter within the jurisdiction of a federal agency."), the presumption in favor of scienter militates in favor of bringing within the statute's mens rea scope knowledge of those facts which would make out "'a vicious will.'"  Rehaif, 588 U.S. at 231 (quoting 4 W. Blackstone, Commentaries on the Laws of England 21 (1769)).  The Court notes that, although it does not adopt Janzad's willfulness-and-intentionality mens rea element, see Janzad Instr. at 3, the same inquiry would arise concerning what precisely Janzad must will and intend, i.e., what those words take as their objects.  Here, the Court concludes that § 6101's implicit knowledge requirement takes as its objects Janzad's fiduciary status, and the words "embezzle," "misappropriate," and "except as authorized."

### 1.    Section 6101 Requires Knowledge of Fiduciary Status.

First, the Court holds that Janzad's knowledge of her status as a fiduciary is one object of § 6101's knowledge requirement.  For ease and accessibility, the Court sets it out in a separate element, rather than group it in with the action terms, which occupy what the Court sets out in a fourth element, see Section I., supra, at 21.  The Court thus agrees with the United States that Janzad's knowledge of her status as a fiduciary goes some way toward identifying what is essentially criminal about the conduct that § 6101 targets, see U.S. Instr. at 3 ("Third: knowing that she was a fiduciary, the defendant knowingly . . . used . . . except as authorized by law, or embezzled, or misappropriated [beneficiary] money or property in whole or in part."), because

Janzad's recognition of her heightened duties go to what is wrongful about the conduct that the statute targets, i.e., betrayal by figures imposed with special duties of care to their beneficiaries. Janzad does not include such a knowledge-of-fiduciary-status, see Janzad Instr. at 3, but the Court sees this provision as uncontroversial.  That Janzad knew she was Hubshman's fiduciary is not likely to be a major sticking point at trial.

###         2.        Section 6101 Requires Knowledge of Embezzlement, Misappropriation or Lack of Authorization.

The most important determination is how the scienter applies to the action terms, and the Court concludes that Janzad must "knowingly" embezzle, "knowingly" misappropriate, and "use" Hubshman's money or property "knowing" that that "use" is "[un]authorized by law."  38 U.S.C. § 6101(a).  The first two provisions track relatively closely the United States' suggested elements. The application of the knowledge scienter to the fact of lack-of-authorization is the most contentious.  How the knowledge scienter applies to the except-as-authorized theory reinforces the conclusion that the except-as-authorized theory is coextensive with the misappropriation theory of § 6101 liability.   Indeed, although the Court has adopted the United States' suggestion of knowledge as the applicable scienter description, nevertheless, the Court's conclusions are closer substantively to Janzad's suggestion.  Insofar as the United States seeks only to have to prove that Janzad's bare, physical actions were done knowingly -- without a requirement it prove she knew anything was wrong about those actions -- the Court disagrees with the United States.  Cf. Tr. at 10:9-16 (Peña)("[Section 6101] is clearly at most a general intent statute. . . . [The mens rea requirement is] just that she intended . . . what she did and nothing more . . . . [T]hat she intended to do the acts that she's charged with doing.").  Section 6101 must be construed to demand, essentially, such a knowledge-of-wrongfulness requirement.

The Court's application of scienter to § 6101's embezzlement theory and misappropriation theory are straightforward, while that to the except-as-authorized theory is more complicated. Although the United States' proposed element contains only one use of the word "knowingly," that word relatively unambiguously modifies both the word "embezzle" and the word "misappropriate."  See U.S. Instr. at 3 ("[T]he defendant knowingly lent, borrowed, pledged, hypothecated, used, or exchanged for other funds or property, except as authorized by law, or embezzled, or misappropriated that money or property in whole or in part.").  Thus, the Court's element states, for the embezzlement theory and the misappropriation theory respectively, that the United States prove Janzad "knowingly embezzled" or "knowingly misappropriated" Hubshman's money.

### a.      The Knowledge Scienter Applies to the Embezzlement Theory.

The United States must prove that Janzad "knowingly embezzled" Hubshman's money. The Court notes that the knowing embezzlement provision is something of a redundancy, because embezzlement on its own, requires some intentional and knowing conduct.  As the Supreme Court explains, embezzlement necessarily is wrongful:

> [E]mbezzlement requires a showing of wrongful intent. *Ibid.* (noting that embezzlement "involv[es] moral turpitude or intentional wrong"). See *Moore v. United States,* 160 U.S. 268, 269-270, 16 S.Ct. 294, 40 L.Ed. 422 (1895) (describing embezzlement and larceny as requiring "felonious intent"). *See also*, *e.g.,* W. LaFave, Criminal Law § 19.6(a), p. 995 (5th ed. 2010) ("intent to deprive" is part of embezzlement).

Bullock v. BankChampaign, N.A., 569 U.S. 267, 274-75 (2013).  See Pattern Crim. Jury Instr. 10th Cir. 2.32 (2023)("To 'embezzle' means the wrongful, intentional taking of money or property of another after the money or property has lawfully come within the possession or control of the person taking it."); Embezzlement, Black's Law Dictionary (11th ed. 2019)("The fraudulent taking

of personal property with which one has been entrusted, esp. as a fiduciary."). Indeed, some embezzlement jury instructions do not append a mens rea term to the word "embezzle"; these provisions do not require that a defendant, e.g., "knowingly embezzle", "intentionally embezzle" or "willfully embezzle," and require only that the defendant "embezzle." Cf. Pattern Crim. Jury Instr. 10th Cir. 2.69 (2023)("First: the defendant was a Postal Service employee . . . ; Second: as a Postal Service employee, the defendant . . . []had been entrusted with[] . . . mail matter . . . ; and Third: the defendant embezzled that . . . mail matter . . . ."). There is no way unwittingly, unknowingly to embezzle money: if it is not knowing, it is not embezzlement.

Despite the redundant construction, the Court sees as valuable appending the word "knowingly" to the word "embezzle" in its statement to the jury of § 6101's elements. Appending the word "knowingly" to "embezzle" forecloses possible juror confusion why one of § 6101's theories need not be accomplished "knowingly": the jury will encounter a consistent list of action items, i.e., that Janzad must "knowingly embezzle," "knowingly misappropriate" or use the money "knowing" such a use was not "authorized by law." The Court notes, however, that under an embezzlement theory, it will not require a knowledge beyond what embezzlement on its own requires. Nonetheless, the Court sees some confusion-avoidance value in appending "knowingly" to "embezzle" in its statement of the elements.

Indeed, therefore, to the extent that the United States argues that § 6101 demands no more than Janzad's baseline knowledge of what, literally, she was doing, that argument is incorrect. Cf. Tr. at 10:9-16 (Peña)("[Section 6101] is clearly at most a general intent statute. . . . [The mens rea requirement is] just that she intended . . . what she did and nothing more . . . . [T]hat she intended to do the acts that she's charged with doing."). Embezzlement, on its own, requires a further intent or knowledge: the wrongful purloining of money entrusted to a defendant. Indeed, embezzlement

is viewed as a specific intent offense.  See United States v. Busacca, 936 F.2d 232, 239-40 (6th Cir. 1991)("The purpose of § 664 is to 'preserve the designated funds for those entitled to their benefits.'  To prove a violation of § 664, the government must show that a defendant (1) embezzled (2) funds (3) from an employee benefit plan, and (4) with the specific intent to deprive the plan of its funds." (quoting United States v. Andreen, 628 F.2d 1236, 1242 (9th Cir. 1980))); United States v. Richards, 9 F. Supp. 2d 455, 458 (D.N.J. 1998)(Ackerman, J.)("The government has contends that [18 U.S.C.] § 666(a)(1)(A) is a general intent crime.  However, § 666 is analogous to embezzlement which courts have historically construed as a specific intent offense.").  Thus, the United States is incorrect that general intent, mere knowledge of the character of a defendant's conduct, establishes a scienter ceiling for § 6101.  See Tr. at 10:9-16 (Peña).  Under the first theory, therefore, the United States must prove that Janzad "knowingly embezzled" Hubshman's money, which requires moreover that Janzad converted Hubshman's money for herself, as the Court discusses later.  See Section I.F.1, infra, at 53-56.

>        **b.        The Knowledge Scienter Applies to the Misappropriation Theory.**

The knowledge scienter's application to the misappropriation theory provides that Janzad must know that her conduct constitutes a misuse of Hubshman's funds.  As discussed, the Court concludes that § 6101 misappropriation functions as a synonym for uses unauthorized by law -- the appellation "in any manner" provides that the misappropriation theory encompasses applications of beneficiary money for which that money was not intended.  Cf. Tr. at 34:17-35:4 (Peña)("The other category of  definition would say ["to misappropriate" means] to misuse, to misallocate, to use in other than the intended use of the property."); Misappropriate, Merriam-Webster ("[T]o appropriate wrongly . . . ."); Misappropriate, Oxford English Dictionary ("To appropriate or assign

wrongly . . . .").  Unlike under the embezzlement theory, then, a "knowingly" requirement does some work: what Janzad must know is that the use to which she is putting the money is a prohibited use.  That construction comports with the Supreme Court's instruction that the presumption of scienter, as an interpretive principle in criminal law, favors reading whatever scienter a criminal statute carries as modifying the statute's "crucial element."  See Rehaif, 588 U.S. at 233 ("In the provisions at issue here, the defendant's status is the 'crucial element' separating innocent from wrongful conduct." (quoting X-Citement Video, 513 U.S. at 73)); Elonis, 575 U.S. at 737 ("[C]ommunicating *something* is not what makes the conduct 'wrongful.' Here 'the crucial element separating legal innocence from wrongful conduct' is the threatening nature of the communication. . . . The mental state requirement must therefore apply to the fact that the communication contains a threat." (quoting X-Citement Video, 513 U.S. at 73))(emphasis is Elonis); X-Citement Video, 513 U.S. at 73 ("[T]he presumption in favor of a scienter requirement should apply to each of the statutory elements that criminalize otherwise innocent conduct."); United States v. Yermian, 468 U.S. at 68-69 (suggesting that, aside from jurisdictional language, the other elements of the offense" may "contain the same culpability requirement").

Such an application of the knowledge scienter to the misappropriation theory reaches effectively the same conclusion the Court reaches next about its application in the except-as-authorized theory, namely, that it requires knowledge of lack of authorization.  These two, misappropriation and except-as-authorized theories, once the scenter's application is construed, are coextensive.  Insofar, therefore, as the United States' proposed instruction already provides that Janzad must "knowingly . . . misappropriate" Hubshman's money, see U.S. Instr. at 3 ("[T]he defendant knowingly lent, borrowed, pledged, hypothecated, used, or exchanged for other funds or property, except as authorized by law, or embezzled, or misappropriated that money or property

in whole or in part."), then the United States' position effectively concedes the conclusion that the Court's except-as-authorized theory discussion later reaches about knowledge of lack of authorization.  On the except-as-authorized-synonymous construction which the Court adopts, to "knowingly misappropriate" means knowledge that the use of money constitutes a prohibited use of such money.  Effectively, what the United States must show is that Janzad's conduct violated applicable VA regulations and that she knew at the time that her conduct violated those regulations.

### b.      The Knowledge Scienter Applies to the Except-As-Authorized Theory.

The Court concludes that, in the except-as-authorized theory, "knowingly" must attach to the fact of the use's lack of authorization.  The Court does not adopt the United States' position that what Janzad must know on an except-as-authorized theory is merely that Janzad was knowingly using the money:  the United States would have the Court rule that, in these circumstances, all Janzad must know is that she is commingling Hubshman's funds, and not that she also knew that use of his money was wrong.  See Tr. at 10:9-16 (Peña)("[Section 6101] is clearly at most a general intent statute. . . . [The mens rea requirement is] just that she intended . . . what she did and nothing more . . .  [T]hat she intended to do the acts that she's charged with doing."); id. at 49:16-23 (Peña)("The defense attorney said at least twice that commingling is not per se illegal.  Commingling is emphatically per se illegal.").  The Court will not adopt this theory of how the word knowingly applies, because, as discussed, the Supreme Court has indicated that the presumption of scienter operates in such a way as to distribute the scienter requirement element to whatever is the most material criminal feature of the conduct that the statute criminalizes.  See Rehaif, 588 U.S. at 233 ("In the provisions at issue here, the defendant's

status is the 'crucial element' separating innocent from wrongful conduct." (quoting X-Citement Video, 513 U.S. at 73)); Elonis, 575 U.S. at 737 ("[C]ommunicating *something* is not what makes the conduct 'wrongful.' Here 'the crucial element separating legal innocence from wrongful conduct' is the threatening nature of the communication. . . . The mental state requirement must therefore apply to the fact that the communication contains a threat." (quoting X-Citement Video, 513 U.S. at 73); X-Citement Video, 513 U.S. at 73 ("[T]he presumption in favor of a scienter requirement should apply to each of the statutory elements that criminalize otherwise innocent conduct."); United States v. Yermian, 468 U.S. at 68-69 (suggesting that, aside from jurisdictional language, the "other elements of the offense" may "contain the same culpability requirement"). The Court reiterates that the United States, providing that Janzad must knowingly misappropriate the money, and applying the most general interpretation of that term, cf. 38 U.S.C. § 6101(a) ("in any manner misappropriate"), concedes necessarily what the Court here establishes: § 6101 requires knowledge that the money's particular use is prohibited.

