## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                         No. CR 23-0346 JB

FAYE JANZAD,

      Defendant.

### MEMORANDUM OPINION AND ORDER[1]

**THIS MATTER** comes before the Court on Defendant Faye Janzad's Sentencing Memorandum, filed May 14, 2025 (Doc. 137)("Objections"). The Court held a hearing on September 23, 2025. See Clerk's Minutes, filed September 23, 2025 (Doc. 158). The primary issues are: (i) whether the Court should overrule Defendant Faye Janzad's Objections regarding the United States Probation Office's Presentence Investigation Report ¶¶ 1, 2, 11, at 3-4, filed January 30, 2025 (Doc. 110)("PSR"), where Janzad objects to the characterization of her offenses as a misappropriation or embezzlement of funds by a fiduciary; (ii) whether the PSR correctly describes why the United States Department of Veterans Affairs ("VA") began investigating Janzad, when it says the investigation began due to a non-compliant surety bond; (iii) whether the PSR characterizing her acts as a pattern of dishonesty rather than the product of a delusional order is proper, when it says Janzad appeared to take advantage of T.H. in a number of different ways; (iv) whether Janzad's communication with the witness, E.G., constitutes attempted bribery, when she offered to remodel her home or pay off her mortgage; (v) whether Janzad misused R.P.'s

---

[1] Upon Defendant Faye Janzad's request, the Court has scheduled an evidentiary hearing on Defendant Faye Janzad's Sentencing Objections for November 12, 2025, at 1:30 p.m. The Court will keep the hearing on the calendar unless, after reviewing this Memorandum Opinion and Order, the parties decide it is no longer necessary.

fiduciary funds, when she took out a mortgage in R.P.'s name; (vi) whether Janzad's use of mortgage documents amounts to utilizing sophisticated means; (vii) whether the Court should give Janzad a reduction in offense level for acceptance of responsibility, when Janzad paid restitution; (viii) whether T.H. suffered loss or pecuniary harm, when Janzad misappropriated $163,363.03 from him; (ix) whether T.H. qualifies as a vulnerable victim, when he suffers from several diagnoses and the VA deemed him 100% disabled; and (x) whether Janzad abused a position of public or private trust, when she misappropriated T.H.'s money.  The Court concludes that: (i) the characterization of Janzad's offenses as a misappropriation of funds by a fiduciary is proper in PSR ¶¶ 1, 2, at 3, but not characterizing it as embezzlement in PSR ¶ 11, at 4, because Janzad is convicted of misappropriation but not embezzlement; (ii) the PSR correctly describes that the VA began investigating Janzad, because she provided a non-compliant surety bond; (iii) the PSR characterizing her acts as a pattern of dishonesty is proper, because Janzad is not suffering from a significantly reduced mental capacity; (iv) Janzad's communications with the witness, E.G., constitutes attempted bribery, because Janzad approached E.G. the week before trial offering to pay off E.G.'s mortgage or remodel her home; (v) Janzad misused R.P.'s fiduciary funds such that the misuse demonstrates a pattern of taking advantage of veterans; (vi) Janzad did not use sophisticated means, because she did not utilize sophisticated means to either execute or avoid detection of the offense; (vii) Janzad is not entitled to a sentence reduction for acceptance of responsibility, because Janzad has not acted in a manner consistent with the acceptance of responsibility; (viii) Janzad caused T.H. to suffer actual loss or pecuniary harm, because T.H. suffered an actual loss when Janzad took over $163,000.00 from him; (ix) T.H. qualifies as a vulnerable victim, because T.H.'s mental health diagnoses make him a vulnerable victim; and (x) Janzad abused a position of public or private trust, because Janzad's fiduciary role placed her

squarely in such a position of private trust that contributed significantly to facilitating the commission or concealment of her offense. The applicable offense level is 20, the applicable criminal history category is I, and the United States Sentencing Guidelines establish an imprisonment range of 33 to 41 months.

## FACTUAL BACKGROUND

Janzad does not object to the PSR's facts except those in ¶¶ 1, 2, 11, 12, 29, 31, 32, 33, 36, 39, 43, 44, 45, 46, 47, at 3-13. See Objections at 10-15. The Court thus concludes that those undisputed facts are the Court's findings of fact. See Fed. R. Crim. P. 32(i)(3)(A) ("[The court] may accept any undisputed portion of the presentence report as a finding of fact."). Regarding the fifteen paragraphs to which Janzad objects, the Court concludes that the United States has shown -- by a preponderance of the evidence -- that the allegations in those paragraphs are true. The Court therefore includes those allegations in the Court's findings of fact.

When resolving factual objections, the Court must determine whether the United States has met its burden of proving disputed facts by a preponderance of the evidence. See United States v. Olsen, 519 F.3d 1096, 1105 (10th Cir. 2008). In evaluating whether the United States has met its burden, "sentencing courts may consider hearsay evidence provided that the evidence has sufficient indicia of reliability." United States v. Dazey, 403 F.3d 1147, 1177 n.7 (10th Cir. 2005). See U.S.S.G. § 6A1.3.[2] "This is not a high standard, for it requires only 'minimal indicia of

---

[2] Although a district court "resolving any dispute concerning a factor important to the sentencing determination . . . may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy," U.S.S.G. § 6A1.3, the federal rules of evidence can be relevant to fact-finding at sentencing. In United States v. Calvert-Cata, No. CR 16-4566 JB, 2022 WL 14813473, at *12 (D.N.M. October 26, 2022)(Browning, J.)*, aff'd*, No. 23-2000, 2024 WL 33901 (10th Cir. January 3, 2024)("Calvert-Cata"), the Court holds, in a revocation context, that it may consider and rely upon out-of-court statements if those statements are admissible under the Federal Rules of Evidence and Crawford v. Washington, 541 U.S. 36 (2004)("Crawford"),

without evaluating separately those statements' reliability.  See 2022 WL 14813473, at *12.  The Court reasons that, "because evidentiary standards for revocation hearings are supposed to be more inclusive and flexible than trials," it "makes no sense to require the United States to" clear hurdles that are not there at trial.  Calvert-Cata, 2022 WL 14813473, at *12.

Here, the Court concludes that the same principles apply and that, in a sentencing context, it may consider and rely upon out-of-court statements that are admissible under the Federal Rules of Evidence without evaluating separately those statements' reliability.  Like revocation hearings, sentencing hearings are supposed to have more inclusive and flexible evidentiary standards than trials.  For example, at sentencing, district courts use a preponderance of the evidence standard to resolve factual disputes and apply sentencing enhancements.  See United States v. Olsen, 519 F.3d 1096, 1105 (10th Cir. 2008); United States v. Magallanez, 408 F.3d 672, 685 (10th Cir. 2005).  Similarly, a district court may "revoke supervised release after concluding that the defendant violated a condition of probation by a preponderance of the evidence."  United States v. Hykes, 653 F. Supp. 3d 913, 926 (D.N.M. 2022)(Browning, J.)(citing 18 U.S.C. § 3583(e)).  Also, a district court may consider, for both sentencing and revocation, out-of-court statements that are not admissible at trial.  See U.S.S.G. § 6A1.3; Fed. R. Crim. P. 32.1(b)(2)(C).  Moreover, the standard for considering an out-of-court statement at sentencing is lower than the standard for considering an out-of-court statement at revocation.  At sentencing, a district court need only determine that the statement has "sufficient indicia of reliability to support its probable accuracy."  U.S.S.G. § 6A1.3.  See United States v. Dazey, 403 F.3d 1147, 1177 n.7 (10th Cir. 2005).  At revocation, a district court must weigh the statement's reliability and the defendant's interest in cross-examination against the United States' explanation for not presenting a witness.  See United States v. Jones, 818 F.3d 1091, 1099-1100 (10th Cir. 2016); United States v. Murphy, 769 F. App'x 631, 633-34 (10th Cir. 2019).  Given that it is easier to consider an inadmissible out-of-court statement at sentencing, it makes sense to apply the Court's reasoning in United States v. Calvert-Cata to sentencing; if the Court can consider admissible out-of-court statements at revocation without evaluating separately whether those statements are reliable, then the Court can do the same at sentencing, where the evidentiary hurdle is lower.

United States v. Murphy, 769 F. App'x 631, 633-34 (10th Cir. 2019), is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit states:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored.  However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that United States v. Murphy, 769 F. App'x 631, 633-34 (10th Cir. 2019), United States v. Ayon, 226 F. App'x 834 (10th Cir. 2007), and United States v. Hendrickson, 592 F. App'x 699, 705 (10th Cir. 2014), have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

reliability.'"  United States v. Ayon, 226 F. App'x 834, 840 (10th Cir. 2007)(unpublished)(quoting

United States v. Fennell, 65 F.3d 812, 813 (10th Cir. 1995)).

Faye Janzad owns and operates Veterans Independent Living of Albuquerque ("VILA"), a

nonprofit company providing various social services to veterans in Albuquerque, New Mexico.

See PSR ¶ 6, at 3.  T.H., now deceased, is one of the individuals for whom Janzad cared.  See PSR

¶ 7, at 3.  T.H. was a Vietnam veteran who never entered combat because of psychological issues.

See PSR ¶ 8, at 4.  The United States Marine Corps honorably discharged T.H. and T.H. began

collecting disability income because he suffered from post-traumatic stress disorder, tinnitus, and

hearing loss.  See PSR ¶ 8, at 4.  He also was diagnosed with non-service-related illnesses such as

organic brain syndrome, depressive neurosis, and having an emotionally unstable personality.  See

PSR ¶ 8, at 4.  Because of his conditions' severity, the VA deems him incompetent in 2001.  See

PSR ¶ 8, at 4.  Because the VA had rated him as one-hundred-percent disabled, he received

approximately $4,000.00 monthly in VA benefits.  See PSR ¶ 8, at 4.

Ultimately, T.H. found his way to VILA under Janzad's care.  See PSR ¶ 9, at 4.  Upon the

death of T.H.'s former fiduciary in 2017, Janzad agrees to take over as T.H.'s fiduciary.  See PSR

¶ 9, at 4.  On January 8, 2018, Janzad signs a standard VA fiduciary agreement, in which she agrees

to receive and manage T.H.'s money for his benefit.  See PSR ¶ 9, at 4.  The initial misappropriation

-- which forms the factual basis of Counts 1 and 2 -- occurs in March, 2019, when Janzad fails to

deposit $163,363.03 of T.H.'s money into his designated account, but instead deposits the money

into the VILA general account.  See PSR ¶ 11, at 4.

This conduct went unnoticed until August, 2018, when the VA began looking into Janzad's

conduct as a fiduciary.  See PSR ¶ 12, at 4.  The VA began an initial investigation, because of

Janzad's failure to provide the VA with proof of a compliant surety bond.  See PSR ¶ 12, at 4. On November 27, 2018, following the VA's determination that Janzad had misused T.H.'s benefits, the VA selects Guiding Star to replace her as his fiduciary.  See PSR ¶ 15, at 5.  Despite this determination, Janzad works with a law firm to create and record a document that purports to be an agreement between VILA and T.H. that provides that T.H. pays $163,363.03 in exchange for a mortgage interest in certain property along with repayments of a four-percent interest rate.  See PSR ¶ 16, at 5.  On January 3, 2019, Janzad submits to the VA an Annual Fiduciary Statement of Account regarding T.H.'s money.  See PSR ¶ 19, at 6.  That statement -- which forms Counts 3 and 4's factual basis -- fails to acknowledge the $163,363.03 that T.H. had when he entered Janzad's fiduciary care, any mortgage interest T.H. may have had in the property, or any income from mortgage payments.  See PSR ¶ 19, at 6.

Janzad also generates two documents that allegedly outline her agreement with T.H.  See PSR ¶ 24, at 7.  The first is entitled "Life Care Contract," and states Janzad deposits T.H.'s $163,262.03 into VILA's general operating account and authorizes Janzad to use the funds in accordance with T.H.'s care needs.  See PSR ¶ 25, at 7.  The second document is titled "Transcription from [T.H.] Understanding Recording, January 2-19."  PSR ¶ 26, at 7.  In that document, Janzad has T.H. ratify the mortgage transaction, which he does with the understanding that Janzad use the money for improvements to one of VILA's housing facilities located on Holiday Avenue.  See PSR ¶ 26, at 8.  Ultimately, the VA determines that Janzad uses T.H.'s money to operate VILA.  See PSR ¶ 30, at 9.  A financial analysis reveals that about $35,000.00 goes to the first mortgage on the property which Janzad supposedly mortgages to T.H., $27,000.00 goes to unknown payees in the form of cashier's checks, and the rest of the money goes to regular expenses

such as paying staff.  <u>See</u> PSR ¶ 30, at 9.  This conduct ultimately leads to the four-count indictment filed March 21, 2023.  <u>See</u> PSR ¶ 1, at 3; <u>See</u> Indictment at 1.

Before trial, Janzad attempts to obstruct the administration of justice by attempting to bribe a witness.  <u>See</u> PSR ¶ 32, at 9.  A week before trial, Janzad contacted a witness, E.G., and offered to help her renovate her home or pay off her mortgage.  <u>See</u> PSR ¶ 32, at 9.  Given that Janzad had not made any such offer earlier than the week before trial, and her offer is disproportionate to E.G.'s one-day-a-week employment at VILA, E.G. interpreted this as a bribe in exchange for favorable testimony.  <u>See</u> PSR ¶ 32, at 9.