Here what is most criminal, most wrongful, about the except-as-authorized theory is that the use is without authorization. Whatever mental state requirement that the Court reads in therefore, should apply to this most critical feature of the conduct criminalized. On this view, therefore, the knowledge cannot only apply to the use alone -- here the commingling alone -- but must apply as well to the fact of lacking authorization. Cf. Tr. at 10:9-16 (Peña)("[Section 6101 is clearly at most a general intent statute. . . . [The mens rea requirement is] just that she intended . . . what she did and nothing more . . . . [T]hat she intended to do the acts that she's charged with doing.").

Construing the knowledge requirement to apply to the fact of lack-of-authorization is not an aggressive reading of the statute. For one, schoolbook grammar is not a significant impedent

to the Court's construction.  See X-Citement Video, Inc., 513 U.S. at 68 ("The most natural grammatical reading . . . suggests that the term 'knowingly' modifies only the surrounding verbs: transports, ships, receives, distributes, or reproduces. . . .  But we do not think this is the end of the matter . . . .").  The proposition is misplaced, moreover, that, because the Court already must read into § 6101 a scienter requirement, the Court should stop there, at the earliest availability, making "knowingly" applies only to the actions of "us[ing]," "lend[ing]," "exchang[ing]," etc.  As noted above, introducing a mens rea term into § 6101 is hardly an interpretive leap.  See Elonis, 575 U.S. at 734 ("The fact that the statute does not specify any required mental state, however, does not mean that none exists.  We have repeatedly held that 'mere omission from a criminal enactment of any mention of criminal intent' should not be read 'as dispensing with it.'" (quoting Morissette v. United States, 342 U.S. at 250)).  Moreover, both parties now agree that some scienter must be introduced.  See U.S. Instr. at 3; Janzad Instr. at 3.  From there, the Court having settled on "knowledge" and/or "knowingly," the Supreme Court's presumption-of-scienter doctrine dictates in a fairly straightforward manner that such a knowledge scienter must apply to what is most criminalizable about the conduct § 6101 proscribes.  See Rehaif, 588 U.S. at 233 ("In the provisions at issue here, the defendant's status is the 'crucial element' separating innocent from wrongful conduct." (quoting X-Citement Video, 513 U.S. at 73)); Elonis, 575 U.S. at 737 ("[C]ommunicating *something* is not what makes the conduct 'wrongful.'  Here 'the crucial element separating legal innocence from wrongful conduct' is the threatening nature of the communication. . . . The mental state requirement must therefore apply to the fact that the communication contains a threat." (quoting X-Citement Video, 513 U.S. at 73)).  In the context of the except-as-authorized theory, that core criminal fact is the fact of lacking authorization.  A criminal defendant prosecuted solely on an except-as-authorized theory who did not know her conduct was impermissible would

lack the "vicious will" central to Anglo-American criminal jurisprudence.  See Rehaif, 588 U.S. at

231 ("[A] basic principle . . . underlies the criminal law, namely, the importance of showing what

Blackstone called 'a vicious will.' . . . Scienter requirements advance this basic principle of

criminal law by helping to 'separate those who understand the wrongful nature of their act from

those who do not.'" (quoting 4 W. Blackstone, Commentaries on the Laws of England 21 (1769),

then X-Citement Video, 513 U.S. at 72-73 n.3)).  The knowledge demand must apply to the fact

of lack of authorization.

To the extent that the United States relies on the proposition that a fiduciary would know,

or should know, that her conduct was unauthorized, the United States's position is misguided.  See

U.S. Br. at 5 ("[Janzad's] knowledge of her status as a VA fiduciary sets the stage for . . . anyone

in her position to know, that it would be wrongful . . . to act in a manner that violates . . . any

particular duties created by becoming a VA fiduciary, including . . . [an] obligation to not

commingle the beneficiary's funds . . . .").  That theory is redolent of one that the Supreme Court

has rejected on multiple occasions, namely, predicating criminal liability on what a reasonable

figure in the defendant's position would have known or done in a certain situation:

> The Government says . . . we should read the statute as implicitly containing
> an "objectively reasonable good-faith effort" or "objective honest-effort standard."
> Brief for United States 16–17; . . .  We are not convinced. . . .  [T]he Government's
> standard would turn a defendant's criminal liability on the mental state of a
> hypothetical "reasonable" doctor, not on the mental state of the defendant himself
> or herself.  Cf. id., at 24 (Government arguing that "a physician can violate Section
> 841(a) when he makes no objectively reasonable attempt to conform his conduct to
> something that his fellow doctors would view as medical care" (emphasis added)).
> We have rejected analogous suggestions in other criminal contexts.  [See Elonis,
> 575 U.S. at 737-38].

Ruan, 597 U.S. at 465.

> Elonis's conviction . . . was premised solely on how his posts would be
> understood by a reasonable person.  Such a "reasonable person" standard is a

> familiar feature of civil liability in tort law, but is inconsistent with "the conventional requirement for criminal conduct -- *awareness* of some wrongdoing." *Staples,* 511 U.S., at 606–607 . . . (quoting *United States v. Dotterweich,* 320 U.S. 277, 281 . . . (1943); emphasis added).   Having liability turn on whether a "reasonable person" regards the communication as a threat—regardless of what the defendant thinks—"reduces culpability on the all-important element of the crime to negligence," *Jeffries,* 692 F.3d, at 484 (Sutton, J., *dubitante*), and we "have long been reluctant to infer that a negligence standard was intended in criminal statutes," *Rogers v. United States,* 422 U.S. 35, 47, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975) (Marshall, J., concurring) . . . .   Under these principles, "what [Elonis] thinks" does matter.

Elonis, 575 U.S. at 737-38.   Thus, the jury cannot satisfy itself relying alone on Janzad's knowledge of her status as a fiduciary and her recognition of its responsibilities.  Cf. Section I.D.1 supra, at 33-34 (providing as an element knowledge of fiduciary status).   Where a central principle of criminal law would require that the defendant possess a "vicious will," Janzad's liability cannot be predicated on what the reasonable fiduciary would do or know: what Janzad thinks matters. See Elonis, 575 U.S. at 738.

Applying a scienter requirement to a lack of authorization is, moreover, not novel.   The Supreme Court on multiple occasions has authorized applying a knowledge scienter demand to "except as authorized" provisions:

> Section 841 states: "Except as authorized by this subchapter, it shall be unlawful for any person *knowingly or intentionally* . . . to manufacture, distribute, or dispense ... a controlled substance." (Emphasis added.)   Like those three cases, the question here concerns the mental state that applies to a statutory clause ("[e]xcept as authorized") that does not immediately follow the scienter provision. Like the three cases, the statutory clause in question plays a critical role in separating a defendant's wrongful from innocent conduct.   And, like the Court in those cases, we conclude that the statute's *mens rea* applies to that critical clause.

Ruan, 597 U.S. at 461.

> The federal statute governing food stamp fraud provides that "whoever knowingly uses, transfers, acquires, alters, or possesses coupons or authorization cards in any manner not authorized by [the statute] or the regulations" is subject to a fine and imprisonment. 78 Stat. 708, as amended, 7 U.S.C. § 2024(b)(1).[] The

question presented is whether in a prosecution under this provision the Government must prove that the defendant knew that he was acting in a manner not authorized by statute or regulations.

. . .

We hold that in a prosecution for violation of § 2024(b)(1), the Government must prove that the defendant knew that his acquisition or possession of food stamps was in a manner unauthorized by statute or regulations.[] This holding does not put an unduly heavy burden on the Government . . . . To prove that petitioner knew that his acquisition or possession of food stamps was unauthorized, for example, the Government need not show that he had knowledge of specific regulations governing food stamp acquisition or possession. . . . Rather, as in any other criminal prosecution requiring *mens rea,* the Government may prove by reference to facts and circumstances surrounding the case that petitioner knew that his conduct was unauthorized or illegal.

Liparota, 471 U.S. at 420, 433-34.  The Supreme Court thus has suggested that the doctrine of presumption of scienter often militates in favor of applying to such phrases -- where a use is or is not "authorized by law" -- whatever scienter requirement a statute demands.

The Court's conclusion does not run afoul of the principle that ignorance of the law is no excuse.  Requiring knowledge of a lack of authorization, the Supreme Court has suggested, does not run afoul of that principle, because these authorization provisions refer to "collateral" legal issues, as Rehaif at length explains:

The Government . . . argues that[, in a prosecution for possession of firearm as an unlawfully present alien,] whether an alien  is "illegally or unlawfully in the United States" is a question of law, not fact, and thus appeals to the well-known maxim that "ignorance of the law" (or a "mistake of law") is no excuse.  *Cheek v. United States*, 498 U.S. 192, 199 . . . (1991).

This maxim, however, normally applies where a defendant has the requisite mental state in respect to the elements of the crime but claims to be "unaware of the existence of a statute proscribing his conduct."  1 W. LaFave & A. Scott, Substantive Criminal Law § 5.1(a), p. 575 (1986).  In contrast, the maxim does not normally apply where a defendant "has a mistaken impression concerning the legal effect of some collateral matter and that mistake results in his misunderstanding the full significance of his conduct," thereby negating an element of the offense.  *Ibid.*; see also Model Penal Code § 2.04, at 27 (a mistake of law is a defense if the mistake

- 44 -

negates the "knowledge . . . required to establish a material element of the offense"). Much of the confusion surrounding the ignorance-of-the-law maxim stems from "the failure to distinguish [these] two quite different situations." LaFave, Substantive Criminal Law § 5.1(d), at 585.

We applied this distinction in *Liparota*, where we considered a statute that imposed criminal liability on "whoever knowingly uses, transfers, acquires, alters, or possesses" food stamps "in any manner not authorized by the statute or the regulations." 471 U.S. at 420 . . . (quotation altered). We held that the statute required scienter not only in respect to the defendant's use of food stamps, but also in respect to whether the food stamps were used in a "manner not authorized by the statute or regulations." *Id.,* at 425, n. 9 . . . . We therefore required the Government to prove that the defendant knew that his use of food stamps was unlawful -- even though that was a question of law. See *ibid.*

This case is similar. The defendant's status as an alien "illegally or unlawfully in the United States" refers to a legal matter, but this legal matter is what the commentators refer to as a "collateral" question of law. A defendant who does not know that he is an alien "illegally or unlawfully in the United States" does not have the guilty state of mind that the statute's language and purposes require.

Rehaif, 588 U.S. at 234-35.

That principle applies here. Whether a "use" of beneficiary money is or is not "authorized by law" can be determined only by reference to statutes and regulations external to § 6101. Cf. Tr. at 50:18-52:6 (Peña)("[T]here is the provision 'except as authorized by law,' and so we need to look at surrounding law to understand what use is prohibited and what use is not."). Indeed, § 6101(b) makes reference to reporting and accounting obligations "required by law," suggesting here too that external sources of references must be drawn upon. See 38 U.S.C. § 6101(b) ("Any willful neglect or refusal to make and file proper accountings or reports concerning such money or property as required by law shall be taken to be sufficient evidence prima facie of such embezzlement or misappropriation."). These other regulatory provisions -- and a conclusion that Janzad's conduct was impermissible thereunder -- form predicates of, but are collateral to, a determination of § 6101 liability. As noted, a VA regulation clearly proscribes commingling, see

38 C.F.R. § 13.200(a) ("[A] fiduciary must establish and maintain a separate financial institution account for each VA beneficiary that the fiduciary serves. The fiduciary must not commingle a beneficiary's funds with the fiduciary's funds or any other beneficiary's funds, either upon or after receipt."), but that Janzad did not know that her particular act of commingling is proscribed is not to proffer an ignorance-of-the-law excuse.  Cf. Ruan, 588 U.S. at 234 ("[T]he maxim does not normally apply where a defendant 'has a mistaken impression concerning the legal effect of some collateral matter and that mistake results in his misunderstanding the full significance of his conduct,' thereby negating an element of the offense." (quoting 1 W. LaFave & A. Scott, supra, § 5.1(a), p. 575)).   Demanding knowledge of her conduct's impermissibility, which requires understanding of that collateral matter, does not create for such an impermissible excuse.