The United States also identifies a man, R.P., as having important information.  <u>See</u> PSR ¶ 33, at 10.  Like T.H., R.P. is another veteran with cognitive impairments.  <u>See</u> PSR ¶ 33, at 10.  Janzad -- as R.P.'s power of attorney -- uses mortgage loans and a cash-out refinance to take hundreds of thousands of dollars from R.P.  <u>See</u> PSR ¶ 33, at 10.  Approximately three years after these incidents, in 2023, Janzad and R.P. enter into a confidential settlement agreement in which Janzad agrees to compensate R.P. for $230,000.00 and pay off the mortgage she causes him to take.  <u>See</u> PSR ¶ 33, at 10.

## PROCEDURAL BACKGROUND

On March 21, 2023, the federal Grand Jury indicts Janzad for "Counts 1-2: Fiduciary Misappropriation" and "Counts 3-4: False Statements."  PSR ¶ 1, at 3.  On August 5, 2024, a petit jury found Janzad guilty for both "Counts 1-2: Fiduciary Misappropriation" in violation of 38 U.S.C. § 6101 and "Counts 3-4: False Statements" in violation of 18 U.S.C. § 1001(a)(2).  PSR ¶ 2, at 3.  On April 5, 2023, the Honorable Karen B. Molzen, United States Magistrate Judge for the United States District Court for the District of New Mexico, placed Janzad on pretrial supervision with all standard conditions of release.  <u>See</u> PSR ¶ 3, at 3.

On January 30, 2025, the United States Parole Office ("USPO") files the PSR, which applies a 16-level enhancement.  See PSR ¶ 51, at 13.  On May 25, 2025, Janzad files the Objections, which raises ten objections to the PSR.  See Objections at 1-15.  Janzad's first Objection is that PSR ¶¶ 1, 2, 11, at 3-4, incorrectly characterizes her offense as a misappropriation or embezzlement of funds by a fiduciary.  See Objections at 10.  She states that, the United States' statement of election specifically disclaims any effort to show that Janzad embezzles money for her benefit; thus, to prevent mischaracterization of the offense as "theft," she requests that the PSR refer to the offense as the misuse of funds by a fiduciary.  Objections at 10.  Janzad's second Objection is a request that PSR ¶ 12, at 4, reflect that she provided the VA with proof of a surety bond.  See Objections at 10.  Janzad's third Objection is that PSR ¶¶ 29, 31, at 8-9, incorrectly concludes that Janzad's behavior is evidence of a pattern of dishonesty.  See Objections at 11. Janzad argues that her acts are a product of a "grandiose delusional disorder," rather than dishonesty.  Objections at 11.  Janzad's fourth Objection is that PSR ¶¶ 32, 47, at 9, 13, improperly applies a 2-level enhancement for Janzad's attempt to obstruct justice in her communication with defense witness E.G.  See Objections at 12.  She asserts that, while she offers to help E.G., those offers were not contingent on E.G. testifying in a certain manner.  See Objections at 12.  Janzad's fifth Objection is that PSR ¶ 33, at 10, is misleading, because R.P.'s lawsuit does not include accusations of fraud or elder abuse as the PSR suggests.  See Objections at 13.  Janzad's sixth Objection is that PSR ¶¶ 36, 44, at 11, 12, incorrectly applies a 2-level enhancement for Janzad's offense involving sophisticated means.  See Objections at 13.  Janzad asserts that her offense does not involve sophisticated means, because she employs "shoddy and ineffectual means with a profound lack of attention to detail."  Objections at 13.  Janzad's seventh Objection is that the USPO should give her credit in the PSR for accepting responsibility for her wrongful conduct.  See

Objections at 13.  Janzad's eighth Objection is that the PSR improperly applies a 10-level enhancement for the loss of over $163,000.00, because T.H. did not suffer any loss or pecuniary harm as the Guidelines define loss, and, even if he suffered loss, the Court should reduce loss by the value of lawful services Janzad provides.  See Objections at 14.  Janzad's ninth Objection is that the PSR ¶ 45, at 12, improperly applies a 2-level enhancement for T.H. being a vulnerable victim.  See Objections at 14.  She argues that T.H. is not vulnerable, because he was not deemed incompetent in his criminal cases and voiced only satisfaction with Janzad's care.  See Objections at 15.  Janzad's tenth Objection is that there should not be a 2-level enhancement for an abuse of position of trust under § 3B1.3, because it improperly would double count an element of the offense charged under 38 U.S.C. § 6101.  See Objections at 15.

On May 30, 2025, the USPO responds to the Objections.  See Addendum to the Presentence Report at 1, filed May 30, 2025 (Doc. 139)("PSR Addendum").  Regarding Janzad's first Objection, the USPO disagrees that the language should be changed in ¶¶ 1 and 2, at 3, because both the statute of conviction and the Indictment in this case identify a violation of 38 U.S.C. § 6101 as "Misappropriation by Fiduciaries" or "Fiduciary Misappropriation."  PSR Addendum at 1.  As to ¶ 11, at 4, the USPO states it will change the word "embezzlement" in the first sentence if the Court orders the USPO to make the change.  PSR Addendum at 1.  Regarding Janzad's second Objection, the USPO agrees to add Janzad's articulated version of events as the defendant's version and notes that the addition does not have a bearing on her offense level.  See PSR Addendum at 2.  Regarding Janzad's third Objection, the USPO maintains that Janzad's conduct evidences a pattern of dishonesty, because there is a pattern of taking advantage of T.H., and because Janzad's grandiose delusional disorder appears to be a self-diagnosis.  See PSR Addendum at 2.  Regarding Janzad's fourth Objection, the USPO maintains the obstruction-of-justice

enhancement, because Janzad contacts E.G. and offers to help her renovate her home or pay off her mortgage -- an offer that Janzad had not discussed with E.G. until the week before trial. See PSR Addendum at 2. Regarding Janzad's fifth Objection, the USPO despite having no impact on the offense level, maintains that Janzad's interactions with R.P. should stay in the PSR, because it shows a pattern of abusive conduct. See PSR Addendum at 3. Regarding Janzad's sixth Objection, the USPO maintains the sophisticated means enhancement is appropriate, because the offense involved complex and intricate conduct pertaining to the execution of the offense. See PSR Addendum at 4. Regarding Janzad's seventh Objection, the USPO concludes that a reduction for acceptance of responsibility is improper, because Janzad refuses to admit the conduct comprising her offenses such that reduction would be appropriate under the Guidelines. See PSR Addendum at 4. Regarding Janzad's eighth Objection, the USPO states that it does not apply the loss enhancement because T.H. suffered substantial financial hardship; rather, the USPO applies it because T.H. incurs a loss of over $163,000.00. See PSR Addendum at 5. As for the reduction based on the value of lawful services that Janzad provides, the USPO has no information on what that figure might be. See PSR Addendum at 5. Regarding Janzad's ninth Objection, the USPO maintains the vulnerable-victim enhancement is appropriate, because T.H. had several mental health diagnoses that ultimately led to the VA rating him one-hundred-percent disabled. See PSR Addendum at 5. Regarding Janzad's tenth Objection, the USPO maintains the position-of-public-or-private-trust enhancement is appropriate, because Janzad's base offense level and specific offense characteristics do not account for her fiduciary breach. See PSR Addendum at 6.

On June 2, 2025, the United States responds to the Objections. See United States' Response to Defendant's Sentencing Memorandum at 1, filed June 2, 2025 (Doc. 143)("Objections Response"). First, regarding Janzad's contention that she healed T.H., the United States disagrees.

See Objections Response at 1. The United States asserts that Janzad's story about healing T.H. is a self-serving fiction intended to cast herself as a hero when the reality is she took his money and tried to hide it. See Objections Response at 2. Second, the United States argues that the 10-level increase for a monetary loss that falls between $150,000 and $250,000 is appropriate, because the "Life Care Contract" is a farce. Objections Response at 2. The United States maintains that the Court should not deduct the services that Janzad provides to T.H. from the total monetary loss, because T.H. received nothing in exchange for the "Life Care Contract," and his successor fiduciaries still paid VILA every month for his care. Objections Response at 4. Finally, the United States maintains that a downward departure because of any delusional disorder is inappropriate. See Objections Response at 5. The United States asserts that any delusional disorder is self-diagnosed and a refusal to accept any accountability. See Objections Response at 5.

### LAW REGARDING OBJECTIONS TO A PRESENTENCE REPORT

Before the court imposes a sentence, the USPO "must conduct a presentence investigation and submit a report to the court . . . ." Fed. R. Crim. P. 32(c)(1). A PSR must apply the advisory sentencing Guideline, meaning that it must:

    (A)    identify all applicable guidelines and policy statements of the Sentencing Commission;

    (B)    calculate the defendant's offense level and criminal history category;

    (C)    state the resulting sentencing range and kinds of sentences available;

    (D)    identify any factor relevant to:

        (i)    the appropriate kind of sentence, or

        (ii)    the appropriate sentence within the applicable sentencing range; and

        (iii)    identify any basis for departing from the applicable sentencing range.

Fed. R. Crim. P. 32(d)(1).  A PSR also must provide additional information, including:

    (A)    the defendant's history and characteristics, including:

        (i)    any prior criminal record;

        (ii)    the defendant's financial condition; and

        (iii)    any circumstances affecting the defendant's behavior that may be helpful in imposing sentence or in correctional treatment;

    (B)    information that assesses any financial, social, psychological, and medical impact on any victim;

    (C)    when appropriate, the nature and extent of nonprison programs and resources available to the defendant;

    (D)    when the law provides for restitution, information sufficient for a restitution order;

    (E)    if the court orders a study under 18 U.S.C. § 3552 (b), any resulting report and recommendation;

    (F)    a statement of whether the government seeks forfeiture under Rule 32.2 and any other law; and

    (G)    any other information that the court requires, including information relevant to the factors under 18 U.S.C. § 3553(a).

Fed. R. Crim. P. 32(d)(2).

After the USPO files a PSR, the parties have an opportunity to object to the report.  See Fed. R. Crim. P. 32(f).  Parties must make their objections in writing within fourteen days of receiving the PSR.  See Fed. R. Crim. P. 32(f)(1).  Parties may object to many aspects of the PSR, "including objections to material information, sentencing guideline ranges, and policy statements contained in or omitted from the report."  Fed. R. Crim. P. 32(f)(1).  For example, a party can object to a PSR's statement of facts.  See, e.g., United States v. Garcia, No. CR 20-1370 KWR, 2022 WL 2341670 (D.N.M. June 29, 2022)(Riggs, J.)(sustaining in part and overruling in part a defendant's objections that a PSR misstates material facts regarding the posted speed limit, and

the circumstances surrounding the victim's injuries).  If a party makes a factual objection, it must present "information to cast doubt on" the PSR's recitation of the facts.  United States v. Yates, 22 F.3d 981, 989 (10th Cir. 1994).  A party also can object that the USPO miscalculates a defendant's criminal history category.  See, e.g., United States v. Chavez, No. CR 18-0836 JB, 2018 WL 6621283 (D.N.M. December 18, 2018)(Browning, J.)(addressing a defendant's objections that the Court should reduce his criminal history score by several points).  Similarly, a party can object that a PSR impermissibly applies a base-offense-level enhancement, see, e.g., United States v. Casias-Grove, No. CR 22-0109 JB, 2022 WL 17830249 (D.N.M. December 21, 2022)(Browning, J.)(sustaining a defendant's objection that the PSR impermissibly applies a 4-level enhancement to his base offense level); that the PSR should apply an additional base-offense-level enhancement, see, e.g., United States v. Talk, No. CR 19-1994 JB, 2021 WL 1978624 (D.N.M. May 18, 2021)(Browning, J.)(sustaining the United States' objection that the PSR should apply a 4-level enhancement to the defendant's base offense level); or that the PSR should  apply a base offense level decrease, see, e.g., United States v. Pena, No. CR 19-3609 JB, CR 19-3611 JB, 2022 WL 16924000 (D.N.M. November 13, 2022)(Browning, J.)(sustaining the parties' objections that the PSR should apply a 2-level reduction to the defendant's base offense level).

Ideally, the parties and the USPO can work through objections without the Court's assistance.  Rule 32(f)(3) establishes: "After receiving objections, the probation officer may meet with the parties to discuss the objections.  The probation officer may then investigate further and revise the presentence report as appropriate."  Fed. R. Civ. P. 32(f)(3).  In keeping with rule 32(f)(3), long ago in the District of New Mexico, the Court, the United States Attorney's Office, and the Federal Public Defender's Office agreed that, if there are objections, counsel first will talk to the USPO and see if they can work to address the objections informally and with the Court's

approval.  If the parties and the USPO cannot work out an objection, then the parties may file an objection with the Court.  If the parties and the USPO cannot resolve an objection, rule 32(g) establishes that, "[a]t least 7 days before sentencing, the probation officer must submit to the court and to the parties the presentence report and an addendum containing any unresolved objections, the grounds for those objections, and the probation officer's comments on them."  Fed. R. Crim. P. 32(g).

If the parties and the USPO cannot resolve an objection on their own, the Court "must . . . rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing."  Fed. R. Crim. P. 32(i)(3)(B).  When resolving factual objections, the court must determine whether the United States has met its burden of proving disputed facts by a preponderance of the evidence. See United States v. Munoz-Tello, 531 F.3d 1174 (10th Cir. 2008).  Similarly, in considering objections to enhancements to a defendant's criminal history category or base offense level, the court must determine whether the United States has met its burden of showing that a particular enhancement applies by a preponderance of the evidence.[3] See United States v. Cervantes-Chavez, 59 F. Supp. 3d 1295, 1315 (D.N.M. 2014)(Browning, J.).  The court may base its conclusion "on evidence presented at trial, undisputed statements in the PSR, and evidence presented at the sentenc[ing] hearing."  United States v. Garcia, 2022 WL 2341670, at *2 (quoting United States v. White, 663 F.3d 1207, 1216 (11th Cir. 2011)).