The Court notes that this reading of the accept-as-authorized theory brings it into fold with the embezzlement theory and the misappropriation theory.  To read the except-as-authorized theory otherwise would create a gaping scienter hole in the statute, permitting conviction on significantly less consciously wrongful conduct than the other theories in § 6101.  As noted, to knowingly embezzle, Janzad must have some consciousness of wrongdoing.  See Section I.D.2.a, supra, at 35-37.  On the misappropriation theory, the knowledge requirement works to demand that Janzad know her use of Hubshman's money constitutes prohibited misuse.  See Section I.D.2.b, supra, at 37-39.  To demand, therefore, that in the except-as-authorized theory only that Janzad know she was using beneficiary money -- e.g., that she not be under the impression she was using Monopoly money -- casts a significantly wider net than do the other two theories, and wholly swallows them. Reading the knowledge scienter requirement, therefore, to take as its object the fact of lack of-authorization makes for a cohesive reading of the statute as a whole.  Read thus, the statute targets conduct motivated similarly by a "vicious will."  See Rehaif, 588 U.S. at 231 ("[A] basic principle

. . . underlies the criminal law, namely, the importance of showing what Blackstone called 'a vicious will.' . . . Scienter requirements advance this basic principle of criminal law by helping to 'separate those who understand the wrongful nature of their act from those who do not.'" (quoting 4 W. Blackstone, Commentaries on the Laws of England 21 (1769), then X-Citement Video, 513 U.S. at 72-73 n.3)).

The Court, in the context of the except-as-authorized theory, will require that the United States prove that Janzad knows that her conduct is wrong.  The United States need not show that Janzad has knowledge of the specific rules and regulations that make the conduct wrongful: it is sufficient just to show that she knows she cannot do what she did, and this can be accomplished by means of circumstantial evidence, such as by the evidence of an alleged coverup that underpins Janzad's two § 1001 charges, see Indictment at 4-5.

> This holding does not put an unduly heavy burden on the Government in prosecuting violators of § 2024(b)(1).  To prove that petitioner knew that his acquisition or possession of food stamps was unauthorized, for example, the Government need not show that he had knowledge of specific regulations governing food stamp acquisition or possession.  Nor must the Government introduce any extraordinary evidence that would conclusively demonstrate petitioner's state of mind.  Rather, as in any other criminal prosecution requiring *mens rea,* the Government may prove by reference to facts and circumstances surrounding the case that petitioner knew that his conduct was unauthorized or illegal.

Liparota, 471 U.S. at 433-34.  See Ruan, 597 U.S. at 467 ("The Government, of course, can prove knowledge of a lack of authorization through circumstantial evidence.").  Accordingly, the scienter requirement of knowledge must apply to what is most wrongful about the conduct that the except-as-authorized theory criminalizes, namely, that the conduct is unauthorized.

### E.    38 U.S.C. § 6106 IS NOT HELPFUL TO CONSTRUING § 6101'S ELEMENTS.

The Court will not import into § 6101's elements the content of a different provision, 38 U.S.C. § 6106, because the latter statute serves a different function, cannot justifiably be imported into § 6101, and would confuse the issues.  That provision, targeting "misuse of benefits," reads as follows:

> **(a)    Fee forfeiture in case of benefit misuse by fiduciaries.** -- A fiduciary may not collect a fee from a beneficiary for any month with respect to which the Secretary or a court of competent jurisdiction has determined that the fiduciary misused all or part of the individual's benefit, and any amount so collected by the fiduciary as a fee for such month shall be treated as a misused part of the individual's benefit.
>
> **(b)    Misuse of benefits defined.** -- For purposes of this chapter, misuse of benefits by a fiduciary occurs in any case in which the fiduciary receives payment, under any of laws administered by the Secretary, for the use and benefit of a beneficiary and uses such payment, or any part thereof, for a use other than for the use and benefit of such beneficiary or that beneficiary's dependents. Retention by a fiduciary of an amount of a benefit payment as a fiduciary fee or commission, or as attorney's fees (including expenses) and court costs, if authorized by the Secretary or a court of competent jurisdiction, shall be considered to be for the use or benefit of such beneficiary.
>
> **(c)    Regulations.** -- The Secretary may prescribe by regulation the meaning of the term "use and benefit" for purposes of this section.

38 U.S.C. § 6106.  The United States had suggested that the Court look to § 6106, and includes some of its content in its § 6101 instruction:

> [Section 6101] makes it a crime to misuse . . . funds received while a fiduciary.
>
> Misuse of benefits by a fiduciary occurs in any case in which the fiduciary receives payment, under any of laws administered by the Secretary, for the use and benefit of a beneficiary and uses such payment, or any part thereof, for a use other than for the use and benefit of such beneficiary or that beneficiary's dependents.
>
> For the "use and benefit" of a beneficiary means any expenditure reasonably intended for the care, support, or maintenance of the beneficiary or the beneficiary's dependents. Such expenditures may include the fiduciary's efforts to improve the beneficiary's standard of living.

U.S. Instr. at 3-4.  Notably, the United States' primary action element, its third element, does not state that the jury must conclude that Janzad knowingly "misuse[d] benefits."  See U.S. Instr. at 3 ("***Third:*** knowing that she was a fiduciary, the defendant knowingly lent, borrowed, pledged, hypothecated, used, or exchanged for other funds or property, except as authorized by law, or embezzled, or misappropriated that money or property in whole or in part.").  Janzad does not draw on § 6106 in her proposed § 6101 instruction, see Janzad Instr. at 3, although at the hearing she did not argue that § 6106 was wholly irrelevant, see Tr. at 46:1-48:10 (Gorence, Court)(arguing in support of proposition that Janzad used Hubshman's money for his benefit).  At the hearing the Court indicated it would take § 6106's provision as shorthand for § 6101's scienter requirement, i.e., that § 6101 liability ought to turn on, per § 6106, whether Janzad acted for Hubshman's benefit. See Tr. at 54:24-55:10 (Court).

On reflection, the Court sees it as best to leave out § 6106, which cannot wholly be grafted onto § 6101 without causing significant confusion.  First, § 6106 serves a different function entirely than § 6101: while the latter statute is a criminal statute, the former works a purely administrative, VA-internal matter, relating to the withholding of payments to fiduciaries if misuse occurs.  See 38 U.S.C. § 6106(a) ("A fiduciary may not collect a fee from a beneficiary for any month . . . [in which] the fiduciary misused all or part of the individual's benefit, and any amount so collected by the fiduciary as a fee for such month shall be treated as a misused part of the individual's benefit.").  These statutes are about different things.

Moreover, were § 6106's "other than for the [beneficiary's] use and benefit" rule to state the whole of § 6101's scienter requirement, it would be at odds with § 6101's terms.  For example, it would be at odds with the embezzlement theory's mens rea, which requires little elaboration that § 6106 could usefully provide.  Embezzlement already provides that the requisite intent must be

to purloin funds in Janzad's care.  See Pattern Crim. Jury Instr. 10th Cir. 2.32 (2023)("To 'embezzle' means the wrongful, intentional taking of money or property of another after the money or property has lawfully come within the possession or control of the person taking it."); Embezzlement, Black's Law Dictionary (11th ed. 2019)("The fraudulent taking of personal property with which one has been entrusted, esp. as a fiduciary.").  Although the Court concludes later that, under an embezzlement theory, the United States must show that Janzad took ownership of Hubshman's money, effectively requiring that she put the money to her personal use or benefit -- a proposition that sounds similar to what § 6106's "other than for [Hubshman]'s use or benefit" provides -- nevertheless the source of that requirement is different than § 6106.  Because embezzlement requires conversion, embezzlement of its own force demands some for-whose-benefit inquiry.  See Bullock v. BankChampaign, N.A., 569 U.S. at 275 ("As commonly used, 'embezzlement' requires conversion . . . ." (citing Wayne R. LaFave, Criminal Law § 19.6)); Yung v. Institutional Trading Co., 693 F. Supp. 2d 70, 80 (D.D.C. 2010)(Gwin, J.)("Conversion is 'any unlawful exercise of ownership, dominion or control over the personal property of another in denial or repudiation of his rights thereto.'" (quoting Curaflex Health Servs. v. Bruni, P.C., 877 F.Supp. 30, 32 (D.D.C.1995))).  Nevertheless, the existence of the embezzlement theory's similar demand for evidence does not support grafting § 6106 onto § 6101.  Embezzlement surely does not need the superimposition of a different mens rea theory -- whether, per § 6106, the conduct was or was not for Hubshman's benefit -- because its scienter theory already is well established.

As to the misappropriation theory and the except-as-authorized theory, importing § 6106's content to inform those theories' scienter requirement would make for incongruous results.  As noted above, these two theories both ought to turn on knowledge of impropriety.  If the Court treated as synonymous with that scienter inquiry a for-Hubshman's-benefit inquiry borrowed from

§ 6106, it would produce untoward results.  For one, such a result would permit Janzad to take the stand and testify that, although she knew that VA regulation prohibited commingling, she genuinely believed she was acting solely for Hubshman's benefit.  If the jury credited Janzad's testimony, then, having grafted on § 6106's no-other-than-Hubshman's-benefit inquiry, the jury could lawfully acquit Janzad.  If knowledge is the applicable scienter element, and knowledge of wrongdoing how that scienter ought to be construed, then § 6101 cannot authorize such an acquittal.

Last, importing wholesale § 6106's for-Hubshman's-benefit inquiry stretches the mens rea inquiry from a matter of mere knowledge into a matter of intention, motivation, and purpose. Whether Janzad's conduct was for Hubshman's benefit or "other than for" Hubshman's benefit could be construed as requiring inquiry into Janzad's motivations.  Importing § 6106's content as stating the misappropriation or except-as-authorized theory's knowledge requirement would thus incongruously make an inquiry into Janzad's knowledge into an inquiry into her intentions, motivations, and purposes.  As noted, such an inquiry could produce divergent results: a jury could conclude that Janzad knew her conduct was impermissible (she knew that VA regulations barred commingling), but nevertheless the same jury could conclude that she acted for Hubshman's ultimate good, that Janzad acted no "other than for" Hubshman's benefit, because she genuinely believed that breaking the rule would benefit him.  Importing § 6106's language wholesale into the Court's construction of § 6101's elements could lead to such incongruous results, demanding acquittal based on why Janzad acted, even if she knew what she was doing was prohibited.  To permit such a result would be to sanction Janzad's vigilantism: even though she knew her conduct violated the regulations, she believed her conduct was for the best, and so should be acquitted. Indeed, although it is the United States that has continued to suggest § 6106's usefulness in

construing § 6106's elements, the Court's conclusion that § 6106 is inapposite likely serves the United States' interests by foreclosing such results.

Although § 6106's "misuse of benefits" provision and § 6101's provisions, particularly its misappropriation and except-as-authorized theories, on the surface appear to address the same subject, the Court does not believe it beneficial to import § 6106 into its construction of § 6101's elements. The Court will instead stick to the elements described above. See Section I supra, at 21. Knowledge -- rather than for- or other-than-for Hubshman's-benefit -- states the mens rea requirement applicable to § 6101.

### F.   NEITHER THE MISAPPROPRIATION THEORY NOR THE EXCEPT-AS-AUTHORIZED THEORY REQUIRES PERSONAL BENEFIT AS AN ELEMENT, BUT THE EMBEZZLEMENT THEORY REQUIRES CONVERSION, SO IT EFFECTIVELY REQUIRES PERSONAL BENEFIT.

Under the embezzlement theory, the United States must prove Janzad converted Hubshman's money, which requires inquiry into ownership, and effectively personal use and benefit; the United States, however, need not prove personal use or benefit under the misappropriation theory or the except-as-authorized theory. As the Court explains later, however, see Section II.E.2-3, infra, at 77-83, the Court will not wholly exclude such evidence under the latter theories. The issue is contested, because Janzad seeks acquittal on the basis that she did not pocket Hubshman's money.

### 1.   Because Embezzlement Requires Conversion, the Embezzlement Theory Requires that Janzad Established Ownership Over Hubshman's Money, so It Effectively Requires Personal Use or Benefit.