---

[3]There is some nuance regarding the applicable burden of proof required for sentencing enhancements, which the Court discusses in greater detail in the next section.

**LAW REGARDING THE BURDEN OF PROOF FOR ENHANCEMENTS UNDER THE GUIDELINES**

In Apprendi v. New Jersey, 530 U.S. 466 (2000), the Supreme Court of the United States reaffirms the principle that it is permissible for sentencing judges "to exercise discretion -- taking into consideration various factors relating both to offense and offender -- in imposing judgment within the range prescribed by statute." 530 U.S. at 481 (emphasis in original). The Supreme Court cautions, however, that the Constitution of the United States of America limits this discretion and that the Sixth Amendment to the Constitution requires that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Apprendi v. New Jersey, 530 U.S. at 490. In Blakely v. Washington, 542 U.S. 296 (2004), the Supreme Court elaborates on its holding in Apprendi v. New Jersey, stating that the "'statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." Blakely v. Washington, 542 U.S. at 303 (emphasis in original)(citing Ring v. Arizona, 536 U.S. 584, 602 (2002); Harris v. United States, 536 U.S. 545, 563 (2002)(plurality opinion), overruled by Alleyne v. United States, 570 U.S. 99 (2012)). In United States v. Booker, however, the Supreme Court holds that, because the sentencing guideline ranges are no longer mandatory, "Apprendi does not apply to the present advisory-Guidelines regime." United States v. Ray, 704 F.3d 1307, 1314 (10th Cir. 2013)(citing United States v. Booker, 543 U.S. 220, 259 (2005)). See United States v. Booker, 543 U.S. at 259 ("[W]ithout this provision [of the Guidelines statute] -- namely, the provision that makes 'the relevant sentencing rules . . . mandatory and impose[s] binding requirements on all sentencing judges' -- the statute falls outside the scope of Apprendi's requirement." (quoting United States v. Booker, 543 U.S. at 221)(United States v. Booker adds second alteration)). More recently, the

Supreme Court holds that the Apprendi v. New Jersey requirements apply to facts that increase a defendant's mandatory minimum sentence. See Alleyne v. United States, 570 U.S. at 103.

In United States v. Magallanez, 408 F.3d 672 (10th Cir. 2005), the Tenth Circuit holds that Blakely v. Washington and United States v. Booker do not change the district court's enhancement findings analysis. See United States v. Magallanez, 408 F.3d at 684-85. United States v. Magallanez involves plain-error review of a drug sentence in which a jury finds the defendant guilty of conspiracy to possess with intent to distribute and conspiracy to distribute methamphetamine. See 408 F.3d at 676. As part of its verdict, the jury, through a special interrogatory, attributes to the defendant 50 to 500 grams of methamphetamine; at sentencing, however, the judge -- based on the testimony of the United States' witnesses about the various amounts that they had sold to the defendant -- attributes 1,200 grams of methamphetamine to the defendant and uses that amount to calculate his sentence under the Guidelines. See United States v. Magallanez, 408 F.3d at 682. The district court's findings increase the defendant's Guidelines sentencing range from 63 to 78 months, based on the jury's 50 grams amount, to 121 to 151 months, based on the judge's 1,200 grams amount. See United States v. Magallanez, 408 F.3d at 682-83. On appeal, the Tenth Circuit states that, both before and after Congress' passage of the "Sentencing Reform Act, sentencing courts maintained the power to consider the broad context of a defendant's conduct, even when a court's view of the conduct conflicted with the jury's verdict." United States v. Magallanez, 408 F.3d at 684. Although United States v. Booker makes the Guidelines ranges "effectively advisory," United States v. Booker, 543 U.S. at 245, the Tenth Circuit reaffirms that "district courts are still required to consider Guideline ranges, which are determined through application of the preponderance standard, just as they were before," United States v. Magallanez, 408 F.3d at 685.

The Tenth Circuit, while "recognizing 'strong arguments that relevant conduct causing a dramatic increase in sentence ought to be subject to a higher standard of proof,'" has "long held that sentencing facts in the 'ordinary case' need only be proven by a preponderance." United States v. Olsen, 519 F.3d 1096, 1105 (10th Cir. 2008)(quoting United States v. Washington, 11 F.3d 1510, 1516 (10th Cir. 1993)).[4] "[T]he application of an enhancement . . . does not implicate the Supreme Court's holding in Apprendi v. New Jersey." United States v. Reyes-Vencomo, No. CR 11-2563 JB, 2012 WL 2574810, at *7 (D.N.M. June 26, 2012)(Browning, J.). The Tenth Circuit applies Apprendi v. New Jersey's requirement that a fact be submitted to a jury only where

_____

[4]Although the Tenth Circuit states in United States v. Washington that "the issue of a higher than a preponderance standard is foreclosed in this circuit," 11 F.3d at 1516, the Tenth Circuit since characterizes its holding as leaving "open the possibility that due process may require proof by clear and convincing evidence before imposition of a Guidelines enhancement that increases a sentence by an 'extraordinary or dramatic' amount," United States v. Ray, 704 F.3d at 1314 (quoting United States v. Olsen, 519 F.3d at 1105). See United States v. Olsen, 519 F.3d at 1105 (affirming the use of the preponderance-of-the-evidence standard for sentencing facts that increase a sentence in the "'ordinary case'" (quoting United States v. Washington, 11 F.3d at 1516)). The Tenth Circuit has not found yet that an "extraordinary or dramatic" instance warrants a higher standard of proof for certain facts that enhance a defendant's sentence. United States v. Olsen, 519 F.3d at 1105 (explaining that it need not determine whether a higher standard of proof is necessary to sentence a defendant for committing perjury in relation to a grand jury investigation, because the enhancement does not require the district court to determine that the defendant committed murder, but only that he obstructed a homicide investigation). See United States v. Constantine, 263 F.3d 1122, 1125 n.2 (10th Cir. 2001)(affirming a preponderance-of-the-evidence standard for facts that enhance a defendant's offense level 4 levels); United States v. Valdez, 225 F.3d 1137, 1143 n.2 (10th Cir. 2000)(rejecting the defendant's argument that a dramatic increase in a sentence because of a sentencing judge's finding of additional amounts of methamphetamine associated with acquitted charges entitles the defendant to a clear-and-convincing evidence standard at sentencing, and noting that the Tenth Circuit "foreclosed by binding precedent" this argument); United States v. Washington, 11 F.3d at 1516 (concluding that a district court need not find by any more than a preponderance of the evidence the amount of cocaine a defendant distributes, even though its findings increase the defendant's sentence from twenty years to consecutive forty-year terms). Subsequent to United States v. Washington, the Tenth Circuit reiterates the position that preponderance of the evidence is the proper standard, stating: "The Supreme Court has not adopted a heightened standard of proof at sentencing for contested facts, thus we hold that the correct standard of proof in this case was a preponderance of the evidence. This issue has been foreclosed in this Circuit." United States v. Robertson, 946 F.3d 1168, 1171 (10th Cir. 2020)(citing United States v. Constantine, 263 F.3d 1122, 1125 n.2 (10th Cir. 2001)).

the fact would increase a defendant's sentence "above the statutory maximum permitted by the statute of conviction." United States v. Price, 400 F.3d 844, 847 (10th Cir. 2005). Accord United States v. Ray, 704 F.3d at 1314. A defendant may assert an error under Apprendi v. New Jersey only where the fact at issue increases his or her sentence beyond the statutory maximum. See United States v. O'Flanagan, 339 F.3d 1229, 1232 n.2 (10th Cir. 2003)(holding that a defendant could not assert an error under Apprendi v. New Jersey, because "his sentence does not exceed the statutory maximum"); United States v. Hendrickson, 592 F. App'x 699, 705 (10th Cir. 2014)(unpublished)(holding that, after Alleyne v. United States, "[i]t is well-established that sentencing factors need not be charged in an indictment and need only be proved to the sentencing judge by a preponderance of the evidence"). The Court has noted:

> [A]lthough the decision of the Supreme Court of the United States in Alleyne v. United States . . . expands the rule from Apprendi v. New Jersey, . . . (holding that facts that increase the maximum sentence a defendant faces must be proven to a jury beyond a reasonable doubt), to cover facts that increase the mandatory minimum sentence, as well as the maximum sentence, it does not prohibit district judges from continuing to find advisory sentencing factors by a preponderance of the evidence. See [United States v. Sangiovanni, No. CR 10-3239 JB,] 2014 WL 4347131, at *22-26 [(D.N.M. August 29, 2014)(Browning, J.)].

United States v. Cervantes-Chavez, 59 F. Supp. 3d at 1315. The Supreme Court clarifies that "[b]oth the 'floor' and 'ceiling' of a sentencing range 'define the legally prescribed penalty.' . . . And under our Constitution, when 'a finding of fact alters the legally prescribed punishment so as to aggravate it,' that finding must be made by a jury of the defendant's peers beyond a reasonable doubt." United States v. Haymond, 588 U.S. 634, 645 (2019)(quoting Alleyne v. United States, 570 U.S. at 112-14). Further, the Tenth Circuit states that a district court can use its own finding on drug quantity to enhance a defendant's Guidelines range consistent with Alleyne v. United States "so long as the court does not use its own drug quantity finding to alter

the defendant's <u>statutory</u> sentencing range." <u>United States v. Cassius</u>, 777 F.3d 1093, 1094 (10th

Cir. 2015)(emphasis in original).

**LAW REGARDING DOWNWARD DEPARTURE BECAUSE OF REDUCED MENTAL**
**CAPACITY**

U.S.S.G. § 5K2.13 provides the following policy statement:

> A downward departure may be warranted if (1) the defendant committed the
> offense while suffering from a significantly reduced mental capacity; and (2) the
> significantly reduced mental capacity contributed substantially to the commission
> of the offense. Similarly, if a departure is warranted under this policy statement, the
> extent of the departure should reflect the extent to which the reduced mental
> capacity contributed to the commission of the offense.

> However, the court may not depart below the applicable guideline range if (1) the
> significantly reduced mental capacity was caused by the voluntary use of drugs or
> other intoxicants; (2) the facts and circumstances of the defendant's offense indicate
> a need to protect the public because the offense involved actual violence or a serious
> threat of violence; (3) the defendant's criminal history indicates a need to
> incarcerate the defendant to protect the public; or (4) the defendant has been
> convicted of an offense under chapter 71, 109A, 110, or 117, of title 18, United
> States Code.

U.S.S.G. § 5K2.13. Application note 1 to U.S.S.G. § 5K2.13 provides that, for purposes of this

policy statement, "'significantly reduced mental capacity' means the defendant, although

convicted, has a significantly impaired ability to (A) understand the wrongfulness of the behavior

comprising the offense or to exercise the power of reason; or (B) control behavior that the

defendant knows is wrongful." U.S.S.G. § 5K2.13 cmt n. 1. Diminished capacity is an

"encouraged" factor - a specific factor that the Commission provides "'to aid the court by

identifying some of the factors that the Commission has not been able to take into account fully in

formulating the guidelines.'" <u>United States v. Neal</u>, 249 F.3d 1251, 1256 (10th Cir.2001)(citing

U.S.S.G. § 5K2.0). In the case of an encouraged factor, "the court is authorized to depart if the

applicable Guideline does not already take it into account." <u>United States v. Neal</u>, 249 F.3d at

1256.  Accord United States v. Trejo-Lara, No. CR 07-1456, 2008 WL 2397672, at *2 (D.N.M.

Jan. 30, 2008)(Browning, J.).

## LAW REGARDING THE OBSTRUCTION-OF-JUSTICE ENHANCEMENT

U.S.S.G. § 3C1.1 states:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.

U.S.S.G. § 3C1.1.  The Application Notes state: "Obstructive conduct that occurred prior to the start of the investigation of the instant offense of conviction may be covered by this guideline if the conduct was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction."  U.S.S.G. § 3C1.1, Application Note 1.

The application notes to § 3C1.1 provide a non-exhaustive list of conduct that warrants the upward adjustment.  See U.S.S.G. § 3C1.1, Application Note 4.

> 4.    Examples of Covered Conduct. -- The following is a non-exhaustive list of examples of the types of conduct to which this enhancement applies:
>
> (A)    threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so;
>
> (B)    committing, suborning, or attempting to suborn perjury, including during the course of a civil proceeding if such perjury pertains to conduct that forms the basis of the offense of conviction;
>
> (C)    producing or attempting to produce a false, altered, or counterfeit document or record during an official investigation or judicial proceeding;
>
> (D)    destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding (e.g., shredding a document or destroying ledgers upon learning that an

official investigation has commenced or is about to commence), or attempting to do so . . .

(E)     escaping or attempting to escape from custody before trial or sentencing; or willfully failing to appear, as ordered, for a judicial proceeding;

(F)     providing materially false information to a judge or magistrate judge;

(G)     providing a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense;

(H)     providing materially false information to a probation officer in respect to a presentence or other investigation for the court;

(I)     other conduct prohibited by obstruction of justice provisions under Title 18, United States Code (e.g., 18 U.S.C. §§ 1510, 1511);

(J)     failing to comply with a restraining order or injunction issued pursuant to 21 U.S.C. 853(e) or with an order to repatriate property issued pursuant to 21 U.S.C. 853(p);

(K)     threatening the victim of the offense in an attempt to prevent the victim from reporting the conduct constituting the offense of conviction.

U.S.S.G. § 3C1.1 Application Note 4.

The application note also lists a number of acts that do not normally trigger the enhancement.