If the United States pursues a § 6101 embezzlement theory, then it effectively must prove that Janzad personally used or personally benefited, because it must prove that Janzad converted Hubhsman's money, meaning she took ownership over it. Embezzlement is defined in part by conversion. See Bullock v. BankChampaign, N.A., 569 U.S. at 275 ("As commonly used,

'embezzlement' requires conversion . . . ." (citing Wayne R. LaFave, <u>Criminal Law</u> § 19.6)). Although the Tenth Circuit pattern instruction does not define embezzlement by way of conversion, it defines it by way of the more colloquial word "take". <u>Cf.</u> Pattern Crim. Jury Instr. 10th Cir. 2.32 (2023)("To 'embezzle' means the wrongful, intentional taking of money or property of another after the money or property has lawfully come within the possession or control of the person taking it."); <u>Take</u>, Merriam-Webster, https://www.merriam-webster.com/dictionary/take ("[T]o get into one's hands or into one's possession, power, or control . . . . [T]to transfer into one's own keeping: appropriate . . . .")(last visited July 24, 2024). Tenth Circuit caselaw similarly speaks of embezzlement as defined by "appropriation," <u>i.e.</u>, an effective transfer in ownership. <u>See</u> <u>Klemens v. Wallace (In re Wallace)</u>, 840 F.2d 762, 765 (10th Cir. 1988)("Embezzlement under federal law is the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come."); <u>Appropriate</u>, Merriam-Webster, https://www.merriam-webster.com/dictionary/appropriate ("[T]o take exclusive possession of: annex . . . .")(last visited July 24, 2024). These principles, which the Court here describes as a matter of conversion, require that a defendant treat someone's property as the defendant's own to the exclusion of the rightful owner. <u>See</u> <u>Benex LC v. First Data Merch. Servs. Corp.</u>, No. CIV 14-6393, 2016 WL 1069657, at *5 (E.D.N.Y. March 16, 2016)(Seybert, J.)("To plausibly allege a conversion claim, a plaintiff must show: '(1) the property subject to conversion is a specific identifiable thing; (2) plaintiff had ownership, possession or control over the property before its conversion; and (3) defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights.'" (quoting <u>Moses v. Martin</u>, 360 F. Supp. 2d 533, 541 (S.D.N.Y. 2004)(Scheindlin, J.))); <u>Yung v. Institutional Trading Co.</u>, 693 F. Supp. 2d at 80 ("Conversion is 'any unlawful exercise of ownership, dominion or

control over the personal property of another in denial or repudiation of his rights thereto.'" (quoting <u>Curaflex Health Servs. v. Bruni, P.C.</u>, 877 F. Supp. at 32)). Accordingly, whether phrased as personal benefit or as personal use, the United States must prove under an embezzlement theory that Janzad sought to take ownership over Hubshman's money to Hubshman's exclusion. As the Court concludes later, therefore, evidence that Janzad did or did not personally benefit from Hubshman's money is relevant to the conversion that the United States must prove under an embezzlement theory. <u>See</u> Section II.E.1, <u>infra</u>, at 75-77.

This conclusion's seeming tension with the one the Court reaches above, in declining to import § 6106 into § 6101, dissipates upon analysis. Above, the Court concludes that it will not graft § 6106's language onto § 6101's scienter requirement. <u>See</u> Section I.E., <u>supra</u>, at 45. Accordingly, the Court there concludes that § 6106's inquiry whether the money's use was "other than for the use and benefit of [Hubshman]," 38 U.S.C. § 6106(b), is not the pertinent scienter inquiry under § 6101, which instead is defined by knowledge of wrongfulness. <u>See</u> Section I.D., <u>supra</u>, at 48-52. At least, however, in the case of embezzlement, some inquiry effectively is necessary into whose benefit and use the money was put toward: because embezzlement requires conversion, it inquires necessarily into the money's ownership, which often entails a use-and-benefit inquiry. Accordingly, the for-whose-benefit inquiry that attends the embezzlement theory arises doctrinally from the law of conversion, a predicate for embezzlement, but not from importing § 6106 into § 6101. Accordingly, there is no tension between the Court's conclusions on these subjects.

Ultimately, therefore, the United States must prove under an embezzlement theory that Janzad converted Hubshman's money, which requires that the United States prove she took ownership of that money. This inquiry will often redound with whether Janzad put Hubshman's

money to her personal use or benefit. This may not be a straightforward task if the evidence all shows that the money was put in VILA's coffers and not in Janzad's pockets. See Tr. at 39:2-9 (Peña)("No one is alleging that she bought herself a new car with it. No one is alleging that she remodeled her home with it. She just used it for the rest of the business."). Nonetheless, and at the very least, as the Court concludes below, the evidence that Janzad did not personally use or benefit is relevant to the embezzlement theory. See Section II.E.1, infra, at 76-77. The United States must prove conversion, if not explicitly personal benefit or use.

      2.      **Personal Benefit Is Not an Element of the Misappropriation Theory**.

Under the misappropriation theory, the United States does not need to prove that Janzad personally used or personally benefited from Hubshman's money. The United States must prove that Janzad "knowingly misappropriated" Hubshman's money: Janzad must have put Hubshman's money to a use for which it was not intended and that she knew at the time it was an improper use. See Section I.D.2.b, supra, at 37-39. Essentially, the United States must prove, first, that her conduct violated the regulations and, second, that she knew at the time that her conduct violated the regulations. Unlike with embezzlement, no conversion is intrinsic to the misappropriation theory. There is thus no need to demonstrate that Janzad took ownership for herself of Hubshman's money, i.e., no need to show she made it for her own personal use and benefit. That Janzad did not put the money for her personal benefit or personal use is not a basis for acquittal therefore under the misappropriation theory. As the Court explains later, however, evidence that the money did not personally benefit Janzad is admissible to a limited extent. See Section II.E.2 infra, at 77-81. Nonetheless, the United States need not prove personal benefit under the misappropriation theory.

### 3. Personal Benefit Is Not an Element of the Except-As-Authorized Theory.

Under an except-as-authorized theory, as well, the United States need not prove personal use or benefit. As noted above, the except-as-authorized theory and the misappropriation theory are coextensive: both require that the United States prove that Janzad violated the VA regulations and that she knew at the time that her conduct violated the VA regulations. Under the except-as-authorized theory specifically, what the United States must prove is that Janzad used, lent, exchanged, etc., Hubshman's money knowing that the manner in which she did so was not "authorized by law." The United States need not prove that Janzad personally used the money or that she personally benefitted from the unauthorized use of Hubshman's money. The Court concludes, however, that Janzad's evidence that she did not personally benefit from the money is admissible to a limited extent even under the except-as-authorized theory. Nonetheless, personal benefit is not something the United States must prove under the except-as-authorized theory. Having described the elements of § 6101, the Court now addresses the admissibility of the evidence that the United States seeks to exclude, and the Court concludes that much of this evidence is admissible.

## II. THE COURT ADMITS AS RELEVANT TO THE § 6101 MENS REA DETERMINATION THE PRIOR OCCASION EVIDENCE, THE EXPRESSED WISHES EVIDENCE, SOME COST OF CARE EVIDENCE, AND THE PERSONAL BENEFIT EVIDENCE.

The Court will admit evidence whose admissibility turns on the Court's construction of § 6101's elements, particularly as the evidence goes to the knowledge mens rea element the Court identifies: evidence that on prior occasions Janzad commingled other veterans' funds, evidence that Janzad received the consent of her beneficiary, evidence that the beneficiaries cost of care were high, and evidence that Janzad did not benefit personally from Hubshman's money, all is

evidence relevant to undermining the United States' burden to prove that Janzad knowingly violated § 6101. This evidence impinges on facts consequential to Janzad's § 6101 liability, so the Court will not exclude it on the basis of irrelevance. See Fed. R. Evid. 401 ("Evidence is relevant if . . . it has any tendency to make a fact more or less probable than it would be without the evidence[,] and . . . the fact is of consequence in determining the action."). The Court will, however, limit the this evidence's scope based on rule 403, particularly evidence and argumentation that suggests improperly that the United States bears burdens of proof that the Court concludes the United States does not bear.

A.   **PRIOR OCCASION EVIDENCE IS ADMISSIBLE TO DETERMINING JANZAD'S KNOWLEDGE.**

Evidence that on prior occasions, Janzad commingled other veterans' funds is admissible, because it could suggest to a jury that Janzad did not know her conduct was prohibited. Janzad intends to testify that she on prior occasions commingled other veterans' funds, and that this practice reflected VILA's theory of pooled care. See Response at 5 ("Ms. Janzad's testimony will establish how veteran funds were pooled and used for the mutual benefit of all veterans in order to upgrade property for VILA and to achieve the mutually beneficial outcome of all veterans being taken care of."). The United States' response is that, if Janzad is to testify to that effect, then essentially she would admitting to prior crimes, because, the United States has argued, commingling is per se a § 6101 crime. See Reply at 3 ("If the evidence in fact shows that Ms. Janzad pooled the victim's money and used it in this manner, then she is in fact guilty of violating § 6101 as charged."). The proposed thrust of Janzad's prior occasion testimony, however, is that she did not believe there was anything wrong with such conduct, which is what the Court concludes above the United States must prove to establish a misappropriation or an except-as-authorized

§ 6101 conviction.  The evidence is relevant to that purpose, because it makes it to some degree less likely that she knew that commingling was a misuse or not "authorized by law."  38 U.S.C. § 6101.  <u>See</u> Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.").  If Janzad's testimony shows that her prior commingling was open and unconcealed, this could suggest to the jury that she was under the impression that this kind of conduct was normal and that, therefore, she was under the mistaken impression that it was authorized.  This undermines what the United States must, under the misappropriation and except-as-authorized theories, prove: that Janzad knew her conduct was wrong.  The same is true with embezzlement, where she must know and intend to divert to her own use those funds.  <u>See</u> Section I.D.2.a, <u>supra</u>, at 35-37.

Rule 404's provisions regulating other-act evidence does not mandate excluding this evidence.  Discussion of Janzad's prior occasion commingling evidence arose in the context of the United States' rule 404 argument.  There, the United States argues Janzad may not offer evidence of her prior good deeds, which it argues is impermissible propensity-for-good evidence:

> The United States respectfully moves this Court to exclude from trial evidence of, or reference to, any of Defendant's specific instances of good conduct or absence of criminal conduct on other occasions. . . . Defendant may attempt to introduce evidence that she served as fiduciary for other clients without accusations of wrongdoing. . . . Whether or not she committed unspecified crimes in relation to other matters is not relevant to any question at trial.
>
> . . . .
>
> Evidence of extraneous good works also would constitute inadmissible character evidence under Federal Rule of Evidence 404(a). . . . The charges in the indictment do not allege a particular character trait, and cannot be rebutted by evidence of a particular trait either.

Motion at 4-6.  Most of the evidence that comes under this rule, the Court addresses later, where it holds that Janzad's good deeds -- Hallmark-style stories of how she has helped veterans -- largely are excludable as sympathy-garnering, prejudicial information; some such evidence, the Court concludes, is admissible only to the limited extent of helping introduce Janzad's background to the jury, explaining VILA, and dispelling the notion that Janzad and VILA never have had success. See Section IV, infra, at 86-87.  Such evidence, the Court explains, must be kept brief.  See Section IV, infra, at 86-87.  The prior occasion commingling evidence here, however, is of a different character.  First, this other act evidence is not intended to demonstrate character -- there is no character for unknowing embezzlement, misappropriation or "use . . . [un]authorized by law." Cf. Fed. R. Evid. 404(b)(1) ("Prohibited Uses.  Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.").  Other act evidence permissibly may be offered to demonstrate, among other subjects, knowledge, lack of mistake or lack of accident.  See Fed. R. Evid. 404(b)(2) ("Permitted Uses. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.").   Janzad's prior act evidence is offered for those subjects' flipside: to demonstrate lack of knowledge, presence of mistake and presence of accident.  The evidence's thrust is that, because she acted on prior occasions without knowledge that commingling was "[un]authorized by law," it is more likely that on this occasion too she lacked that knowledge. Although the inference is impermissible that she necessarily did not know the conduct's illegality on this occasion solely because she lacked that knowledge on prior occasions -- e.g., she might have learned between then and now that commingling was improper; indeed, she may have known even on prior occasions that commingling was improper -- nevertheless, rule 404(b)(2) authorizes

the jury to draw that mistaken-then mistaken-now inference.  The Court therefore concludes that the prior occasion commingling evidence is relevant and not excludable under rule 404.

Rule 403 does not foreclose this evidence either, because it is more probative of Janzad's alleged lack of knowledge than it is prejudicial.  Although the parties should avoid a mini-trial on the circumstances of the prior occasions of Janzad's commingling -- i.e., whether she knew then that commingling was wrong -- still the evidence is not otherwise prejudicial.  The Court will admit this evidence.