5.     Examples of Conduct Ordinarily Not Covered. -- Some types of conduct ordinarily do not warrant application of this adjustment, but may warrant a greater sentence within the otherwise applicable guideline range or affect the determination of whether other guideline adjustments apply (e.g., § 3E1.1 (Acceptance of Responsibility)). . . .

The following is a non-exhaustive list of examples of the types of conduct to which this application note applies:

(A)     providing a false name or identification document at arrest, except where such conduct actually resulted in a significant

hindrance to the investigation or prosecution of the instant offense;

(B)     making false statements, not under oath, to law enforcement officers, unless Application Note 4(G) above applies;

(C)     providing incomplete or misleading information, not amounting to a material falsehood, in respect to a presentence investigation;

(D)     avoiding or fleeing from arrest (see, however, § 3C1.2) (Reckless Endangerment During Flight);

(E)     lying to a probation or pretrial services officer about defendant's drug use while on pre-trial release, although such conduct may be a factor in determining whether to   reduce the defendant's sentence under § 3E1.1 (Acceptance of Responsibility).

U.S.S.G. § 3C1.1 Application Note 5.

In United States v. Farnsworth, 92 F.3d 1001 (10th Cir. 1996), the Tenth Circuit recognizes that an attempt to influence a witness by instructing the witness to lie warrants an enhancement under § 3C1.1.  See United States v. Farnsworth, 92 F.3d at 1011.  The Tenth Circuit remands the case to the district court, however, because the district court does not make a specific finding as to the issue, instead doing no more than adopting "the analysis of the Probation Department as accurate and correct."  United States v. Farnsworth, 92 F.3d at 1011.  In United States v. Yuselew, No. CR 09-1035 JB, 2010 WL 3834418 (D.N.M. Aug. 5, 2010)(Browning, J.), the Court holds that, "to warrant application of the § 3C1.1 enhancement, the defendant must have deliberately -- not accidentally, incidentally, or mistakenly -- done some act with the specific purpose of thwarting the investigation and prosecution."  United States v. Yuselew, 2010 WL 3834418, at *12.  The Court also concludes that attempts to obstruct justice may be sufficient if the acts are of a kind that likely are to thwart the investigation and eventual prosecution.  See 2010 WL 3834418, at *13.

The enhancement applies even for attempted obstruction of justice if the United States demonstrates that the defendant intends to obstruct justice and that the defendant commits an act which constitutes a substantial step toward the obstruction of justice.  See United States v. Fleming, 667 F.3d at 1107.  Moreover, a "defendant's offense level is enhanced by two levels for attempted obstruction of justice when the Government demonstrates that the defendant: (1) intended to obstruct justice, and (2) committed an act that constitutes a substantial step toward the obstruction of justice."  United States v. Fleming, 667 F.3d at 1107 (citing United States v. Washington, 653 F.3d 1251, 1264 (10th Cir. 2011)).

> A substantial step must be something more than mere preparation, yet may be less than the last act necessary before the actual commission of the substantive crime. . . . Whether a defendant's actions amount to an attempt, and, in particular, whether his actions qualify as a substantial step, is a highly fact-specific inquiry.

United States v. Washington, 653 F.3d at 1264.

## LAW REGARDING THE SOPHISTICATED-MEANS ENHANCEMENT

U.S.S.G. § 3B1.1 provides for enhancements to a defendant's offense level in cases involving larceny, embezzlement, other forms of theft, stolen or damaged property, fraud, forgery, and counterfeiting.  See U.S.S.G. § 2B1.1. Under § 2B1.1(b)(10):

> If (A) the defendant relocated, or participated in relocating, a fraudulent scheme to another jurisdiction to evade law enforcement or regulatory officials; (B) a substantial part of a fraudulent scheme was committed from outside the United States; or (C) the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means, increase by 2 levels. If the resulting offense level is less than level 12, increase to level 12.

U.S.S.G. § 2B1.1(b)(10). For U.S.S.G. § 2B1.1(b)(10)(C), Application Note 9.B states:

> [S]ophisticated means means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. For example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means. Conduct such as hiding assets or transactions, or both, through

the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.

U.S.S.G. § 2B1.1(b)(10) Application Note 9.B.

The Tenth Circuit addresses the enhancement for sophisticated means in the commission of tax evasion in United States v. Rice, 52 F.3d 843 (10th Cir. 1995). In United States v. Rice, the defendant receives a "tax refund based on excessive withholding that was never in fact withheld." 52 F.3d at 845. The district court applies the sophisticated-means enhancement, "in part because [the defendant] contested the IRS' ability to require him to produce documents during the civil phase of his case." 52 F.3d at 849. The Tenth Circuit holds that the defendant's tax evasion scheme is not sophisticated, because it is "the functional equivalent of claiming more in itemized deductions than actually paid." 52 F.3d at 849. In making its holding, the Tenth Circuit notes that, if the defendant's scheme is sophisticated, then "every fraudulent tax return will fall within that enhancement's rubric." 52 F.3d at 849.

By contrast, in United States v. Guidry, 199 F.3d 1150 (10th Cir. 1999), the Tenth Circuit concludes that the district court's application of the sophisticated-means enhancement is appropriate, even though the defendant does not use a sham corporation or offshore bank accounts. See 199 F.3d at 1158. The defendant in United States v. Guidry makes her embezzlement particularly difficult to detect by using checks that are payable to a bank and not to herself, which is harder to trace. See 199 F.3d at 1158. By depositing only a small fraction of her embezzled funds in a bank, the defendant makes it more difficult for the IRS to investigate her conduct. See 199 F.3d at 1158. By never withdrawing more than $10,000.00 in one day, the defendant demonstrates that she knows that depositing any more requires the bank to notify the IRS of the deposit, and thus further demonstrates that she understands how to use sophisticated means to conceal her embezzlement. See 199 F.3d at 1158. The Tenth Circuit holds that using multiple

storage units to hold items purchased with embezzled funds has a similar effect, and that her case is not one of representing to have paid withholding taxes not paid or not disclosing one's income. See United States v. Guidry, 199 F.3d at 1158 (citing United States v. Rice, 52 F.3d at 849; United States v. Stokes, 998 F.2d 279, 282 (5th Cir. 1993)).

Similarly, in United States v. Tilga, 824 F. Supp. 2d 1295 (D.N.M. 2011)(Browning, J.), the Court concludes that an enhancement for the defendant's use of sophisticated means is appropriate when the defendant uses offshore accounts and shell companies to evade taxes by hiding the amount of money she earned. See 824 F. Supp. 2d at 1330-34. The Court explains that the application notes to the Sentencing Guidelines regarding the use of sophisticated means recognizes that the enhancement applies, because of the inherent complexity of the entities a defendant uses, and not because a defendant uses the entities "in an especially complex or novel manner." 824 F. Supp. 2d at 1330-31. Moreover, the Court explains that the caselaw addressing the use of sophisticated means does not require that a defendant create the sophisticated means, but, rather, "[t]here is nothing in the comments or the case law to suggest that a person must create the sophisticated means to qualify for the enhancement." 824 F. Supp. 2d at 1332.

More recently, in United States v. Pangburn, 467 F. Supp. 3d 1103 (D.N.M. 2020) (Browning, J.), the Court declines to apply the U.S.S.G. § 2B1.1(b)(10) enhancement. See 467 F. Supp. 3d at 1114. The defendant in United States v. Pangburn is an office manager at a business in Albuquerque, New Mexico, who uses Quickbooks, a standard accounting software program, to give herself additional payments above her salary. See 467 F. Supp. 3d at 1105. She voids the transactions on Quickbooks to conceal the payments. See 467 F. Supp. 3d at 1105. The defendant pleads guilty to one count of wire fraud. See 467 F. Supp. 3d at 1106. The PSR applies a 2-level enhancement under U.S.S.G. § 2B1.1(b)(10), but the Court does not apply it. See 467 F. Supp. 3d

at 1114.  The Court reasons that the defendant has not used sophisticated means in furtherance of her scheme, because she "did not go to great efforts to execute the fraud, but rather did no more than simply duplicate payments in QuickBooks, a relatively basic accounting program."  467 F. Supp. 3d at 1113.  Similarly, the Court determines that the defendant does not use sophisticated means to conceal her criminal activity, because she does no more than void the transactions on Quickbooks, and a skilled accountant "quickly detected the unauthorized payments."  467 F. Supp. 3d at 1113.

## LAW REGARDING REDUCTIONS FOR THE ACCEPTANCE OF RESPONSIBILITY

The defendant has the burden of proving by a preponderance of the evidence that she is entitled to a reduction for acceptance of responsibility under U.S.S.G. § 3E1.1.  See United States v. Meyers, 95 F.3d 1475, 1486 (10th Cir. 1996); United States v. McMahon, 91 F.3d 1394, 1396-97 (10th Cir. 1996).  The Tenth Circuit reviews "a district court's determination not to grant a reduction for acceptance of responsibility for clear error."  United States v. Ochoa-Olivas, 426 F. App'x 612, 613 (10th Cir. 2011)(citing United States v. Hutchinson, 573 F.3d 1011, 1032 (10th Cir. 2009)).  In reviewing the district court's findings, the Tenth Circuit "remain[s] mindful that '[t]he sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility.  For this reason, the determination of the sentencing judge is entitled to great deference on review.'"  United States v. Ivy, 83 F.3d 1266, 1292-93 (10th Cir. 1996)(quoting U.S.S.G. § 3E1.1, Application Note 5).

U.S.S.G. § 3E1.1 provides:

(a)    If the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels.

(b)    If the defendant qualifies for a decrease under subsection (a), the offense level determined prior to the operation of subsection (a) is level 16 or greater, and upon motion of the government stating that the defendant has assisted authorities

in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently, decrease the offense level by 1 additional level.

U.S.S.G. § 3E1.1. The application notes to U.S.S.G. § 3E1.1(a) indicate that, in deciding whether

to apply an acceptance-of-responsibility reduction, a court can consider:

(A)    truthfully admitting the conduct comprising the offense(s) of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct). Note that a defendant is not required to volunteer, or affirmatively admit, relevant conduct beyond the offense of conviction in order to obtain a reduction under subsection (a). A defendant may remain silent in respect to relevant conduct beyond the offense of conviction without affecting his ability to obtain a reduction under this subsection. However, a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility;

(B)    voluntary termination or withdrawal from criminal conduct or associations;

(C)    voluntary payment of restitution prior to adjudication of guilt;

(D)    voluntary surrender to authorities promptly after commission of the offense;

(E)    voluntary assistance to authorities in the recovery of the fruits and instrumentalities of the offense;

(F)    voluntary resignation from the office or position held during the commission of the offense;

(G)    post-offense rehabilitative efforts (e.g., counseling or drug treatment); and

(H)    the timeliness of the defendant's conduct in manifesting the acceptance of responsibility.

See U.S.S.G. § 3E1.1 Application Note 1.

The § 3E1.1 reduction applies most regularly in cases where a defendant pleas.  U.S.S.G.

§ 3E1.1 Application Note 3 provides:

Entry of a plea of guilty prior to the commencement of trial combined with truthfully admitting the conduct comprising the offense of conviction, and

truthfully admitting or not falsely denying any additional relevant conduct for which he is accountable under § 1B1.3 (Relevant Conduct) (see Application Note 1(A)), will constitute significant evidence of acceptance of responsibility for the purposes of subsection (a). However, this evidence may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility. A defendant who enters a guilty plea is not entitled to an adjustment under this section as a matter of right.

U.S.S.G. § 3E1.1 Application Note 3. Although the § 3E1.1 reduction is most regularly applied in cases where a defendant pleas, see U.S.S.G. § 3E1.1 Application Note 3, the Application Notes clarify that the reduction can apply to a defendant who proceeds to trial in "rare situations":

This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse. Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction. In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct). In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct.

U.S.S.G. § 3E1.1 Application Note 2.

## LAW REGARDING THE MONETARY LOSS ENHANCEMENT

Section 2B1.1 of the United States Sentencing Guidelines guides a court when sentencing a defendant for "Larceny, Embezzlement, and other Forms of Theft; Offenses Involving Stolen Property; Property Damage or Destruction; Fraud and Deceit; Forgery; Offenses Involving Altered or Counterfeit Instruments Other than Counterfeit Bearer Obligations of the United States." U.S.S.G. § 2B1.1.  Part of a court's duty when sentencing under § 2B1.1 is to determine whether the court should increase a defendant's base offense level, because of the amount of loss the offense causes.  See U.S.S.G. § 2B1.1(b)(1) ("If the loss exceeded $5,000, increase the offense level as follows. . . . ").  "The court need only make reasonable estimate of the loss."  U.S.S.G. §

2B1.1, Application Note 3(C).    The Sentencing Guidelines neither proscribe nor prohibit a methodology for a court to use when calculating the "reasonable estimate" of the loss a defendant's conduct caused.    United States v. Erpenbeck, 532 F.3d 423, 433 (6th Cir. 2008)(rejecting a defendant's argument that the court should use the entire value of collateral that he pledges for a legitimate loan to off-set his fraudulent transactions and holding that the court should reduce the pro-rata collateral based upon the ratio of the fraudulent transactions to the underlying, legitimate loan).