### B.    EVIDENCE OF HUBSHMAN'S EXPRESSED WISHES IS ADMISSIBLE, BUT EVIDENCE THAT HUBSHMAN "CONSENTED" IS INADMISSIBLE.

The alleged consent evidence is relevant, but, on the basis of rule 403, the Court will require that Janzad present it as evidence of Hubshman's "expressed wishes," because the language of "consent" may mislead the jury to believe that consent is a defense, and the Court will require that Janzad not use this evidence for sympathy-garnering purposes.  The United States seeks to exclude evidence that Hubshman wanted his funds commingled with VILA's.  See Motion at 7 ("Congress carefully crafted § 6101 to avoid any question of the beneficiary's consent or ratification. The statute criminalizes embezzlement and misappropriation, but also criminalizes the mere acts of borrowing the beneficiary's funds. The policy is clear: . . . the fiduciary's consent or ratification is not relevant").  Janzad responds that her belief that that she was acting in accordance with Hubshman's wishes suggests that she did not believe she was doing anything wrong.  See Response at 6 ("Ms. Janzad will testify that Mr. Hubshman specifically authorized her to use his funds for the benefit of the entire VILA community . . . .  That testimony . . . will be offered to demonstrate Ms. Janzad's state of mind with regard to her administration of Mr. Hubshman's funds and that she never willfully or intentionally embezzled or misappropriated that money."); Suppl. Br. at 1-2

("Ms. Janzad will testify that Mr. Hubshman stated that he 'thought Ms. Janzad was already in charge of me' during the six years he had lived at the VILA Georgene Campus. Ms. Janzad will testify that she specifically asked Mr. Hubshman what he wanted done with his fiduciary funds and Mr. Hubshman replied, 'I want what is best for VILA and for me to stay here.'" (no citation given for quoted material)).   The evidence comes in similarly under each of the § 6101 theories -- embezzlement, misappropriation and except-as-authorized -- that the United States may pursue, because under each theory the evidence undercuts the knowledge mental state the United States must prove Janzad possessed.   Under the embezzlement theory, evidence that Janzad carried out Hubshman's express wishes undermines that she sought to exercise ownership over his money. Under the misappropriation theory and the except-as-authorized theory alike, the evidence may undermine that Janzad knew that her conduct violated the VA regulations; the jury may credit a naïve-fiduciary narrative, i.e., a belief that, because Janzad was acting in accordance with Hubshman's wishes, that fact meant her conduct was permissible under the regulations.

The evidence, however, must be carefully cabined to avoid prejudice under rule 403, in two important ways.   First, the language of "consent" should entirely be avoided, because that term, sounding in legalese, could improperly suggest to a jury that Hubshman's purported consent matters legally for Janzad's § 6101 liability: lack of consent is not something the United States needs to prove under any § 6101 theory.   Because the term "consent" is capable of such confusion, it should be avoided, and instead the parties should use the phraseology of Hubshman's "express wishes."   Second, because, moreover, the United States also does not need to prove that Janzad acted against Hubshman's express wishes, the express-wish evidence carefully should be tied to what probative value it possesses, particularly under the misappropriation and except-as-authorized theories; namely, as providing a basis for Janzad's mistaken belief that her conduct was

legal.  The Court excludes any evidence or argument that, because Janzad commingled in accordance with Hubshman's express wishes, her conduct therefore is not so bad or that the underlying regulatory violation is a mere technicality.  <u>Cf.</u> Gorence-Peña Letter at 15 ("While there may be technical issues regarding Ms. Janzad's obligations as a fiduciary, they were not material with regard to the end result that they were used for Mr. Hubshman's benefit in multiple ways.").  Such evidence is irrelevant, non-probative, and highly prejudicial.  Assuming the evidence is kept within these contours, it is admissible.

> **1.**      **<u>Evidence Of Hubshman's Expressed Wishes Is Admissible Under an Embezzlement Theory.</u>**

Evidence that Janzad was carrying out Hubshman's expressed wishes is admissible under a § 6101 embezzlement theory.  As discussed, to obtain a § 6101 embezzlement conviction, the United States must prove Janzad converted Hubshman's property, which means she must have sought ownership thereof.  Evidence that Janzad acted in accordance with Hubshman's express wishes could suggest to a jury that Janzad lacked the intent necessary for embezzlement.  The jury may conclude that she was not seeking to exercise ownership rights, but instead was serving Hubshman's rights as an owner to have his money disposed of as he wished.  The evidence thus is directly relevant to undermining the United States' burden under an embezzlement theory.  Under rule 403, the evidence is probative for the same proposition, namely, that Janzad did not seek dominion for herself over Hubshman's money.  The evidence, however, is capable of substantial prejudice under rule 403, particularly based on: (i) the word "consent" alone, which the Court concludes must be omitted at trial; and (ii) the possibility that jurors will think that they should acquit Janzad, because she acted in accordance with Hubshman's express wishes, a possibility which must be minimized.

As to the language of "consent," the Court will exclude this language under rule 403.  The United States, under the embezzlement theory, as under the other theories, need not prove lack-of-consent: Hubshman's consent is not a defense, nor a valid basis upon which to acquit Janzad if the United States otherwise proves its case.  Evidence of Hubshman's "consent" violates rule 403 because it could confuse the jury into believing that Hubshman's consent matters from a legal perspective.  As the Court notes above, "consent" being a legalese-sounding word, the jury may assume it must factor into their evaluation of the United States' evidence.  What is important is Janzad's beliefs about her actions, not whether or not Hubshman actually consented.  As the Court discusses later, it is for this reason that Hubshman's out-of-court statements are admissible on the basis that they are as effect-on-Janzad statements and not on the basis that they are state-of-mind statements or verbal act statements.  <u>See</u> Section III <u>infra</u>, at 83-86 & n.10.  Evidence that Hubshman "consented" to Janzad's conduct, therefore, is inadmissible under rule 403, and instead the phrasing "expressed wishes" should be employed.

Rule 403, however, also governs the evidence's introduction under the guise of "expressed-wishes evidence," to avoid the possible prejudice that jurors will believe that they should acquit Janzad if they conclude she acted in accordance with Hubshman's expressed wishes.  The Court will instruct the jury that under the embezzlement theory, the United States does not have to prove that Janzad acted against Hubshman's wishes.  The United States need only establish that Janzad knowingly and wrongfully converted Hubshman's property.  <u>See</u> Pattern Crim. Jury Instr. 10th Cir. 2.32 ("To 'embezzle' means the wrongful, intentional taking of money or property of another after the money or property has lawfully come within the possession or control of the person taking it.").  Although evidence that Janzad acted in accordance with Hubshman's express wishes is probative to undermining that she wrongfully sought to convert his property, it does not necessarily

foreclose such a finding. That is, the jury should not be able to acquit Janzad if it concludes that she acted in accordance with Hubshman's express wishes, despite that it also finds that she wrongfully converted Hubshman's property, e.g., if it concludes that Janzad manipulated Hubshman to procure his assent. Prejudice under rule 403 would be the jury's belief that such a basis for acquittal is available -- i.e., that the United States has an evidentiary burden to prove lack-of-accordance with Hubshman's wishes. To avoid that possibility, the Court will instruct the jury that the United States bears no such burden. Moreover, the Court excludes any evidentiary suggestion that, because she was acting in accordance with Hubshman's wishes, Janzad's conduct is not so bad or that the underlying no-commingling violation was a mere technicality. So long as the express-wishes evidence is tailored to the purposes for which it is probative, namely, as undermining the mens rea and conversion at issue, and the prejudicial effect of the word "consent" and the proposition that acting-in-accordance is an independent basis for acquittal is obviated, then the express-wishes evidence is admissible under an embezzlement theory.

### 2. Expressed Wishes Evidence Is Admissible Under the Misappropriation Theory.

The expressed wishes evidence is admissible under the misappropriation theory. Under the misappropriation theory, the United States must prove that Janzad "knowingly misappropriated" Hubshman's money: the United States must prove that Janzad put Hubshman's money to an improper purpose and that she knew at the time that purpose to which she put it was improper, i.e., that her conduct violated VA regulations and that she knew at the time that her conduct violated those regulations. See Section I.D.2.b. supra, at 37-39. As the Court concludes above regarding the embezzlement theory, the Court first concludes that evidence of Hubshman's "consent" is inadmissible under the misappropriation theory, because, although the United States does not need

to prove Hubshman's lack-of-consent, that legalese-sounding term may suggest to jurors that "consent" is something with which the United States' evidence must contend and represents an independent basis for acquittal.  Under rule 403, therefore, the evidence instead must be repackaged under the heading "express-wishes evidence," as the Court concludes above.

Even under the guise of express-wishes evidence, however, the evidence's relevance and rule 403 propriety must be carefully policed, because the evidence is relevant and satisfies rule 403's probative-versus-prejudice balancing only insofar as it undermines the knowledge-of-wrongfulness that the United States must prove.  As noted, what the United States must prove under a misappropriation theory is that Janzad used Hubshman's money in a way that VA regulations prohibited and that she knew at the time that such a use was prohibited.  The expressed-wishes evidence is not, of its own force, relevant or probative, so Janzad must flow it through a lack-of-knowledge box, i.e., as a basis for Janzad's mistaken belief that her conduct was not prohibited.  The Court takes in turn the evidence's rule 401 relevance and rule 403 balancing under this framework.

The expressed-wishes evidence is relevant to demonstrating Janzad's mental state or lack thereof under the misappropriation theory.  As the Court concludes, under that theory of § 6101 liability, Janzad's mental state, specifically her knowledge, matters.  Cf. Elonis, 575 U.S. at 737-38 ("[A] 'reasonable person' standard is a familiar feature of civil liability in tort law, but is inconsistent with 'the conventional requirement for criminal conduct -- *awareness* of some wrongdoing.' . . . . Under these principles, 'what [Elonis] thinks' does matter." (quoting Staples v. United States, 511 U.S. at 606-60).  That Janzad was acting in accordance with Hubshman's express wishes does not obviate § 6101 liability, because the United States has no burden vis-à-vis Hubshman's express wishes, but that Janzad did not know her use of Hubshman's money was

improper is an argument against such liability.  See Section I.D.2.b supra, at 37-39.  Her belief that she possessed Hubshman's assent and her belief that she was acting in accordance with his wishes could contribute to a mistaken belief that commingling was proper.

To make the express-wishes evidence relevant, therefore, it must be flowed through a lack-of-knowledge box.  Janzad's story essentially must be twofold, the compound of two beliefs: (i) a belief that she was acting in accordance with Hubshman's wishes; and (ii) a mistaken belief that her conduct was permissible because she was acting in accordance with his wishes.  That is, Janzad cannot escape liability if she believed that she had Hubshman's assent but knew, nevertheless, that his assent did not mean that she was permitted to commingle.  Effectively, Janzad must have been under the mistaken impression that there existed some carveout to 38 C.F.R. § 13.200 that permits commingling under such circumstances as hers, namely, where the fiduciary is acting in accordance with a beneficiary's express desire to have his funds commingled.  See 38 C.F.R. § 13.200(a) ("[A] fiduciary must establish and maintain a separate financial institution account for each VA beneficiary that the fiduciary serves.  The fiduciary must not commingle a beneficiary's funds with the fiduciary's funds or any other beneficiary's funds, either upon or after receipt.").

This theory of the expressed-wishes evidence's relevance is not precisely the story that Janzad seeks to tell, but it is not far from it.  The mistaken-belief theory forms a cohesive narrative with Janzad's narrative of herself as an untrained naïve, i.e., that she was not VILA's money person, not a professional fiduciary, etc.  See Tr. at 5:24-6:6 (Gorence)("[T]he real question in part will be did she serve as a fiduciary on every one of these individuals? . . . What was her training and understanding? And that is all relevant to her role and what was she really tasked with doing? Was she the comptroller? Was she the financial manager?"); id. at 18:1-10 (Gorence)("[Who did what, that's critical in this case . . . . [T]here is only a handful of people where . . . she took this fiduciary

responsibility. . . . [I]t is very different than professional fiduciary companies that are guardianship companies, because that's what that's all they do."); id. at 18:22-19:1 (Gorence)("[It is] relevant to show how she managed this, and what her job duties were. She doesn't draw a salary compared to these professional fiduciary who embezzled millions that's all relevant to show that she didn't do that.").  That she might mistakenly have believed that obtaining Hubshman's assent authorizes commingling is consistent with such a theory.  Janzad's mistaken belief that Hubshman's assent rendered permissible her actions -- really, the compound of two beliefs -- undermines what the United States must prove under the misappropriation theory, so the expressed wishes evidence is relevant under that theory.