Loss is "the greater of actual or intended loss."  U.S.S.G. § 2B1.1, Application Note 3(A). "'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.SG. § 2B1.1, Application Note 3(A)(i). "'Intended loss' . . . means the pecuniary harm that was intended to result from the offense."  U.S.S.G. § 2B1.1, Application Note 3(A)(ii).  "Offense" within the definition either of actual or of intended loss refers to a defendant's relevant conduct, as § 1B1.3 defines that loss.  United States v. Holbert, 285 F.3d 1257, 1261, 1261 n.3 (10th Cir. 2002)(explaining that the Sentencing Guidelines explicitly differentiate between the terms "offense of conviction," which "encompasses only facts immediately related to the specific offense for which the defendant was convicted," and "offense," which "'means offense of conviction and all relevant conduct,'" and that, "[w]hen the Sentencing Commission intends to limit the applicability of a victim-related enhancement" to the offense of conviction, "it does so explicitly") (quoting U.S.S.G. § 1B1.1, Application Note 1(H)); Robert W. Haines, Jr., Frank O. Bowman III, & Jennifer C. Woll, Federal Sentencing Guidelines Handbook § 2B1.1, § 5, at 335 (2012-13 ed.)("Guidelines Handbook")(explaining that the Commission intended for the meaning of "offense" to refer to a defendant's relevant conduct under U.S.S.G. § 1B1.3 and that the omission of a cross-reference to § 1B1.3 in the application notes to § 2B1.1 is of no "substantive

significance," because "the drafters apparently felt that the cross-reference to § 1B1.3 was unnecessary because the relevant conduct rules apply to all offense types"). Additionally, "the Commission makes clear that a loss that 'resulted from' an offense is one that would not have occurred <u>but for</u> the occurrence of the offense," but a defendant's liability is limited to those losses "foreseeable to a reasonable person." <u>Guidelines Handbook</u> § 5, at 334 (emphasis in original)("The loss definition in 2B1.1 . . . insists, as a minimum, that the defendant's offense have been a cause-in-fact of the economic harm at issue.").

When the parties dispute the loss amount, the United States bears the burden of establishing its estimation of loss by a preponderance of the evidence. <u>See</u> <u>Guidelines Handbook</u> § 14, at 353. The Tenth Circuit has ruled, accordingly, that a district court cannot include losses in its calculation under § 2B1.1 until the "Government first . . . prove[s] by a preponderance of the evidence that the conduct giving rise to those losses (1) was a part of Defendant's ongoing scheme . . . and (2) constituted a criminal offense under a federal or state statute." <u>United States v. Kieffer</u>, 681 F.3d 1143, 1168 (10th Cir. 2012). Next, the United States must "prove the amount of loss (or a reasonable estimate thereof) associated with that conduct by a preponderance of the evidence." <u>United States v. Kieffer</u>, 681 F.3d at 1168 (citing <u>United States v. Peterson</u>, 312 F.3d 1300, 1302 (10th Cir. 2002)). For example, in <u>United States v. Chapman</u>, No. CR 11-0904 JB, 2012 WL 2574814 (D.N.M. June 22, 2012)(Browning, J.), the Court determines that an enhancement pursuant to § 2B1.1(b)(1) is not appropriate, because, although the United States contends that a New Mexico Corrections Department facilities manager awarded $4,000,000.00 worth of State government contracts to a developer in exchange for bribes, the United States submits no evidence regarding the profit, if any, the developer receives from the contracts. <u>See</u> 2012 WL 2574814, at *1, 9-10. The Court notes that, without "evidence regarding the value of the benefit Moya received

under these government contracts, the United States cannot establish by a preponderance of the evidence that an . . . enhancement is appropriate" under § 2B1.1(b)(1).  2012 WL 2574814, at *10.

The application notes to § 2B1.1 provide that a court shall reduce the loss by certain credits. First, the court reduces the loss by the "money returned, and the fair market value of the property returned and the services rendered by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected."  U.S.S.G. § 2B1.1, Application Note 3(E)(i).  "[W]hen no actual sales price is available to calculate loss, the Guidelines permit a district court 'to *estimate* loss based on *available* information.'"  United States v. Snow, 663 F.3d 1156, 1161 (10th Cir. 2011)(quoting United States v. James, 592 F.3d 1109, 1116 (10th Cir. 2010))(emphasis in United States Snow but not in United States v. James).  See United States v. Merriman, 647 F.3d 1002 (10th Cir. 2011)("[T]he Guidelines permit a reduction for restoring victims' losses prior to the onset of any government involvement, . . . not . . . when payments are not returned to the victims until after the crime has been discovered by the government and the defendant has . . . motivation to use his ill-gotten gains as leverage. . . .").  The application notes indicate that the court should credit the value returned against the losses which the victim who received the value suffers, and not against a lump sum of total losses where there are more than one victims: for example, in a case involving a Ponzi or other fraudulent investment scheme, value which one investor receives in excess of that investor's principal investment "shall not be used to offset the loss to another individual investor in the scheme."  U.S.S.G. § 2B1.1, Application Note 3(F)(iv).

## LAW REGARDING VULNERABLE-VICTIM ENHANCEMENT

The vulnerable-victim enhancement, U.S.S.G. § 3A1.1(b), provides:

(b)(1)  If the defendant knew or should have known that a victim of the offense was a vulnerable victim, increase by 2 levels.

>    (2)    If (A) subdivision (1) applies; and (B) the offense involved a large number of vulnerable victims, increase the offense level determined under subdivision (1) by 2 additional levels.

U.S.S.G. § 3A1.1(b)(1). Application Note 2 to U.S.S.G. § 3A1.1 explains:

>    For purposes of subsection (b), "vulnerable victim" means a person (A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct); and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct.

>    Subsection (b) applies to offenses involving an unusually vulnerable victim in which the defendant knows or should have known of the victim's unusual vulnerability. The adjustment would apply, for example, in a fraud case in which the defendant marketed an ineffective cancer cure or in a robbery in which the defendant selected a handicapped victim. But it would not apply in a case in which the defendant sold fraudulent securities by mail to the general public and one of the victims happened to be senile. Similarly, for example, a bank teller is not an unusually vulnerable victim solely by virtue of the teller's position in a bank.

>    Do not apply subsection (b) if the factor that makes the person a vulnerable victim is incorporated by the offense guideline. For example, if the offense guideline provides an enhancement for the age of the victim, this subsection would not be applied unless the victim was unusually vulnerable for reasons unrelated to age.

U.S.S.G. § 3A1.1 Application Note 2. "In order to classify a victim as 'vulnerable,' 'the sentencing court must make particularized findings of vulnerability.'" United States v. Brunson, 54 F.3d 673, 676 (10th Cir. 1995)(quoting United States v. Lee, 973 F.2d 832, 834 (10th Cir. 1992)). "The focus of the inquiry must be on the 'victim's personal or individual vulnerability.'" United States v. Brunson, 54 F.3d at 676 (quoting United States v. Lee, 973 F.2d at 835).

"'[V]ulnerable victims' are those who are in need of greater societal protection." United States v. Brunson, 54 F.3d at 676. "Specifically, the enhancement should apply when the victim is 'less able to resist than the typical victim.'" United States v. Scott, 529 F.3d 1290, 1300 (10th Cir. 2008)(quoting United States v. Castaneda, 239 F.3d 978, 980 (9th Cir. 2001)). "Moreover, the vulnerable victim enhancement cannot be based solely on the victim's membership in a certain

class; the sentencing court is required to make particularized findings of vulnerability, focusing on the individual victim and not the class of persons to which the victim belonged." United States v. Smith, 133 F.3d at 749.

In United States v. Janusz, 135 F.3d 1319 (10th Cir. 1998), the Tenth Circuit holds that an enhancement under U.S.S.G. § 3A1.1 is appropriate. See United States v. Janusz, 135 F.3d at 1325. The enhancement is appropriate, because the sentencing court "made specific findings as to the vulnerability of both [of the victims]. [One victim] was bedridden, unable to tend for himself, sick and extremely vulnerable." United States v. Janusz, 135 F.3d at 1325. The other victim "was confused about many things, very susceptible to suggestion from anyone, including the defendant [and] . . . was extremely trusting in many respects." United States v. Janusz, 135 F.3d at 1325. The enhancement is also appropriate, because the sentencing court "found a nexus between [the victims]' vulnerability and the commission of the crimes." United States v. Janusz, 135 F.3d at 1325. The Tenth Circuit comments:

> It would be difficult, indeed, to imagine a stronger nexus. The evidence indicate[s that the defendant] recognized [the victims]' age, wealth, and diminished physical capacity, and believing they would both soon die . . . devised a scheme to separate them from their money by making loans which he would collect for himself after their death.

135 F.3d at 1325. The Tenth Circuit provides that the vulnerable-victim adjustment is warranted where "the defendant selected and targeted this particular victim for the [offense] because of unusual characteristics." United States v. Pearce, 967 F.2d 434, 435 (10th Cir. 1992). The vulnerable-victim adjustment, however, "does not require a finding that the defendant targeted the victim because of the victim's vulnerability." United States v. Checora, 175 F.3d 782, 789 n.4 (10th Cir. 1999). See United States v. Smith, 133 F.3d at 749; United States v. Hardesty, 105 F.3d 558, 560-61 (10th Cir.1997); United States v. Joe, 325 F. Supp. 3d 1226, 1230-31 (D.N.M.

2018)(Browning, J.), aff'd 2019 WL 3956431 (10th Cir. Aug. 22, 2019); United States v. Hubbard,

No. CR 15-0430, 2016 WL 4009826, *4-5 (D.N.M. June 8, 2016)(Browning, J.).

## ANALYSIS

The Court sustains in part and overrules in part the Objections.  First, the Court overrules

Janzad's PSR ¶¶ 1, 2, at 3, Objection, because the jury convicts her of Fiduciary Misappropriation,

but sustains Janzad's PSR ¶ 11, at 4, Objection, because the United States does not pursue

embezzlement charges, see PSR ¶¶ 1, 2, at 3-4.  Second, the Court overrules Janzad's PSR ¶ 12,

at 4, Objection, because the Court concludes that the PSR accurately states the reason why the VA

begins investigating Janzad.  See PSR ¶ 12, at 4.  Third, the Court overrules Janzad's PSR ¶¶ 29,

31, at 8-9, Objection, because a U.S.S.G. § 5K2.13 downward departure is inappropriate if the

defendant is not suffering from a significantly reduced mental capacity.  See PSR ¶¶ 29, 31, at 8-

9.  Fourth, the Court overrules Janzad's Obstruction Enhancement objection, because Janzad's

contact with defense witness E.G. before trial constitutes attempted bribery.  See PSR ¶ 34, at 10.

Fifth, the Court overrules Janzad's PSR ¶ 33, at 10, Objection, because Janzad's interactions with

R.P. demonstrate a pattern of taking advantage of veterans.  See PSR ¶ 33, at 10.  Sixth, the Court

sustains Janzad's Sophisticated-Means Enhancement Objection, because she does not use

sophisticated means either to execute or to avoid detection of the offense.  See PSR ¶ 35, at 10-11.

Seventh, the Court overrules Janzad's Objection that she should receive a sentence reduction for

accepting responsibility, because Janzad has not acted in a manner consistent with the acceptance

of responsibility.  See PSR ¶ 39, at 12.  Eighth, the Court overrules Janzad's Monetary Loss

Enhancement Objection, because T.H. suffers an actual loss when Janzad took over $163,000.00

from him.  See PSR ¶ 43, at 12.  Ninth, the Court overrules Janzad's Vulnerable Victim-

Enhancement-Objection, because T.H.'s mental health diagnoses make him a vulnerable victim.

See PSR ¶ 45, at 12.  Tenth, the Court overrules Janzad's Position-of-Public-or-Private-Trust-Enhancement Objection, because Janzad's fiduciary role placed her squarely in such a position of private trust that contributed significantly to facilitating the commission or concealment of her offense.  See PSR ¶ 46, at 13.

## I.     PSR ¶¶ 1, 2, at 3, ACCURATELY CHARACTERIZE JANZAD'S OFFENSE, WHILE PSR ¶ 11, at 4, IS NOT ACCURATE.

The Court concludes that PSR ¶¶ 1, 2, at 3, accurately characterizes Janzad's offense, because she is convicted of Fiduciary Misappropriation, while PSR ¶ 11, at 4, is not an accurate characterization, because the Government does not seek a conviction on an embezzlement theory. The pertinent language is as follows: "On March 21, 2023, a four-count indictment was filed in United States District Court, District of New Mexico, charging the defendant, Faye Janzad, with Counts 1-2: Fiduciary Misappropriation; and Counts 3-4: False Statements. . . ."  PSR ¶ 1, at 3. "On August 5, 2024, the defendant was found guilty by a jury at trial of all four counts. Counts 1-2 charged Fiduciary Misappropriation, in violation of 38 U.S.C. § 6101; and Counts 3-4 charged False Statements, in violation of 18 U.S.C. § 1001(a)(2)."  PSR ¶ 2, at 3.  "The initial embezzlement, which formed the factual basis of Counts 1 and 2, occurred in March 2018. On March 2018, T.H.'s prior fiduciary company sent Janzad the unspent benefits they had accumulated on his behalf. . . ."  PSR ¶ 11, at 4.