This conclusion is similar to the conclusion that the Court reaches above, in setting aside § 6106's for-his-benefit language as a theory of § 6101 liability.  There, the Court concludes that if Janzad knew that commingling was unauthorized, she cannot be acquitted on the basis that nevertheless she was acting to benefit Hubshman.  That theory is not § 6101's theory of liability, as the Court construes the statute, so the Court sidelines § 6106's for-the-beneficiary's-benefit language.  Thus, with the express-wishes evidence, Janzad should not argue that, because she was carrying out Hubshman's express wishes, she was acting in his benefit.  Whether the commingling was or was not "other than for the use and benefit of [Hubshman]," 38 U.S.C. § 6106(b), is not the relevant inquiry under § 6101.  Accordingly, Janzad's theory must instead be that, because in commingling she was carrying out Hubshman's wishes, she believed mistakenly her conduct was not improper.[9]

---

[9]Whether the jury buys Janzad's know-nothing-fiduciary story, however, is of course a separate question.  Having sketched the theory of relevance available to Janzad to dispute § 6101's mens rea burden, the Court sketches briefly how other evidence is relevant to the same proposition's flipside.   The United States' argument that no reasonable fiduciary would possess

The above is a permissible relevance theory of the expressed-wishes evidence, and rule 403 does not foreclose that evidence's admissibility, so long as the evidence is kept within proper bounds. The evidence is probative to the same purpose for which it is relevant: the belief that Janzad was acting in accordance with Hubshman's wishes, in conjunction with the belief that his assent meant that her conduct was not a misallocation of the funds undermines what the United States must prove, namely that Janzad "knowingly" misappropriated. Cf. Tr. at 34:17-35:4

_____

such a belief as Janzad's -- that any fiduciary would know that merely obtaining a beneficiary's say-so is not grounds sufficient to violate the applicable rules -- contributes to evaluating the credibility of Janzad's testimony. As the Court notes, that reasonable-fiduciary proposition cannot itself support liability, see Elonis, 575 U.S. at 737-38 ("Elonis's conviction . . . was premised solely on how his posts would be understood by a reasonable person. Such a 'reasonable person' standard is a familiar feature of civil liability in tort law, but is inconsistent with 'the conventional requirement for criminal conduct -- *awareness* of some wrongdoing.'" (quoting Staples v. United States, 511 U.S. at 606-07)(emphasis in Elonis, not in Staples v. United States)); Ruan, 597 U.S. at 465 ("[T]he Government's standard would turn a defendant's criminal liability on the mental state of a hypothetical 'reasonable' doctor, not on the mental state of the defendant himself or herself. . . . We have rejected analogous suggestions in other criminal contexts."), but it does help to evaluate the credibility of Janzad's testimony: if no other fiduciary would hold this belief, Janzad herself likely did not either. Other evidence that the United States emphasizes also could undermine the credibility of such a belief: Janzad signed the Fiduciary Agreement, explicitly prohibiting commingling, see Indictment ¶ 3, at 1; she knew that depositing money in a segregated account was the way she was supposed to operate, because she set up a segregated account to receive Hubshman's regular VA payments, see Tr. at 38:17-22 (Peña); she inexplicably sought Hubshman's assent only as to the large, lump-sum California funds, and not any of Hubshman's other funds, see n.4 supra, at 5; the alleged coverup underlying Janzad's § 1001 charges suggests a guilty knowledge, see Indictment at 4-5; and Janzad was not unsophisticated, evidenced by her having founded and operating VILA, a large enterprise, see Indictment at 1-5. Moreover, it is unclear whence Janzad would have derived the idea that the say-so of a completely disabled, severely drug-addicted individual committed to her care overrides the VA's explicit, unambiguous directive not to commingle. See 38 C.F.R. § 13.200(a) ("[A] fiduciary must establish and maintain a separate financial institution account for each VA beneficiary that the fiduciary serves. The fiduciary must not commingle a beneficiary's funds with the fiduciary's funds or any other beneficiary's funds, either upon or after receipt."). Nonetheless, although these facts are relevant to undermining the credibility of any testimony that Janzad believed mistakenly that Hubshman's assent meant that she could act as she did, that will be a matter for the jury's determination.

(Peña)("The other category of  definition would say ["to misappropriate" means] to misuse, to misallocate, to use in other than the intended use of the property."); <u>Misappropriate</u>, Merriam-Webster ("[T]o appropriate wrongly . . . ."); <u>Misappropriate</u>, Oxford English Dictionary ("To appropriate or assign wrongly . . . ."). It would not be done knowingly if Janzad believed mistakenly that Hubshman's assent authorized her actions.

Rule 403's rule against prejudice acts on this evidence in two ways. First, as noted above, Janzad should not articulate this evidence as a matter of Hubshman's "consent," because that legalese-sounding word could confuse a jury into thinking that Hubshman's consent or lack thereof matters for Janzad's liability. Rule 403 guards against this kind of prejudicial confusion, so the parties should omit the language of "consent," and use instead the language of "express wishes." Second, rule 403's concern for unfair prejudice prohibits using the express-wishes evidence for sympathy-garnering purposes. Janzad should not argue to the jury that, even if they conclude she knew commingling was impermissible, they should acquit her, because she was acting in accordance with Hubshman's wishes: the acting-in-accordance evidence does not, of its force, negate anything that the United States must prove. Such an argument is merely improper sympathy garnering. Thus Janzad should not offer evidence that her conduct was not morally rephensible or that the underlying regulatory violation a mere technicality, because she carried out Hubshman's express wishes. <u>See</u> Gorence-Peña Letter at 15 ("While there may be technical issues regarding Ms. Janzad's obligations as a fiduciary, they were not material with regard to the end result that they were used for Mr. Hubshman's benefit in multiple ways."). The evidence must be funneled through the channel for which it is relevant and probative, namely, Janzad's naïve-fiduciary story, undermining the knowledge-of-wrongfulness scienter which is the United States' burden to prove.

Kept within those bounds, the express-wishes evidence is admissible under the misappropriation theory.

### 3.  Expressed Wishes Evidence Is Admissible Under the Except-As-Authorized Theory.

The express-wishes evidence is admissible under the except-as-authorized theory for the same reasons as under the misappropriation theory, because, as noted, the theories are coextensive. Under the except-as-authorized theory, the United States must prove that Janzad used Hubshman's money in a manner not "authorized by law" and that she knew that fact, i.e., the United States must prove that Janzad's conduct violated VA regulations and that she knew at the time that her conduct violated those regulations.  First, the "consent" evidence is inadmissible:  the United States does not need to prove that Janzad acted without Hubshman's consent, and, because that legalese-sounding word may suggest to the jury that the United States has such an evidentiary burden, the language of "consent" is inadmissible.

Even the permissible "expressed wishes" phraseology must be regulated, however.  The United States does not need to prove that Janzad acted against or in the absence of Hubshman's express wishes; it needs only to prove Janzad's knowledge that commingling was "[un]authorized by law."  38 U.S.C. § 6101(a).  Accordingly, the express-wishes evidence is not, of its own force, relevant or probative, but it supports Janzad's fiduciary-as-naïve picture, so she must flow it through the lack-of-knowledge box.  Janzad's imagined 38 C.F.R. § 13.200 carveout -- authorizing commingling if the fiduciary acts in accordance with a beneficiary's express wishes -- makes the express-wishes evidence relevant and probative.  Analogous to the Court's admission of the personal-benefit evidence, see Section II.E.2-3 infra, at 77-83, the express-wishes evidence supports Janzad's naïve-fiduciary story, the credibility of which the jury will test.  The evidence

must be kept brief and narrowly tailored, however, because of the risk of rule 403 prejudice, and avoid playing to the jury's sympathies on the mere-technicality or not-morally-reprehensible bases. See Gorence-Peña Letter at 15. Because the United States need not prove Janzad acted against or in the absence of Hubshman's wishes, Janzad should not garner sympathy by urging acquittal on the basis that she merely was carrying out Hubshman's directives. Assuming the evidence is kept within the limits prescribed, the Court will not exclude the express-wishes evidence if the United States pursues an except-as-authorized theory.

### C.     EVIDENCE OF RATIFICATION IS INADMISSIBLE.

The evidence of ratification is irrelevant because it postdates the criminal acts of which Janzad is charged. Janzad seeks to introduce evidence that Hubshman executed a purported life-care contract, exchanging his California funds to VILA in consideration of being able to remain at VILA for the remainder of his life, regardless of the costs thereof. See Tr. at 60:6-61:20 (Gorence). The United States argues this is a mere after-the-fact rationalization, and part of an elaborate coverup. See Tr. at 40:15-23 (Peña)("[L]ater on she protested her removal as fiduciary for him by ginning up another document, that purports to be a life care contract that purports to say Mr. Hubshman gives her all this money in exchange for social services for life. So the crime is certainly entirely committed prior to this third notion of the life care contract. That's months afterwards."). Given the elements of the offense, what matters is what Janzad believed about her actions at the time, not any ratification or affirmation after the fact. Because the purported ratification postdates the temporal window at issue, it is wholly irrelevant. The Court will therefore exclude evidence that Hubshman purportedly ratified Janzad's actions, and the Court will exclude evidence of the life-care contract.

### D.    EVIDENCE OF COST OF CARE IS ADMISSIBLE TO A LIMITED EXTENT.

Evidence of the cost of Hubshman's care is relevant to undermining the burden of proof of knowledge of wrongdoing to a limited extent. Evidence that the cost of Hubshman's care was high, is admissible only for the limited purpose of helping to explain Hubshman's wishes.  Evidence of the precise cost of Hubshman's care, however, is not relevant, and Janzad should keep this cost of care evidence to the minimum proposition that the costs of Hubshman's care exceeded what his normal benefits income was able to pay for.  This evidence should occupy no more than one or two sentences of testimony: providing some context why Hubshman wanted his California funds commingled.

The Court's ruling above that § 6106 should not be grafted onto § 6101 impacts the scope of the cost of care evidence: because what matters for a misappropriation and an except-as-authorized theory solely is whether Janzad knew what she was doing was unauthorized, the cost of care evidence is of limited relevance.  Detailed evidence about the cost of Hubshman's care would inform whether Janzad's actions were for his benefit.  Knowing the full extent of Hubshman's large costs and the burden that he placed on VILA suggests that, because the cost was so high, Janzad mercifully cut Hubshman a deal by accepting his California funds in satisfaction of his debts instead of turning Hubshman out on the street.  On the § 6106-import theory, the cost-of-care evidence shows why Janzad's actions were for Hubshman's benefit. Because, however, the Court concludes that whether the acts were for his benefit is not what matters under § 6101, and what matters is solely whether she knew her actions were wrong, the cost of evidence is less relevant than it would be if were § 6106 grafted onto § 6101.  Again, for purposes of § 6101's elements as the Court construes them, the cost of care evidence only is relevant to provide some

context to Hubshman's expressed wishes.  The theory the Court sketches above must provide the relevancy link between Hubshman's expressed wishes and Janzad's mistaken belief that those expressed wishes meant she could act as she did.  The cost-of-care evidence should be limited to a sentence or two along the following lines: (i) Hubshman expressed his desire that his funds be commingled, which he and Janzad agreed would satisfy his debts to VILA, and (ii) those debts that were due to the high costs of his care, costs which exceeded what he otherwise could afford by his benefits.  Details and figures on the costs of his care are irrelevant.

Beyond its irrelevance, this evidence is unduly prejudicial and not probative under rule 403.  The effect of details about how high Hubshman's costs of care were only serves to produce sympathy for Janzad: it will produce the inference that Janzad was a good person for continuing to care for Hubshman despite his inability to pay; the jury will think that Janzad is saintly for continuing to house and care for Hubshman despite his debts.  These are unfairly prejudicial uses of the information.  Nor is this evidence probative.  As noted, whether Janzad's actions were for Hubshman's benefit is not the pertinent inquiry; merely whether she knew her conduct was wrongful is the inquiry.  The high costs of Hubshman's care, and effectively the deal Janzad cut Hubshman by permitting him to stay on at VILA is probative to the former inquiry, but not much probative to the latter inquiry.  Its probative value lies only in helping explain Hubshman's expressed wishes.  Rule 403's balance is further basis to exclude extensive details about the costs of Hubshman's care beyond what limited information is necessary to understanding Hubshman's expressed wishes.

### E.   EVIDENCE THAT JANZAD DID NOT PERSONALLY USE OR BENEFIT FROM HUBSHMAN'S MONEY IS ADMISSIBLE.

Evidence that Janzad did not personally use or personally benefit from Hubshman's money is admissible either in large part or for a limited extent, depending on the theory that the United States pursues. If the United States pursues an embezzlement theory, then evidence that Janzad did not personally benefit from Hubshman's money -- i.e., that she did pocket the money -- is directly relevant to undermining the conversion that the United States must establish under that theory. Under the misappropriation theory and the except-as-authorized theories, the personal-benefit or personal-use evidence is admissible to a limited extent, namely, to support Janzad's theory that she lacked knowledge of commingling's unauthorized quality and to disabuse jurors of the misapprehension that Janzad pocketed Hubshman's money. The Court thus will not exclude entirely the personal-benefit under any theory that the United States pursues.