Janzad objects to PSR ¶¶ 1, 2, 11, at 3-4, because they characterize her offense as a misappropriation or embezzlement of funds by a fiduciary.  See Objections at 10.  She contends that this conclusion is improper, because "the Government specifically disclaimed any effort to show that Ms. Janzad embezzled money for her personal benefit."  Objections at 10.  To prevent a mischaracterization of her offense as a theft, Janzad asks that the offense be characterized properly as the misuse of funds by a fiduciary based on two acts of commingling.  See Objections

at 10.  As for PSR ¶¶ 1, 2, at 3, the Court disagrees.  The Grand Jury charged Janzad with "Misappropriation by Fiduciaries" under 38 U.S.C. § 6101, and the petit jury convicted her of that offense.  PSR ¶¶ 1, 2, at 3, states that Janzad was charged and convicted of "Fiduciary Misappropriation," and therefore accurately characterizes Janzad's offense. As a result, the Court will not modify PSR ¶¶ 1, 2, at 3.  The Court agrees, however, with Janzad's assessment of PSR ¶ 11, at 4.  This paragraph describes Janzad's behavior as "the initial embezzlement[.]" PSR ¶ 11, at 4.  This characterization is not an accurate, because -- as Janzad notes in her Objections -- the United States specifically disclaimed an embezzlement theory in the United States' Notice of Election of Theory, filed July 28, 2024 (Doc. 81).  The Court therefore modifies the language in PSR ¶ 11, at 4, to read: "The initial misappropriation, . . ."  PSR ¶ 11, at 4.  This language modification in PSR ¶ 11, at 4, has no bearing on Janzad's offense level.  Accordingly, the Court sustains in part and overrules in part Janzad's Objections to PSR ¶¶ 1, 2, 11, at 3-4.

## II.    PSR ¶ 12, at 4, ACCURATELY REFLECTS WHY THE VA BEGAN INVESTIGATING JANZAD.

The Court concludes that PSR ¶ 12, at 4, is an accurate representation why the VA began investigating Janzad's fiduciary relationship with T.H.  See PSR ¶ 12, at 4, states:

> Several months later, in August 2018, the VA began looking into Janzad's conduct as a fiduciary. The initial prompt for this inquiry was her failure to provide proof of a compliant surety bond, meaning she had received the lump sum of T.H.'s unspent benefits and had failed to obtain a surety bond protecting those funds from loss. To provide some context, the VA has a statutory obligation to compensate beneficiaries whose benefits are misused or embezzled, and a surety bond protects the VA. Therefore, the surety bond must be made payable to the VA. Janzad did, in fact, obtain a surety bond, but she made it payable to VILA. What this meant was that in the event T.H.'s money was ever lost or stolen, the bonding company would compensate Janzad, rather than the VA. However, to be clear, none of the four charges in the indictment focused on Janzad's mishandling of the surety bond, and it is quite possible the bonding company was responsible for writing the policy 5 incorrectly. Nevertheless, the incorrect bond led to Janzad being flagged as a problem fiduciary, and the VA began looking into her.

PSR ¶ 12, at 4. Janzad objects to PSR ¶ 12, at 4, insofar as it implies that the reason that the VA began investigating her was because she did not provide them with proof of a surety bond. See Objections at 10. The Court overrules this objection, because PSR ¶ 12, at 4, does not state that Janzad failed to provide the VA with proof of a surety bond. Indeed, the PSR states that Janzad provides the VA with a surety bond, but that the bond is not compliant; the bond is payable to VILA when it should have been payable to the VA. See PSR ¶ 12, at 4. This non-compliance ultimately leads to the VA investigating Janzad's fiduciary relationship with T.H. See PSR ¶ 12, at 4. Furthermore, this language has no bearing on Janzad's offense level. The Court overrules Janzad's Objection to PSR ¶ 12, at 4.

### III.    JANZAD IS NOT ENTITLED TO A DOWNWARD DEPARTURE PURSUANT TO U.S.S.G. § 5K2.13 FOR HER ALLEGED GRANDIOSE DELUSIONAL DISORDER.

U.S.S.G. § 5K2.13 provides: "A downward departure may be warranted if (1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense." Significantly reduced mental capacity means that the defendant has a significantly impaired ability to: (i) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (ii) control behavior that the defendant knows is wrongful. U.S.S.G. § 5K2.13. The Court finds that Janzad is able to understand the wrongfulness of her behavior and control this wrongful behavior. The most persuasive evidence of her mental state is Janzad's admissions. See Transcript of Hearing at 127:7-24, taken August 2, 2024 ("August 2, 2024, Tr.")(USA, Janzad). In reviewing the transcript, it is apparent that Janzad understands right from wrong and is able to conform her behavior as such:

> Q.    Do you agree that you have to follow regular law?

A.      Absolutely.  If the law is presented to me, I have no other choice except to follow it.

Q.      Well, the same laws apply to you as they do to everyone else.  And I'm talking about regular laws.

A.      Yeah, stop sign, and getting a driver's license, yeah.

Q.      Just like everybody else, you have to tell the truth?

A.      Of course you have to tell the truth.

Q.      Just like everybody else, you have to keep your promises?

A.      Have to keep your promises, yes.

Q.      Do you agree to be held to the same standards that apply to everybody?

A.       If you say so.

August 2, 2024, Tr. at 127:7-24.  Janzad's conduct further shows that she knows her actions are wrongful.  Her inconsistent explanations about how she uses T.H's unspent benefits reinforce this conclusion.  See PSR ¶ 29, at 8.  For example, on the same day, she executes two contracts: (i) the "Life Care Contract," which states that T.H.'s money will be used for his care; and (ii) another contract states that the money will fund improvements to the VILA housing facility.  See PSR ¶ 29, at 8.  Creating two conflicting contracts on the same date is not the act of someone who believes her conduct is innocent.

Janzad nevertheless argues that she is entitled to a downward departure under § 5K2.13, because she does not understand the wrongfulness of her behavior because of "grandiose delusional disorder."  Objections at 25.  She defines grandiose delusional disorder as a disorder often characterized by "the conviction of having some great (but unrecognized) talent or insight."  Objections at 25.  Janzad contends that this disorder makes her believe that anything she does for the veterans' greater good is not subject to legal sanction.  See Objections at 25.  Although the

Court is sympathetic to the potential mental health issues from which Janzad may be suffering, these health issues do not persuade the Court that this alleged disorder affects her ability to understand the wrongfulness of her actions. As the United States notes, Janzad's assertion that she suffers from grandiose delusional disorder is a self-diagnosis. See Objections Response at 5. This self-diagnosis does not outweigh: (i) Janzad's statements that she understands that she must abide by the law; and (ii) the actions taken to atone for the crime, demonstrating that she understood her actions were wrongful. See August 2, 2024, Tr. at 127:7-24; see PSR ¶ 29, at 8. Even more, the Court finds it difficult to reconcile Janzad's claimed impairment with her ability to operate VILA. As a result, the Court concludes that a § 5K2.13 downward departure is not warranted. The Court denies Janzad's request for a downward departure and overrules Janzad's Objection.

Moreover, even if a departure is appropriate, the Court exercises its discretion not to depart in these circumstances, because Janzad's manifestations of psychological problems place her situation in a position similar to that of many of the defendants the Court routinely sees. Unfortunately, the United States' prisons are filled with individuals who have psychological problems inhibiting their ability to appreciate the consequences before they act. Janzad's case, in regards to any diminished capacity, remains within the heartland of cases that federal courts see.

IV. **JANZAD'S BASE OFFENSE LEVEL IS SUBJECT TO A 2-LEVEL OBSTRUCTION ENHANCEMENT INCREASE PURSUANT TO U.S.S.G. § 3C1.1.**

The Court concludes that the Obstruction Enhancement applies, because Janzad attempts to bribe a witness before trial. As a threshold issue, the Court concludes that the United States has shown -- by a preponderance of the evidence -- that Janzad tries to bribe defense witness E.G. the week before trial. The Court concludes that the evidence supports this conclusion. At trial, E.G. testifies that she drafts the fiduciary accounting for VILA and that Janzad specifically asks her to omit T.H.'s $163,383.03 from the accounting. See PSR ¶ 32, at 9. A week before trial, Janzad

contacts E.G., and offers to help her renovate her home or to pay off her mortgage.  See PSR ¶ 32, at 9.  E.G. interprets, justifiably, this offer as a bribe, because Janzad had made no such offer in the past, and the offer is significantly disproportionate to E.G.'s one-day-a-week employment at VILA.  See PSR ¶ 32, at 9.  Accordingly, the Court concludes that the United States has shown -- by a preponderance of the evidence -- that Janzad tries to bribe defense witness E.G. a week before Janzad's trial was set to begin.

Turning to whether the Obstruction Enhancement applies here, the Court considers whether Janzad's bribery attempt constitutes an attempt to obstruct or to impede the prosecution.  The Obstruction Enhancement states:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.

U.S.S.G. § 3C1.1. Regarding part (1) -- whether Janzad's attempted bribery constitutes obstructed conduct -- the Court considers whether the activity fits under Application Note 4(A), which applies to "threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so."  U.S.S.G. § 3C1.1, Application Note 4.  Janzad argues that the Obstruction Enhancement is inapplicable, because she does not intend to influence E.G. to procure favorable testimony.  See Objections at 22.  Instead, she characterizes her offer as a mere gesture of kindness.  See Objections at 22.  This argument does not persuade the Court.  It is undisputed that E.G. was only a part-time employee who worked at VILA one day a week before resigning.  See PSR ¶ 32, at 9.  An offer to pay off the mortgage of a part-time employee is disproportionate to the services that E.G. provides to VILA.  Coupled with the timing of the offer -- one week before trial, when Janzad knew unfavorable testimony is imminent -- the evidence is

sufficient to show, by a preponderance of the evidence, that Janzad attempts to bribe E.G. Accordingly, the Court concludes that the facts here satisfy part (1) of the Obstruction Enhancement.

The Court also concludes that part (2) is satisfied, because Janzad's attempted bribery of a witness directly relates to the offenses of conviction -- the fiduciary misappropriation and false statements. Although Janzad characterizes her offer to pay E.G.'s mortgage as an innocent gesture, the Court disagrees with this contention for the reasons already discussed. See Objections at 22. The inference is straightforward: Janzad attempts to bribe E.G. a week before trial to prevent unfavorable testimony in her prosecution for fiduciary misappropriation and false statements. See United States v. Farnsworth, 92 F.3d 1001 (10th Cir. 1996)(holding that the Tenth Circuit recognizes that an attempt to influence a witness warrants enhancement under § 3C1.1). The Court therefore concludes that the 2-level Obstruction Enhancement applies. The Court overrules Janzad's Objection to the application of the U.S.S.G. § 3C1.1 enhancement.

**V.    PSR ¶ 33, at 10, ACCURATELY REFLECTS JANZAD'S EARLIER INTERACTIONS WITH R.P.**

The United States has proven, by a preponderance of the evidence, that Janzad takes advantage of former VILA board member R.P. In 2012, Janzad arranges for R.P. to get a cash-out refinance on his property, resulting in a mortgage loan check issued to Janzad for the equity R.P. has accumulated. See PSR ¶ 33, at 10. Janzad then has R.P. convey the property to VILA, even though the mortgage remains in R.P.'s name. See PSR ¶ 33, at 10. Like T.H., R.P. was a veteran with cognitive impairments. See PSR ¶ 33, at 10. The arrangement ultimately leads to a confidential settlement in which Janzad agrees to compensate R.P. $230,000.00 and to pay off the mortgage she causes him to incur. See PSR ¶ 33, at 10.

Rather than disputing these facts, Janzad objects to PSR ¶ 33, at 10, arguing that the Court should characterize her conduct as an accounting error rather than fraud or elder abuse.  See Objections at 13.  The Court overrules the Objection.  The USPO does not conclude in PSR ¶ 33, at 10, that Janzad commits fraud or elder abuse; it describes her actions regarding R.P. and finds that they demonstrate a pattern of exploiting mentally disabled veterans.  Further, the language in PSR ¶ 33, at 10, does not affect Janzad's offense level.  Accordingly, the Court overrules Janzad's objection to PSR ¶ 33, at 10.

## VI.    JANZAD'S BASE OFFENSE LEVEL IS NOT SUBJECT TO A 2-LEVEL SOPHISTICATED MEANS ENHANCEMENT INCREASE PURSUANT TO U.S.S.G. § 2B1.1(b)(10).

Next, the Court concludes that Janzad's base offense level is not subject to a 2-level increase under U.S.S.G. § 2B1.1(b)(10), because Janzad does not use sophisticated means either in furtherance of misappropriating T.H.'s funds or to avoid detection.  U.S.S.G. § 2B1.1(b)(10) provides:

> If (A) the defendant relocated, or participated in relocating, a fraudulent scheme to another jurisdiction to evade law enforcement or regulatory officials; (B) a substantial part of a fraudulent scheme was committed from outside the United States; or (C) the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means, increase by 2 levels.

U.S.S.G. § 2B1.1(b)(10). Application Note 9.B states:

> "Sophisticated means" means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. For example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.

U.S.S.G. § 2B1.1(b)(10) Application Note 9.B.  Here, the Court does not apply a 2-level increase to Janzad's base offense level under U.S.S.G. § 2B1.1(b)(10), because Janzad does not use sophisticated means to misappropriate T.H.'s funds or to avoid detection.

First, the Court considers whether Janzad uses sophisticated means to execute the offense -- T.H.'s misappropriation of funds.  The misappropriation occurs when Janzad deposits T.H.'s money into a VILA operating account rather than T.H.'s segregated account, as the VA instructs.  See Objections at 21.  The Court agrees with Janzad that this conduct is not sophisticated; it is placing funds in one account instead of another.  See Objections at 21.  Janzad's case is analogous to United States v. Pangburn, 467 F. Supp. 3d 1103 (D.N.M. 2020)(Browning, J.)("Pangburn").  In Pangburn, the defendant, an office manager, uses a standard accounting program to give herself additional payments above her salary, later voiding the transactions in QuickBooks to conceal them.  See 467 F. Supp. 3d at 1105.  The Court holds that the § 2B1.1(b)(10) enhancement is unwarranted, because the defendant "did not go to great efforts to execute the fraud, but rather did no more than simply duplicate payments in QuickBooks, a relatively basic accounting program." 467 F. Supp. 3d at 11113.  Similarly, Janzad's depositing T.H.'s money into the VILA account rather than the segregated account is a simple process that does not qualify as using sophisticated means to execute the offense.