### 1. **Personal-Benefit Evidence Is Largely Admissible Under an Embezzlement Theory.**

As the Court notes above, evidence that Janzad did not personally benefit or use Hubshman's money is directly relevant, and more probative than prejudicial, to undermining that she converted Hubshman's property, which the United States must prove under an embezzlement theory. For conversion, the United States must establish that Janzad exercised ownership over the California funds to Hubshman's exclusion. See Section I.F.1 supra, at 53-56. Evidence that Janzad did not personally benefit from or use Hubshman's money is directly relevant to whether she sought and established ownership over the money. The United States has not suggested that Janzad literally pocketed the money, bought a fancy car or nice clothes, etc. Rather, the money went to VILA, not to Janzad personally:

> She deposited it into her general business operating [and] . . . within several months that money was gone, just used for other purposes, business purposes. No one is alleging that she bought herself a new car with it. No one is alleging that

> she remodeled her home with it.  She just used it for the rest of the business.
> Completely unauthorized under [§] 6101 . . . .

Tr. at 39:2-9 (Peña).  To demonstrate conversion, the United States may argue that, to put the

money to VILA's use is to put the money to Janzad's own use, because Janzad's interests and

VILA's interests essentially are identical.  The United States thus may argue that to convert

Hubshman's money to VILA's ownership is to convert it to Janzad's ownership.  In turn, Janzad

may argue that to convert the money to VILA's use is not to convert it to her own use.  She also

may argue that her conduct does not amount to conversion, because although used by VILA, the

money was still for Hubshman's use; she may thus argue Janzad's conduct did not strip his

ownership rights.  Cf. Tr. at 43:7-12 (Gorence)("Every penny was going to his benefit and . . . Ms.

Janzad is going to be able to explain everything, because she didn't take it.  She didn't buy a box

at the [Isotopes stadium].  It wasn't used for, not a penny for other personal use.").  Accordingly,

to prove or to undermine the conversion necessary to establish embezzlement, Janzad's evidence

that the money was not put to her personal use or benefit is directly relevant.

    This evidence also is not inadmissible under rule 403. That Janzad did not personally

benefit from Hubshman's California funds is probative for the proposition that she did not convert

the money.  It is also not prejudicial: it hurts the United States' position at trial, but that is not unfair

prejudice.  See United States v. Burgess, 576 F.3d 1078, 1098-99 (10th Cir. 2009)("[E]vidence

[improper under rule 403] must do more than 'damage the Defendant's position at trial,' it must

'make[ ] a conviction more likely because it provokes an emotional response . . . or otherwise . . .

affect[s] adversely the jury's attitude toward the defendant *wholly apart* from . . . his guilt or

innocense [sic] of the crime charged.'" (quoting United States v. Tan, 254 F.3d 1204, 1211-12 (10th

Cir. 2001))(correction in United States v. Burgess, but not in United States v. Tan))).

### 2. **Personal Benefit Evidence Is Admissible to a Limited Extent Under the Misappropriation Theory.**

Under the misappropriation theory, the no-personal-benefit evidence is admissible for limited purposes. Under the misappropriation theory, the United States must prove that Janzad "knowingly misappropriated" Hubshman's money: the United States must prove that Janzad put Hubshman's money to an improper purpose and that she knew at the time that the purpose to which she put it was improper, i.e., that her conduct violated VA regulations and that she knew at the time that her conduct violated those regulations. The personal benefit evidence is not, on its own, relevant or probative, because under the misappropriation theory, the United States does not need to prove that Janzad personally used or benefited from Hubshman's money, see Section I.F.2 supra, at 56. The evidence is for two reasons, however, relevant under rule 401 and not substantially more prejudicial than probative under rule 403: (i) as supplying another basis for Janzad's mistaken belief that her conduct was not improper, analogously to the express-wishes evidence; and (ii) to complete the factual picture, that is, to avoid juror misapprehension that Janzad pocketed the money.

First, Janzad may present the no-personal-benefit evidence to support her mistaken belief that her conduct was permissible, a theory of relevance that aligns precisely with the relevance described above of the express-wishes evidence. As noted, the personal benefit evidence is not, on its own, relevant to a § 6101 misappropriation theory, because the United States does not need to prove that Janzad personally benefited from the misuse of Hubshman's money, see Section I.F.2, supra, at 56. The evidence is relevant only if Janzad flows it through the lack-of-knowledge box. As she may with the express-wishes evidence, to undermine the United States' burden to prove her knowledge of impropriety, Janzad may offer evidence explaining that she lacked such knowledge.

Janzad may have thought that her conduct was permissible, because she was not spending the money on herself.  She may have imagined the existence of a second 38 C.F.R. § 13.200 carveout beyond the imagined express-wishes carveout, see Section II.B.2 supra, at 70-71, which permits commingling in the event the fiduciary does not spend the money on herself personally.  The personal benefit evidence is relevant for establishing this mistaken-belief, imagined-carveout theory.  It is also consistent with Janzad's overall fiduciary-as-naïve narrative of herself, namely, that she was not experienced, or professional fiduciary.  See Tr. at 5:24-6:6 (Gorence)("[T]he real question in part will be did she serve as a fiduciary on every one of these individuals? . . . What was her training and understanding? And that is all relevant to her role and what was she really tasked with doing? Was she the comptroller? Was she the financial manager?"); id. at 18:1-10 (Gorence)("[Who did what, that's critical in this case . . . . [T]here is only a handful of people where . . . she took this fiduciary responsibility. . . . [I]t is very different than professional fiduciary companies that are guardianship companies, because that's what that's all they do."); id. at 18:22-19:1 (Gorence)("[It is] relevant to show how she managed this, and what her job duties were. She doesn't draw a salary compared to these professional fiduciary who embezzled millions that's all relevant to show that she didn't do that.").  As the Court explains above, see n.9 supra, at 67-68, Janzad's know-nothing-fiduciary story may be dubious, but that is a credibility determination that the jury will make.  The evidence is probative to such a theory, because it serves to demonstrate lack-of-knowledge, undermining the United States' burden to prove knowledge of impropriety. The Court discusses below why the evidence used in this manner, is not substantially more prejudicial than probative, so as to be inadmissible under rule 403, but first the Court identifies a second basis for the evidence's relevance and probativity.

The second basis for the no-personal-benefit evidence's relevance and probativity is to complete the factual picture and avoid juror misapprehension that she pocketed Hubshman's money.  To demonstrate how Janzad knowingly misappropriated Hubshman's money, the United States likely will produce one or more witnesses who will tell the jury where Hubshman's money went.  That witness will tell the jury that the money went into VILA's coffers; that witness likely will not tell the jury that the money went into Janzad's personal bank account or that Janzad spent it on personal frivolities.  See Tr. at 39:2-9 (Peña)("No one is alleging that she bought herself a new car with it.  No one is alleging that she remodeled her home with it.  She just used it for the rest of the business.").  Janzad is entitled to bring out explicitly this latter proposition, that the money did not go into her pockets.  The relevance of this evidence is avoiding the misapprehension of jurors, who may otherwise think that Janzad pocketed the money.  A question or two to this effect, posed to the United States' money-tracing witness is appropriate.  Janzad thus may ask that witness, for example, "Did the money go into Janzad's personal bank account?"  The same conclusion applies to Janzad's testimony: if she takes the stand, a question or two may be asked of her to this effect, e.g., "Did you put this money in your own bank account?" or, "Did you buy yourself a car or fancy clothes with this money?"  Although the United States' case-in-chief already will demonstrate that Janzad did not use the money for her direct personal benefit, see Tr. at 39:2-9 (Peña)("No one is alleging that she bought herself a new car with it.  No one is alleging that she remodeled her home with it.  She just used it for the rest of the business."), nevertheless, Janzad may make explicit that proposition.  Such a misconception-avoiding purpose is a proper relevance and probativity function.

The possibility of prejudice, however, is not insubstantial, so the evidence must be cabined, or it risks upsetting rule 403's probativity-prejudice balance.  As discussed, the United States does

not need to prove that Janzad personally benefited from the use of Hubshman's money if it pursues a misappropriation theory.  See Section I.F.2, supra, at 56.  The United States also need not prove that Janzad used Hubshman's money for a purpose "other than for [Hubshman's] use and benefit," 38 U.S.C. § 6106(b), per the Court's conclusion that § 6106's content cannot be grafted onto § 6101's scienter requirement, see Section I.E., supra, at 48-52.  The Court will instruct the jury that the United States has no such burdens.  The no-personal-benefit evidence, therefore, is not probative of its own force.  Instead, as noted, the evidence is probative for two narrow purposes: (i) the evidence, when flowed through the lack-of-knowledge box, provides support for Janzad's fiduciary-as-naïve story; and (ii) the evidence is probative to obviate juror misapprehension that Janzad pocketed Hubshman's money.  Janzad's no-personal-benefit must be kept brief and tied to these two theories.  If long and drawn out, evidence that Janzad derived no personal gain from Hubshman's money has the potential to be merely sympathy-garnering.  Janzad improperly may suggest to jurors that they should acquit her because she used Hubshman's money not to benefit herself, but to benefit Hubshman -- that her conduct was not morally reprehensible and that, anyway, the underlying regulatory violation is a mere technicality.  See Gorence-Peña Letter at 15. This theory is sympathy garnering and is impermissible under rule 403.  Accordingly, that the jury believes that Janzad did not personally benefit or personally use Hubshman's money is not reason alone to acquit her, because that is not something that the United States needs to prove.  The Court explicitly will instruct the jury that the United States bears no such burden.  Accordingly, Janzad must keep brief any no-personal-benefit evidence that she presents and must tie it narrowly to the two theories of relevance and probativity that the Court identifies above.  Assuming that Janzad accomplishes this challenge, the evidence that she did not personally benefit from Hubshman's money is not inadmissible under a misappropriation theory.

### 3.   Personal Benefit Evidence Is Admissible to a Limited Extent Under the Except-As-Authorized Theory.

The Court concludes that the personal benefit evidence is admissible to the same extent under the except-as-authorized theory as it is under the misappropriation theory. Under the except-as-authorized theory, the United must prove that Janzad used Hubshman's money in a manner not "authorized by law" and that she knew that fact, i.e., the United States must prove that Janzad's conduct violated VA regulations and that she knew at the time that her conduct violated those regulations. The United States does not need to prove that Janzad personally benefited or used Hubshman's money. Accordingly, the no-personal-benefit evidence is not, of its own force, relevant or probative. As under the misappropriation theory, however, this evidence is admissible for two reasons: (i) to support Janzad's fiduciary-as-naïve picture; and (ii) to avoid juror misapprehension that Janzad pocketed the money.

As with the misappropriation theory, the except-as-authorized theory permits Janzad's know-nothing-fiduciary theory, to which the no-personal-benefit evidence is relevant and probative. As noted, the personal benefit evidence is not, on its own, relevant to a § 6101 except-as-authorized theory, because the United States does not need to prove that Janzad personally benefited from the unauthorized use of Hubshman's money, see Section I.F.3 supra, at 56-57. As with the express-wishes evidence, the evidence is relevant only if Janzad flows it through the lack-of-knowledge box. Janzad's imagined 38 C.F.R. § 13.200 carveout -- authorizing commingling if the fiduciary does not spend the money on herself personally -- makes the no-personal-benefit evidence relevant and probative. Analogous to the Court's admission of the expressed-wishes evidence, the no-personal-benefit evidence supports Janzad's naïve-fiduciary story, the credibility of which the jury will test. Aside from this basis, as noted, the no-personal-benefit evidence will

dispel juror misapprehension that Janzad pocketed Hubshman's money.  The evidence must be kept brief and narrowly tailored, however, because of the risk of rule 403 prejudice.  Because the United States need not prove Janzad personally benefit from her unauthorized use of Hubshman's money, Janzad should not garner sympathy by urging acquittal on the basis that she did it not for herself, but for Hubshman, nor that her conduct is not morally reprehensible and the no-commingling violation a mere technical breach.  Assuming the evidence is kept within the limits prescribed, the Court will not exclude the no-personal-benefit evidence if the United States pursues an except-as-authorized theory.

## III.   THE COURT WILL NOT EXCLUDE HUBSHMAN'S STATEMENTS ON HEARSAY GROUNDS.

The Court will not exclude as hearsay Hubshman's statements to which Janzad will testify, because, as effect-on-listener statements, they are not offered for their truth, and, therefore not hearsay.  Out-of-court statements offered for the truth of the matter asserted are hearsay, and usually must be excluded, unless some exception applies.  See Fed. R. Evid. 801(c)(2) ("'Hearsay' means a[n out-of-court] statement that . . . a party offers in evidence to prove the truth of the matter asserted in the statement."); Fed. R. Evid. 802 ("Hearsay is not admissible unless any of the following provides otherwise: a federal statute; these rules; or other rules prescribed by the Supreme Court.").  Out-of-court statements offered to prove their effect on the listener are not hearsay, however, and so not excludable under the rule against hearsay, see United States v. Smalls, 605 F.3d 765, 785 n.18 (10th Cir. 2010)("[S]tatements offered for their effect on the listener are not hearsay.").  Here, the statements Janzad intends to testify that Hubshman said to her primarily are admissible as non-hearsay, because they are offered for their effect on Janzad.  Janzad indicates that she will testify that Hubshman made the following statements to her:

Mr. Hubshman asked if Ms. Janzad would serve as his successor fiduciary. Ms. Janzad will testify that Mr. Hubshman stated that he "thought Ms. Janzad was already in charge of me" during the six years he had lived at the VILA Georgene Campus. Ms. Janzad will testify that she specifically asked Mr. Hubshman what he wanted done with his fiduciary funds and Mr. Hubshman replied, "I want what is best for VILA and for me to stay here."