Second, the Court considers whether Janzad uses sophisticated means to conceal the offense.  The Addendum to the Presentence Report, filed May 30, 2025 (Doc. 139)("Addendum"), argues that Janzad uses sophisticated means in two ways: (i) through a fraudulent mortgage; and (ii) through a fraudulent fiduciary state of account submitted to the VA.  See Addendum at 4.  According to the USPO, when the VA asks for bank statements reflecting the disposition of T.H.'s $163,363.03, Janzad does not state that she places the money in the correct account; rather, she

responds with an email asserting that she has secured the funds with a recorded mortgage. <u>See</u> Addendum at 4. She later records a mortgage with the Bernalillo County Clerk containing incorrect information. <u>See</u> Addendum at 4. When the VA removes her as T.H.'s fiduciary and orders her to transfer the funds to a successor fiduciary, Janzad refuses and sends the VA a fraudulent fiduciary state of account. <u>See</u> Addendum at 4. Although improper, these actions do not amount to sophisticated concealment. The offense occurs when Janzad places T.H.'s funds in the VILA account, not when she later attempts to address the VA's concerns. Her subsequent actions are not attempts to conceal the misappropriation, but rather misguided efforts to "make it right." Objections at 21.

Tenth Circuit precedent underscores this conclusion. In <u>United States v. Snow</u>, 468 F. App'x 830, 2012 WL 401521 (10th Cir. 2012), the Tenth Circuit upholds a § 2B1.1(b)(10) enhancement where the defendant conceals his mortgage scheme with sufficient sophistication to deceive trained bank and closing personnel into approving more than forty fraudulent loans, using fraudulent documents and orchestrating others to provide false information. <u>See</u> 468 F. App'x at 842, 2012 WL 401521, at *10. Likewise, in <u>United States v. Weiss</u>, 630 F.3d 1263 (10th Cir. 2010), the enhancement is proper, because the defendant uses complex calculations regarding loan-to-value ratios, mortgage-payment-to-income ratios, and total-fixed-payment-to-income ratios to disguise his funding of down payments. <u>See</u> 630 F.3d at 1279. By contrast, Janzad makes no comparable efforts to avoid detection. The VA expressly tells her to deposit T.H.'s funds into his segregated account, yet she places them in the VILA account. When the VA investigates, she does not conceal that fact but attempts -- albeit improperly -- to rectify the situation. Her conduct therefore falls short of the sophisticated means contemplated by § 2B1.1(b)(10). The Court sustains Janzad's U.S.S.G. § 2B1.1(b)(10) Objection.

## VII.     JANZAD'S BASE OFFENSE LEVEL IS NOT SUBJECT TO A 2-LEVEL ACCEPTANCE OF RESPONSIBILITY REDUCTION PURSUANT TO U.S.S.G. § 3E1.1.

The Court will not reduce Janzad's offense level 2 levels for her acceptance of responsibility under U.S.S.G. § 3E1.1(a), because the record does not evince that Janzad proceeds to trial to "challenge . . . the applicability of a statute to [her] conduct." U.S.S.G. § 3E1.1(a) Application Note 2. As the Court explains in greater detail in its legal section above, § 3E1.1(a) most commonly applies in cases where a defendant pleads guilty and accepts responsibility for his or her conduct as part of that plea agreement. "In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to trial," including where a defendant goes to trial to "challenge . . . the applicability of a statute to his conduct." U.S.S.G. § 3E1.1(a) Application Note 2 (emphasis added). In those rare cases, "however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct." U.S.S.G. § 3E1.1(a) Application Note 2.

The Tenth Circuit clarifies that a number of circumstances undermine acceptance of responsibility where a defendant proceeds to trial. For example, the Tenth Circuit holds that a defendant is ineligible for the acceptance-of-responsibility reduction where the defendant denies having the requisite mens rea at trial. See United States v. Tom, 494 F.3d 1277, 1281-82 (10th Cir. 2007); United States v. Bailey, 327 F.3d 1131, 1148 (10th Cir. 2003). But see United States v. Gauvin, 173 F.3d 798 (10th Cir. 1999)(upholding the acceptance-of-responsibility reduction where the defendant "admitted to all the conduct with which he was charged," but goes to trial to determine whether the "factual state of mind met the legal criteria of intent to harm"). Similarly, the Tenth Circuit holds that a defendant is ineligible for the reduction where he or she contests the sufficiency of the United States' evidence. See Salazar-Samaniega, 361 F.3d 1271, 1281 (10th

Cir. 2004).  Additionally, the Tenth Circuit has established that a defendant is ineligible for the reduction where the defendant proceeds to trial, but maintains that his or her conduct was innocent. See United States v. Hill, 197 F.3d 436, 446-47 (10th Cir. 1999).

Section 3E1.1(a)'s application is thorny in cases where a defendant professes to have proceeded to trial to "challenge . . . the applicability of a statute to his conduct." U.S.S.G. § 3E1.1 Application Note 2. These cases hit on the sometimes murky line between factual defenses and legal defenses.  The Tenth Circuit discusses this tension in United States v. Herriman, 739 F.3d 1250 (10th Cir. 2014).  In United States v. Herriman, Herriman places a bomb near a gas pipeline, surrenders, but then pleads not guilty and proceeds to trial.  See 739 F.3d at 1252.  At trial, Herriman raises an insanity defense and asserts that his "irresistible impulse" to plant the bomb prevents him from forming the requisite intent.  739 F.3d at 1253-54.  The jury convicts Herriman. See 739 F.3d at 1253.  At sentencing, the district court declines to apply the acceptance-of-responsibility reduction to Herriman's base offense level, reasoning that Herriman's insanity defense "directly challenges one of the elements of guilt."  739 F.3d at 1253.

On appeal, the Tenth Circuit affirms the district court's judgment.  See 739 F.3d at 1263. The Tenth Circuit surveys its prior decisions on the acceptance-of-responsibility reduction, with a particular focus on United States v. Gauvin, 173 F.3d at 198, a case in which the Tenth Circuit affirms "a district court's decision to grant an acceptance-of-responsibility adjustment to a defendant who forced the government to take its evidence to a jury."  739 F.3d at 1556.  The Tenth Circuit distills that caselaw into the rule that, where a defendant seeks the acceptance-of-responsibility reduction after trial, the defendant "must demonstrate that he *only* disputed purely legal questions in going to trial and did not contest material facts relating to his guilt of the charged offenses.  Mr. Herriman has not made that showing."  739 F.3d at 1257 (emphasis in original).

The Tenth Circuit acknowledges that Herriman's insanity defense has a "legal dimension," 739 F.3d at 1262, but that the parties had a "factual disagreement" as to Herriman's mental state, which is "material to Mr. Herriman's guilt," 739 F.3d at 1261. In so holding, the Tenth Circuit adds:

> We are not insensitive to the reality that it may not always be easy to tell when a challenge is purely legal -- thereby making a defendant who advanced such a challenge at trial eligible for a § 3E1.1 adjustment -- and when a challenge embodies a factual component, such that the defendant who pursued such a challenge at trial would be disqualified from receiving a § 3E1.1 adjustment. Nevertheless, wherever in this context the line between law and fact is, we have no doubt that Mr. Herriman's claim falls cleanly on the wrong (i.e., factual) side of it. For, he and the government fiercely contested whether he was -- as a factual matter -- psychotic at the time he committed the charged acts. We are content to leave to our colleagues in the future -- in cases that present closer questions -- the task of sketching in greater detail the contours of this law-fact line.

United States v. Herriman, 739 F.3d at 1262.

Here, the Court categorizes Janzad's defense theory as a fact dispute rather than a legal dispute. At trial, Janzad argues that she "never took a penny of Mr. Hubshman's money." Transcript of Hearing at 26:11-12, taken July 29, 2024 ("July 29, 2024, Tr.")(Gorence); see id. ("Let me repeat: Not one penny was taken by Faye, or anything else"). Janzad also argues that she does not have the requisite mens rea to commit the crime:

> The Judge told you that for you to find Faye guilty of this fiduciary misappropriation, the Government has to prove that she knowingly misappropriated Hubshman's money or that she used Hubshman's money in an unauthorized manner and that she knew that was illegal when it was unauthorized. That is not the case here.

July 29, 2024, Tr. at 76:23-77:4. Janzad's mens rea defense and sworn innocence is similar to the defense in United States v. Herriman, where the Tenth Circuit concludes that the defendant is not entitled to a § 3E1.1 sentence reduction, because the parties have a factual disagreement about the defendant's mental state, which is material to the defendant's guilt. 739 F.3d at 1261. This is because, to be entitled to a § 3E1.1 sentence reduction, a defendant "must demonstrate that he *only*

disputed purely legal questions in going to trial and did not contest material facts relating to his guilt of the charged offenses." 739 F.3d at 1257 (emphasis in original). Accordingly, because Janzad goes to trial, and, in that trial, she contests material facts relating to her guilt, she is not entitled to a § 3E1.1 sentence reduction. The Court overrules Janzad's U.S.S.G. § 3E1.1 Objection.

## VIII.   JANZAD'S BASE OFFENSE LEVEL IS SUBJECT TO A 10-LEVEL ACTUAL-LOSS-ENHANCEMENT INCREASE PURSUANT TO U.S.S.G. § 2B1.1(B)(1)(F).

The Court concludes that a 10-level enhancement pursuant to U.S.S.G. § 2B1.1(B)(1)(F) is appropriate, because T.H. suffers a loss of over $150,000.00. Section 2B1.1 provides a sliding-scale offense level that increases with an offense's "loss." U.S.S.G. § 2B1.1(b)(1). Loss is "the greater of actual or intended loss." U.S.S.G. § 2B1.1, Application Note 3(A). "Actual loss means the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1, Application Note 3(A)(i). "Intended loss . . . means the pecuniary harm that was intended to result from the offense." U.S.S.G. § 2B1.1, Application Note 3(A)(ii). "Offense" within the definition of either actual or intended loss refers to a defendant's relevant conduct, as determined by § 1B1.3. United States v. Holbert, 285 F.3d 1257, 1261, 1261 n.3 (10th Cir. 2002)(explaining that the Guidelines differentiate between the terms "offense of conviction," which "encompasses only facts immediately related to the specific offense for which the defendant was convicted," and "offense," which "'means offense of conviction and all relevant conduct,'" and that, "[w]hen the Sentencing Commission intends to limit the applicability of a victim-related enhancement" to the offense of conviction, "it does so explicitly")(quoting U.S.S.G. § 1B1.1, Application Note 1(H)); Robert W. Haines, Jr., Frank O. Bowman III, & Jennifer C. Woll, Federal Sentencing Guidelines Handbook § 2B1.1, § 5, at 335 (2012-13 ed.)(explaining that the United States Sentencing Commission intends for the meaning of "offense" to refer to a defendant's relevant conduct under U.S.S.G. § 1B1.3 and that the omission of a cross-reference to § 1B1.3 in the application notes to § 2B1.1 is

of no "substantive significance," because "the drafters apparently felt that the cross-reference to §

1B1.3 was unnecessary because the relevant conduct rules apply to all offense types").

Additionally, "the Commission makes clear that a loss that 'resulted from' an offense is one that

would not have occurred but for the occurrence of the offense," but a defendant's liability is limited

to those losses "foreseeable to a reasonable person." Guidelines Handbook § 5, at 334 (emphasis

in original)("The loss definition in 2B1.1 . . . insists, as a minimum, that the defendant's offense

have been a cause-in-fact of the economic harm at issue.").

        When the loss amount is disputed, the United States bears the burden of establishing its

estimation of loss by a preponderance of the evidence.  See Guidelines Handbook § 14, at 353.

The Tenth Circuit has ruled, accordingly, that a district court cannot include losses in its calculation

under § 2B1.1 until the "Government first . . . prove[s] by a preponderance of the evidence that

the conduct giving rise to those losses (1) was a part of Defendant's ongoing scheme . . . and (2)

constituted a criminal offense under a federal or state statute."  United States v. Kieffer, 681 F.3d

1143, 1168 (10th Cir. 2012).  Next, the United States must "prove the amount of loss (or a

reasonable estimate thereof) associated with that conduct by a preponderance of the evidence."

United States v. Kieffer, 681 F.3d at 1168 (citing United States v. Peterson, 312 F.3d 1300, 1302

(10th Cir. 2002)).  For example, in United States v. Chapman, No. CR 11-0904 JB, 2012 WL

2574814 (D.N.M. June 22, 2012)(Browning, J.), the Court determines that an enhancement

pursuant to § 2B1.1(b)(1) is not appropriate, because, although the United States contends that a

New Mexico Corrections Department facilities manager awards four million dollars' worth of

State government contracts to a developer in exchange for bribes, the United States submits no

evidence regarding the profit, if any, the developer received from the contracts.  See 2012 WL

2574814, at *1, 9-10.  The Court notes that, without "evidence regarding the value of the benefit

Moya received under these government contracts, the United States cannot establish by a preponderance of the evidence that an . . . enhancement is appropriate" under § 2B1.1(b)(1). 2012 WL 2574814, at *10.