Ms. Janzad then told Mr. Hubshman that his money would be temporarily pooled for his benefit and for the assistance of his fellow veterans. Ms. Janzad specifically told Mr. Hubshman that all of his fiduciary funds would ultimately be used for his benefit because all of those funds would be used to cover his room and board, and other expenses for as long as he lived and was a resident of VILA whatever the cost of his care. Ms. Janzad will testify that Mr. Hubshman specifically "agreed to that fiduciary arrangement" and she recalls Mr. Hubshman saying, "I am so grateful to you, you just don't know."

On March 21, 2018, Ms. Janzad received two checks dated March 20, 2018, from California Bank & Trust which represented Mr. Hubshman's fiduciary funds. Ms. Janzad will testify that on that day she had another conversation with Mr. Hubshman and, again, he repeated what he wanted done with his funds in terms of pooling them to assist other veterans yet with the knowledge that all of those funds would be used for his lifetime care, whatever the amount.

Suppl. Br. at 1-2. These statements may be offered to prove their effect on Janzad. That is, they may be offered to prove that Janzad believed she was doing what Hubshman wanted done with his California funds. This evidence, as discussed above, is relevant to undermine the showing that the United States must make that Janzad knew her conduct was wrongful: although, as the Court notes, the assent alone does not undermine the mens rea burden -- she cannot escape liability by claiming Hubshman's assent if she knew, nevertheless, that her conduct was impermissible -- the evidence may suggest to a jury that she thought, because her conduct had Hubshman's assent, that it was permissible. Because the statements are offered to prove facts about Janzad's mental state, they are non-hearsay.[10]

_____

[10]The Court seemingly could admit Hubshman's statements under two other doctrines -- the state-of-mind hearsay exception and the verbal act non-hearsay rule -- but those doctrines are inapposite. One exception to the hearsay rule is a declarant's statements about their own state of

The United States is, of course, correct that there is no way directly to cross-examine the deceased Hubshman, but the United States can offer evidence undermining the credibility of Hubhsman's expressions of his desires.  That is, the United States can offer evidence to impeach Hubshman as a hearsay declarant.  See Fed. R. Evid. 806 ("When a hearsay statement -- or a statement described in Rule 801(d)(2)(C), (D), or (E) -- has been admitted in evidence, the declarant's credibility may be attacked, and then supported, by any evidence that would be admissible for those purposes if the declarant had testified as a witness.").  Because what is of primary importance is Janzad's beliefs about her actions, the existence of contrary evidence undermines the credibility of Janzad's narrative that she believed her conduct was permissible.

---

mind: such statements are hearsay because offered to prove the truth of the matter asserted, i.e., facts the declarant avers about their own beliefs or feelings, but they are admissible anyway.  See Meek v. Martin, 450 F. Supp. 3d at 1253 ("[T]he statements made by the victim were statements relevant to her state of mind -- a firmly established exception to the inadmissibility of hearsay."). Under the other doctrine, verbal acts are non-hearsay, because not offered to prove the truth of the matter asserted: the classic example being "I do" in the exchange of wedding vows, verbal acts are out-of-court statements offered to prove merely that they were made and accomplished some legal effect.  See United States v. Pang, 362 F.3d at 1192 ("[O]ut-of-court statements that are offered as evidence of legally operative verbal conduct are not hearsay. They are considered 'verbal acts.'") (quoting Stuart v. UNUM Life Ins. Co. of America, 217 F.3d at 1154)).

If Hubshman's statements are offered to prove that Hubshman in fact possessed a state of mind -- that he in actuality wanted his funds pooled/commingled -- then they are hearsay statements offered to prove he possessed a state of mind, and as such come under that exception to the hearsay rule.  As verbal acts, Hubshman's statements might be theorized as offered for the legal effect they theoretically accomplish, i.e., that he consented to Janzad's actions.  On this second theory they are not offered for their truth, and so are non-hearsay.

Hubshman's statements are best viewed under the effect-on-listener doctrine, however, instead of under the state-of-mind exception or the verbal acts rule.  What matters for Janzad's liability is her beliefs about her actions, not Hubshman's consent and not his beliefs.  Accordingly, proving facts about Hubshman's state of mind, i.e., admitting his statements under the state of mind exception, is immaterial, so that doctrinal home is not an appropriate one.  Nor is the verbal act doctrine an appropriate home, because Hubshman's statements purportedly giving consent accomplished no legal effect material to Janzad's § 6101 liability, i.e., because consent is not a defense.

Hubshman's statements are admissible because they are not hearsay, as they are offered not for their truth, but instead to prove their effect on Janzad.

## IV.   THE COURT WILL PERMIT TESTIMONY AS TO JANZAD'S BACKGROUND THAT MENTIONS THAT VILA HAS HAD SUCCESS HELPING VETERANS BUT WILL NOT PERMIT IT AT LENGTH.

The Court will not exclude evidence that VILA has improved veterans' lives offered as part of Janzad's introduction to the jury, when she testifies, so long as the evidence is kept brief, because the information gives the jury a fuller picture of Janzad and VILA's profile.  The parties seek guidance from the Court on the pertinent line between acceptable testimony introducing Janzad's background and impermissible sympathy-garnering testimony about the good deeds for veterans that she and VILA have done.  See Tr. at 15:11-23 (Peña).  Janzad concedes that she cannot -- at length -- go through the history of each of the hundreds or thousands of veterans in VILA's care whom she has helped.  See Tr. at 17:10-18 (Gorence).  The United States does not seek to exclude all such evidence, but asks that the Court limit its scope.  See Tr. at 15:11-23 (Peña).  Janzad notes that some of this testimony bleeds into testimony she hopes to offer, and that the United States seeks to exclude, about VILA's pooled concept of care theory.  See Tr. at 18:1-19:6 (Gorence).

The Court agrees that some middle ground, however, is appropriate, so Janzad may discuss briefly the subject of her and VILA's success in general terms.  As part of introducing herself to the jury, when she testifies, Janzad may explain that VILA has helped veterans in its care; she cannot discuss any individual cases in which she has had success, however.  This testimony's function will be to introduce Janzad to the jury and to eliminate possible misconception that VILA has never had success in helping veterans.  This information is relevant to the jury's assessment of Janzad as a witness.  Individual, Hallmark-style stories of Janzad or VILA's beneficence, however, is prejudicial under rule 403.  Janzad, moreover, may not introduce that VILA has never kicked

out persons from their facility for their inability to pay, because such evidence is only sympathy

garnering.  Cabined to introducing Janzad to the jury, this past-successes evidence is admissible.

## V.     THE COURT WILL ALLOW JANZAD TO ROUGH UP THE UNITED STATES' INVESTIGATION, BUT NOT OFFER EXTENSIVE EVIDENCE ON THE <u>SUBJECT</u>.

The Court will admit evidence attacking the United States' investigation's quality to the

extent Janzad will question shoddy investigative work, and admit evidence meant to demonstrate

that the questions asked to Janzad that form the basis for the events underlying the two counts

under 18 U.S.C. § 1001 were misleading. Typically, criminal defendants cannot offer evidence

attacking the United States's investigation's quality for failing to pursue alternative leads to

alternative possible responsible persons.  See <u>United States v. McVeigh</u>, 153 F.3d 1166, 1192 (10th

Cir. 1998)("Under our system of criminal justice, the issue submitted to the jury is whether the

accused is guilty or not guilty. The jury is not asked to render judgment about non-parties, nor is

it normally asked to render a verdict on the United States's investigation.").  Under that general

rule, Janzad may offer evidence attacking as inadequate the United States' investigation of her

alleged crimes, but may not offer extensive evidence about other possibly culpable persons.

Janzad, specifically, seeks to introduce evidence that, the questions asked to her, forming the basis

of the § 1001 charges, were misleading.  See Response at 1-2.  The United States does not dispute

that Janzad may offer such evidence and argument.  See Reply at 7-8.  The Court agrees with the

parties that evidence and argument that aims at calls into doubt questions asked underlying the

§ 1001 charges is relevant to negating the mens rea requirement under that statute, <u>i.e.</u>, that she did

not willfully lie to investigators, see Tenth Circuit Pattern Jury Instruction 2.46.1 (2021)(requiring

that United States must prove that "the defendant made [a] statement [that the defendant knew was

false] willfully, that is deliberately, voluntarily and intentionally"); the evidence is not more

prejudicial than probative to that effect, see Fed. R. Evid. 403.  Accordingly, Janzad may offer

evidence and argument that critiques the investigators' conduct in those events, and may offer

evidence roughing up the investigation, because it goes to reasonable doubt.

## VI.    THE COURT WILL EXCLUDE EVIDENCE OF THE CONSEQUENCES OF JANZAD'S CONVICTION.

The Court will exclude evidence of the consequences of Janzad's criminal conviction,

because the evidence is irrelevant under rule 401 and is unfairly prejudicial under rule 403.

Although the Court has serious concerns about whether the doctrine excluding sentencing

ramifications preserves fully the Sixth Amendment right to a jury trial recognized at the founding

era, the Court nevertheless recognizes the well-established rule that sentencing is for the court

while fact-finding is for the jury.  See United States v. Beckner, No. CR 15-2218, 2024 WL

2880613, at *13-41 (D.N.M. June 7, 2024)(Browning, J.).  The United States, in addition to

seeking to exclude the typical kinds of evidence along this line, namely, the sentencing ramification

parameters of a conviction, also seeks to exclude evidence about other indirect, collateral

consequences of Janzad's potential conviction.  See Motion at 7-10.  The United States specifically

seeks to exclude evidence that VILA facilities will be forced to close if Janzad is convicted at trial.

See Motion at 7-10; Tr. at 56:17-57:4 (Peña).  The Court agrees with the United States' view that

this evidence's only function would be to elicit the jury's sympathy for Janzad and the veterans in

VILA's care, sympathy that is irrelevant under rule 401 and prejudicial under rule 403, because it

simply pulls on the jury's heartstrings.  See United States v. Rodriguez, 192 F.3d 946, 951 (10th

Cir. 1999)("Evidence is unfairly prejudicial if 'it provokes an emotional response in the jury or

otherwise tends to affect adversely the jury's attitude toward the defendant *wholly apart* from its

judgment as to his guilt or innocence of the crime charged.'" (quoting United States v. Roberts, 88

F.3d 872, 880 (10th Cir. 1996))); United States v. Overton, 437 F. Supp. 3d 1078, 1087 (D.N.M. 2020)(Parker, J.)("The Court believes th[e] evidence [here] has a high likelihood of provoking sympathy from a jury -- an improper basis for its judgment.").  At the hearing, Janzad recognized that this evidence merely is sympathy garnering, and that it is therefore improper.  See Tr. at 57:10-58:9 (Court, Gorence).  Accordingly, the Court will exclude any such collateral, indirect consequence evidence.

 **IT IS ORDERED** that: (i) the Court will instruct the jury on 38 U.S.C. § 6101's elements as it has stated them above; (ii) the Court will admit and exclude the following evidence: (a) the Court will admit the prior-occasion evidence of Janzad's commingling; (b) the Court will admit Hubshman's expressed wishes, although the Court will exclude that Hubshman "consented"; (c) the Court will exclude the purported ratification, because it postdates the alleged crimes and so cannot inform Janzad's mens rea; (d) the Court will admit in limited form evidence of the costs of Hubshman's care; and (e) the Court will admit evidence that Janzad did not personally benefit from using Hubshman's money; (iii) the Court will not exclude Hubshman's statements as inadmissible hearsay;  (iv) the Court will admit limited evidence that Janzad and VILA have had success helping veterans; (v) the Court will admit evidence roughing up the United States' investigation of the case; and (vi) the Court will exclude evidence of the indirect consequences of Janzad's criminal conviction.  Accordingly, the Court grants in part and denies in part the Motion.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Alexander M. M. Uballez
  United States Attorney
Frederick T. Mendenhall, III
Jeremy Peña
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

*Attorneys for the Plaintiff*

Jason Bowles
Bowles Law Firm
Albuquerque, New Mexico

-- and ---

Robert J. Gorence
Gorence & Oliveros PC
Albuquerque, New Mexico

*Attorneys for the Defendant*