Janzad first contends that there is no loss, because the $163,363.03 represents consideration for T.H.'s "Life Care Contract," which purportedly allows him to reside at VILA for the rest of his life. Objections at 16. This argument does not persuade the Court. The United States has proven, by a preponderance of the evidence, that Janzad did not receive T.H.'s $163,363.03 in exchange for a "Life Care Contract." Several facts support this conclusion. First, the "Life Care Contract" is dated January 10, 2019, but Janzad took T.H.'s money in March, 2018. Objections Response at 3. Second, Janzad creates another document, bearing the same date as the "Life Care Contract," stating that T.H.'s funds are to improve one of VILA's facilities. PSR at 8. The existence of these two contradictory documents establishes, by a preponderance of the evidence, that the "Life Care Contract" is not consideration for T.H.'s payment. A contract written after the money is gone is not evidence of value; the contract is evidence of guilt. Accordingly, Janzad's misappropriation of the $163,363.03 constitutes actual loss under § 2B1.1.

Because there is actual loss, the United States also must show, by a preponderance of the evidence, that the conduct giving rise to the loss is: (i) part of Janzad's ongoing scheme; and (ii) constitutes a criminal offense under a federal statute. See United States v. Kieffer, 681 F.3d 1143, 1168 (10th Cir. 2012). To make this showing, the United States must show that the defendant is charged with the criminal misconduct that relates to the loss. See United States v. Kieffer, 681 F.3d at 1168. The United States meets this burden: the USPO calculates the loss at $163,363.03, and Janzad is convicted of fiduciary misappropriation of that same amount.

The Court must now determine whether the United States has established, by a preponderance of the evidence, the amount of loss or reasonable estimate thereof.  See United States v. Kieffer, 681 F.3d at 1168.  The record shows that T.H.'s loss equals the amount Janzad deposits into the VILA general account -- $163,363.03.  See PSR ¶ 11, at 4.  Janzad nevertheless argues that the Court should reduce this figure to account for VILA's provision of health care services.  See Objections at 17.  Under the Guidelines, courts should reduce actual loss by the "money returned, and the fair market value of the property returned and the services rendered by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected."  U.S.S.G. § 2B1.1, Application Note 3(E)(i).  Janzad asserts that she provides $220,000.00 worth of care to T.H. under the "Life Care Contract;" thus, after subtracting this amount the actual loss is zero dollars.  Objections at 18.  This argument fails.  After Janzad misappropriated T.H.'s money, he continues receiving thousands of dollars in monthly VA benefits, which his successor fiduciaries pay to VILA for his care.  See Objections Response at 4.  Those payments -- not Janzad's self-serving "Life Care Contract" -- fund T.H.'s life care.  Objections Response at 4.  Accordingly, the United States has proven, by a preponderance of the evidence, that T.H. suffers an actual loss of $163,363.03.  Under U.S.S.G. § 2B1.1(B)(1)(F), this amount lost results in a 10-level increase to Janzad's base offense level.  The Court overrules Janzad's U.S.S.G. § 2B1.1(B)(1)(F) Objection.

## IX. JANZAD'S BASE OFFENSE LEVEL IS SUBJECT TO A 2-LEVEL VULNERABLE VICTIM ENHANCEMENT INCREASE PURSUANT TO U.S.S.G. § 3A1.1(b).

The Court concludes that a 2-level enhancement pursuant to U.S.S.G. § 3A1.1(b) is appropriate, because T.H. qualifies as a vulnerable victim.  The enhancement applies when the victim "is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct," and "the defendant knows or should have known

of the victim's unusual vulnerability." U.S.S.G. § 3A1.1 Application Note 2. The Tenth Circuit explains that the adjustment applies where the "victim is unusually vulnerable or particularly susceptible to the crime committed," and where the victims "are unable to protect themselves [and] therefore require greater societal protection." United States v. Proffit, 304 F.3d 1001, 1007 (10th Cir. 2001). As to the defendant's mental state, appellate courts long have held that the defendant need not have target the victim because of the vulnerability; it is enough that the defendant "knew or should have known" of the vulnerability. See e.g., United States v. Checora, 175 F.3d at 789 n.4; United States v. Cruz, 106 F.3d 1134, 1139 (3d Cir. 1997); United States v. Feldman, 83 F.3d 9, 16 (1st Cir. 1996).

Janzad -- acting as both T.H.'s healthcare provider and fiduciary -- knew of his mental health conditions. Nonetheless, Janzad disputes that T.H. is a vulnerable victim under § 3A1.1(b)(1). She argues that, because T.H. was charged and convicted of both a misdemeanor and a felony, after the VA determines that he is incompetent, without the State courts making any finding of incompetence, the federal Court cannot consider T.H. unusually vulnerable. Objections at 14. She also contends that T.H.'s expressions of satisfaction with his care and his faith in Janzad's management of his funds show he was not vulnerable. See Objections at 15. The Court disagrees with Janzad's arguments. These arguments overlook the reality of T.H.'s condition and circumstances.

To classify a victim as vulnerable, "the sentencing court must make particularized findings of vulnerability." United States v. Brunson, 54 F.3d 573, 676 (10th Cir. 1995). The record contains ample evidence supporting a finding of vulnerability. Janzad was appointed as T.H's fiduciary because the VA found him one-hundred percent incompetent. See PSR ¶¶ 8, 9, at 4. He suffered from PTSD, organic brain syndrome, depressive neurosis, and an emotionally unstable

personality -- conditions that require placement in a long-term care facility such as VILA.  See PSR ¶¶ 8, 9, at 4.  These impairments make T.H. unusually trusting and susceptible to manipulation.  For example, although Janzad changes her explanations of where his money is going, T.H. never questions her.  When she finally tells him that his funds secure a mortgage yielding four-percent interest that would be placed in his savings account, T.H. accepts her word without seeking proof.  See Objections Response at 4.  T.H.'s dependence and credulity are the hallmarks of a victim "in need of greater societal protection."  United States v. Brunson, 54 F.3d at 676.

Courts apply § 3A1.1(b) where the defendant exploits a vulnerable victim's trust.  In United States v. Basralian, 843 Fed. App'x. 453 (3rd Cir. 2021)("Basralian"), the Third Circuit upheld the enhancement based on the trusting relationship the defendant built with two vulnerable victims.  See Basralian, 843 Fed. App'x. at 457.  One victim is a recently widowed woman recovering from head injuries who regards the defendant as "a friend and confidant"; the other victim is an elderly woman who welcomes the defendant into her home "over homemade cookies" because of their perceived closeness.  Basralian, 843 Fed. Appx. at 457.  Tenth Circuit precedent follows this line of rulings.   For example, in United States v. Janusz, 135 F.3d 1319 (10th Cir. 1998), the enhancement is appropriate in part because the victim "was confused about many things, very susceptible to suggestion from anyone, including the defendant [and] . . . was extremely trusting in many respects."  135 F.3d at 1325.  Similarly, Janzad cultivates an intimate relationship with T.H. -- a mentally ill veteran under her fiduciary care -- by offering him a way to "heal" from his past trauma if he is willing to turn over more than $163,000.00, and by suggesting a spiritual connection with him.  See Objections at 1-3; Objections Response at 1-2.  That combination of trust, dependence, and mental illness renders T.H. susceptible to her conduct.  Accordingly, the

Court finds that T.H. is a vulnerable victim within the meaning of § 3A1.1(b), and the enhancement properly applies. The Court overrules Janzad's U.S.S.G. § 3A1.1(b) Objection.

## X.    JANZAD'S BASE OFFENSE LEVEL IS SUBJECT TO A 2-LEVEL ABUSE-OF-TRUST-ENHANCEMENT INCREASE PURSUANT TO U.S.S.G. § 3B1.3.

To establish abuse of a position of trust under § 3B1.3's 2-level enhancement, the United States must show that: (i) "the person occupies a position of trust," and (ii) "the position of trust was used to facilitate significantly the commission or concealment of the crime." United States v. Spear, 491 F.3d 1150, 1153 (10th Cir. 2007). A position of "public or private trust is 'characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable defense).'" United States v. Merriman, 647 F.3d 1002, 1005 (10th Cir. 2011). Section 3B1.3 further provides: "This adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic."

Janzad does not dispute that she occupies a position of trust, but argues that the enhancement should not apply, because the jury cannot convict her of misuse of funds by a fiduciary unless she occupies a position of trust. See Objections at 15. She notes that the Guidelines specifically provide that the Court may not employ the adjustment if an abuse of trust or skill is included in the base offense level or specific offense characteristic. See Objections at 15. She therefore concludes that it would be unfair to face an enhancement for an element of the offense, thereby exposing Janzad to improper double counting. See Objections at 15. The Court disagrees with Janzad's argument.

The court may not employ the enhancement for abuse of a position of trust when the elements of the underlying offense include abuse of trust. See United States v. Evans, 44 Fed. Appx. 449,453 (10th Cir. 2002)("Evans"). One of Janzad's convictions -- misappropriation by a fiduciary under 38 U.S.C.A. § 6101 -- by definition involves an abuse of trust:

Whoever, being a fiduciary (as defined in section 5506 of this title [38 USCA § 5506]) for the benefit of a minor, incompetent, or other beneficiary under laws administered by the Secretary, shall lend, borrow, pledge, hypothecate, use, or exchange for other funds or property, except as authorized by law, or embezzle or in any manner misappropriate any such money or property derived therefrom in whole or in part and coming into such fiduciary's control in any manner whatever in the execution of such fiduciary's trust, or under color of such fiduciary's office or service as such fiduciary, shall be fined in accordance with title 18, or imprisoned not more than five years, or both.

38 U.S.C.A. § 6101 (emphasis added).    Notwithstanding, the Tenth Circuit holds that enhancement remains appropriate when the position of trust substantially facilitates the commission or concealment of the crime.  United States v. Chimal, 976 F.2d 608, 613-14 (10th Cir 1992)(emphasis added)("Chimal").   Thus, defendants convicted of crimes that inherently involve trust -- such as embezzlement -- still may receive the enhancement when their discretionary authority materially aids the offense. See Chimal, 976 F.2d at 613-14.

Application Note 1 to § 3B1.3 reinforces this principle, explaining:

"Public or private trust" refers to a position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature. For this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (e.g., by making the detection of the offense or the defendant's responsibility for the offense more difficult). This adjustment, for example, applies in the case of an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination. This adjustment does not apply in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk because such positions are not characterized by the above-described factors.

38 U.S.C.S. § 6101 Application Note 1.  Courts apply the enhancement where defendants exploit discretionary authority with minimal supervision.  For example, enhancement is appropriate when a bank vice president with authority to balance the bank suspense account, who is not regularly supervised and who is able to conduct thirty-six transactions over four years without being caught,

holds a qualifying position of trust.  See Chimal, 976 F.2d at 613-14 (citing United States v. Milligan, 958 F.2d 345, 347 (11th Cir. 1992).  In United States v. Ajiboye, 961 F.2d 892 (9th Cir. 1992), enhancement was appropriate because infrequent monitoring and infrequent audits placed postal window clerk in a position of trust.  See 961 F.2d at 895.  In Chimal, the Tenth Circuit concludes that a position of trust enhancement is appropriate, because the defendant has access to the vendor checks and her position enables her to alter deposit slips without arousing suspicion. See 976 F.2d at 614.  The key in Chimal is that the "Defendant's position did not merely provide an opportunity which could as easily have been afforded to other persons."  Chimal, 976 F.2d at 613-14.

Here, Janzad's fiduciary role places her in a position of private trust that contributes significantly to facilitating the commission or concealment of her offense.  As T.H.'s fiduciary, she agrees to manage his funds for his benefit but, with little oversight, misappropriates those funds.  See PSR ¶ 11, at 4.    Specifically, in March, 2018, Janzad commits the initial misappropriation that forms the factual basis of Counts 1 and 2.  See PSR ¶ 11, at 4.  Given that she is in this position of trust, she is able to go undetected until August, 2018, when the VA begins looking into her conduct as a fiduciary.  See PSR at 4.  Essentially, from when she begins as T.H.'s fiduciary in January, 2018, until the VA begins investigating in August, 2018, she has complete access to T.H.'s funds with limited oversight.  Her position of trust is not incidental to her offense; it is its engine.  Because her discretionary authority and lack of supervision substantially facilitates both the commission and concealment of her crime, a 2-level enhancement under § 3B1.3 is appropriated.  The Court overrules Janzad's U.S.S.G. § 3B1.3 Objection.

**IT IS ORDERED** that: (i) the Objections in Defendant Faye Janzad's Sentencing Memorandum, filed May 25, 2025 (Doc. 137)("Objections"), are sustained in part and overruled

in part; (ii) the characterization of Janzad's offenses is proper in PSR ¶¶ 1,2, at 3, but not PSR ¶ 11, at 4; (iii) PSR ¶ 12, at 4 accurately reflects why the VA began investigating Janzad; (iv) the 2-level U.S.S.G. § 5K2.13 downward departure does not apply; (v) the 2-level § 3C1.1 enhancement applies; (vi) PSR ¶ 33, at 10, accurately reflects Janzad's interactions with R.P.; (vii) the 2-level U.S.S.G. § 2B1.1(b)(10) enhancement does not apply; (viii) the 2-level U.S.S.G. § 3E1.1 downward departure does not apply; (ix) the 10-level § 2B1.1(b)(1)(F) enhancement applies; (x) the 2-level 3A1.1(b)(1) enhancement applies; (xi) the 2-level § 3B1.3 enhancement applies; (xii); (xiii) the 2-level § 4C1.1 enhancement reduction applies; (xv) the applicable offense level is 20; (xvi) the applicable criminal history category is I; and (xvii) the United States Sentencing Guidelines establish an imprisonment range of 33 to 41 months.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Ryan Ellison
  United States Attorney
Frederick T. Mendenhall, III
Jeremy Pena
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

     *Attorneys for the Plaintiff*

Brian A Pori
Albuquerque, New Mexico

     *Attorney for the Defendant*