# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                               No. CR 23-0346 JB

FAYE JANZAD,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Opposed Motion to Reconsider Three Parts of the Court's Memorandum Opinion Overruling Defendant's Objections to the Pre-Sentence Report, filed November 12, 2025 (Doc. 164)("MTR"). The primary issues are: (i) whether the Court should reconsider its holding that Defendant Faye Janzad's base offense level is subject to a 10-level loss-enhancement, because Janzad now provides invoices showing T.H. suffers no actual loss; (ii) whether the Court should reconsider its holding that Janzad is not entitled to a downward departure based on her alleged grandiose delusional disorder, because she now submits a psychological report; and (iii) whether the Court should reconsider its holding that Janzad is subject to a 2-level obstruction-enhancement, because offering to pay E.G.'s mortgage a week before trial is, she says, a gesture of kindness. The Court concludes that: (i) upon reconsideration, the 10-level actual-loss enhancement remains warranted, because T.H. suffers an actual loss of $163,363.03 that is not subject to any offsets; (ii) upon reconsideration, Janzad still is not entitled to a downward departure for significantly reduced mental capacity, because her actions, her testimony, and Dr. Simone Viljoen's testimony demonstrate that she understands the wrongfulness of her conduct and is capable of controlling her behavior; and (iii) reconsideration of the Court's conclusion that the 2-level obstruction enhancement is warranted is unnecessary,

because Janzad makes the same argument in the MTR that she makes in her Sentencing Memorandum, filed May 25, 2025 (Doc. 137)("Sentencing Objections"). The applicable offense level is 20, the applicable criminal history category is I, and the United States Sentencing Guidelines establish an imprisonment range of 33 to 41 months.

## FINDINGS OF FACT

The Court recites only the facts pertinent to the MTR. The Court takes its facts from the Presentence Investigation Report, filed January 30, 2025 (Doc. 110)("PSR"); Janzad's VA Fiduciary Account Statement (dated January 3, 2019)(Doc. 167-2)(US Trial Exhibit 19); Thomas Louis Hubshman Final VILA Life Care Accounting, filed November 12, 2025 (Doc. 165-1)("VILA Invoices"); Letter from Raymond G. Murphy Medical Center to Thomas Hubshman (October 29, 2020), filed November 17, 2025 (Doc. 170-2)("October 29, 2020, Letter"); Antonia Chavez Check, filed November 17, 2025 (Doc. 170-4); Email from Janzad to George Smith (November 7, 2018), filed November 17, 2025 (Doc. 167-1)("November 7, 2018, Email"); Transcript of Hearing taken August 2, 2024 ("August 2, 2024, Tr."); and the Transcript of Hearing taken November 12, 2025 ("November 12, 2025, Tr."). The Court makes its findings of fact by a preponderance of the evidence. See United States v. Williams, No. 17-2556, 2020 WL 4016108, at *6 (D.N.M. July 16, 2020)(Browning, J.)(citing United States v. Olsen, 519 F.3d 1096, 1105 (10th Cir. 2008)). The evidence and information upon which the Court relies must have sufficient indicia of reliability. See U.S.S.G. § 6A1.3 ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy."). The Court may rely on hearsay if the hearsay is reliable. See United States v. Damato, 672 F.3d 832, 847 (10th

Cir. 2012)("[H]earsay statements may be considered at sentencing if they bear some minimal indicia of reliability.").  The Court finds as follows:

1.      Janzad owns and operates Veterans Independent Living of Albuquerque ("VILA"), a nonprofit providing social services to veterans in Albuquerque, New Mexico.  PSR ¶ 6, at 3.

2.      T.H., now deceased, is a Vietnam veteran whom the VA deems incompetent in 2001.  See PSR ¶ 8, at 4.

3.      Because the VA rates T.H. as one-hundred-percent disabled, he receives approximately $4,000.00 per month in VA benefits.  See PSR ¶ 8, at 4.

4.      After T.H.'s former fiduciary dies in 2017, Janzad agrees to assume his fiduciary role, and, on January 8, 2018, signs a standard VA fiduciary agreement obligating her to receive and manage T.H.'s money for his benefit.  See PSR ¶ 9, at 4.

5.      The initial misappropriation -- which forms the factual basis of Counts 1 and 2 -- occurs in March, 2019, when Janzad fails to deposit $163,363.03 of T.H.'s money into his designated account and instead deposits the money into the VILA general account.  See PSR ¶ 11, at 4.

6.      Despite Janzad's misappropriation of $163,363.03 of his money, T.H. continued to pay VILA for his room and board each month he lived there.  See VA Fiduciary's Account Statement at 1.

7.      T.H.'s higher level of care room and board cost is $3,950.00 per month, and that rate is all-inclusive.  See VA Fiduciary's Account Statement at 1.

8.      On January 3, 2019, Janzad submits to the VA an annual fiduciary accounting reporting T.H.'s beginning-of-year estate as zero, listing his monthly VA benefits as income, identifying room, board, and care-related expenses as expenditures, and declaring his remaining

assets as $2,049.00 -- with no acknowledgment of the $163,363.03 T.H. has upon entering her care.  See PSR ¶ 19, at 6.

9.      Janzad provides the Court with a "Life Care Contract" that is dated January 10, 2019, which allegedly guarantees T.H. lifetime residency at VILA in exchange for $163,363.03. See PSR ¶ 26, at 7-8.

10.     The Court finds the "Life Care Contract" unreliable, because it is dated January 10, 2019, yet Janzad takes T.H.'s money in March, 2018.  See PSR ¶ 26, at 7-8; See PSR ¶ 11, at 4.

11.     A financial analysis shows that, once the $163,363.03 is deposited into VILA's general operating account, Janzad distributes the funds as follows: (i) approximately $35,000.00 toward a mortgage; (ii) approximately $27,000.00 to unknown payees via cashier's checks; and (iii) the remainder to regular operating expenses, including employee wages.  See PSR ¶ 30, at 9.

12.     On the morning of sentencing, Janzad submits seventy-three pages of invoices that she argues demonstrates that she provides T.H. with $223,159.98 worth of services for which he never had to pay.  See VILA Invoices at 1.

13.     The VILA Invoices show both the money that T.H. pays to VILA each month and the deficit between the amount T.H. pays and the services that VILA provides to him.  See VILA Invoices at 1.

14.     The Court finds the VILA Invoices unreliable, because: (i) although T.H. had resided at VILA since 2011, the earliest invoice Janzad provides is dated October 1, 2017, and bears Invoice #1, making it implausible that this invoice would be the first in the sequence; (ii) every invoice -- including those from 2017 -- reference a "VILA Life Care Account" that was not signed until January 10, 2019; (iii) the invoices contradict Janzad's VA fiduciary accounting by listing room-and-board charges as high as $7,850.00 despite her certified representation that the

rate is $3,950.00; and (iv) the invoices inflate charges, including listing a $10,000.00 exorcism when the VA Fiduciary's Account Statement lists only $2,000.00. See VILA Invoices at 1-73; see VA Fiduciary's Account Statement at 1.

15.     An October 29, 2020, letter from a nurse practitioner recommends that T.H. move to a higher level of care based on his deteriorating health. See October 29, 2020, Letter at 1.

16.     To support the asserted $7,850.00 higher-level-care charge, Janzad provides a check from another resident payable to VILA for $7,850.00. See Antonia Chavez Check at 1.

17.     Notwithstanding these submissions, Janzad's certified fiduciary accounting to the VA states that T.H.'s higher-level-care room-and-board rate is $3,950.00 per month. See VA Fiduciary's Account Statement at 1.

18.     In a November 7, 2018, email to a VA agent, Janzad states that T.H.'s room-and-board rate increases from $2,200.00 to $3,950.00 when he moves to a higher-level-care facility. See November 7, 2018, Email at 1.

19.     The initial misappropriation occurs on March 21, 2018, when Janzad deposits the fiduciary checks into VILA's general operating account. See PSR ¶ 11, at 4. The Court does not consider invoices dated before March 21, 2018, for offset purposes.

20.     The offense is detected no later than November 7, 2018, when Janzad emails a VA agent acknowledging receipt and commingling of fiduciary funds. See November 7, 2018, Email at 1.

21.     After excluding invoices dated before March 21, 2018, and after November 7, 2018, the remaining invoices total, at most, $8,274.00 in potentially creditable services rendered during that period. See VILA Invoices at 7–16; see VA Fiduciary's Account Statement at 1.

22.    Subtracting $8,274.00 from the $163,363.03 that Janzad misappropriates results in a total loss of $155,089.03.

23.    A loss of $155,089.03 triggers a 10-level enhancement under U.S.S.G. § 2B1.1(b)(1)(F), meaning that even if the Court accepted all invoices not disproven by the United States, the offense level would remain unchanged.

24.    Janzad made several admissions regarding her ability to understand and follow the law.  She agreed that: (i) the same laws apply to her as to everyone else; (ii) she must tell the truth; (iii) she must keep her promises; and (iv) she is subject to the same legal standards as others.  See August 2, 2024, Tr. at 127:7-24 (Janzad).

25.    Janzad has operated VILA for several years, which requires her to plan, organize, and manage the program's operations.  See PSR ¶ 6, at 3.

26.    Dr. Viljoen testifies that Janzad "is aware she is not above the law," and that Janzad would lie to preserve her image.  See November 12, 2025, Tr. at 193:17-20 (Viljoen); November 12, 2025 Tr. at 198:22-25 (Viljoen).

27.    The mental-health issues identified in Dr. Viljoen's report fall within the types of conditions that federal courts frequently encounter; therefore, the Court finds that Janzad is able to understand the wrongfulness of her behavior and control this wrongful behavior.  See November 12, 2025, Tr. at 266:1-14 (Court).

28.    A week before trial, Janzad attempts to obstruct justice by contacting a witness, E.G., and offering to help renovate her home or pay off her mortgage.  See PSR ¶ 32, at 9.

## PROCEDURAL BACKGROUND

On October 30, 2025, the Court files its Memorandum Opinion and Order regarding Janzad's Sentencing Objections (Doc. 160)("Sentencing MOO").  First, the Court overrules

Janzad's PSR ¶¶ 1, 2, at 3, Objection, because the jury convicts her of Fiduciary Misappropriation, but sustains Janzad's PSR ¶ 11, at 4, Objection, because the United States does not pursue embezzlement charges. See Sentencing MOO at 35. Second, the Court overrules Janzad's PSR ¶ 12, at 4, Objection, because the Court concludes that the PSR accurately states the reason why the VA begins investigating Janzad. See Sentencing MOO at 36. Third, the Court overrules Janzad's PSR ¶¶ 29, 31, at 8-9, Objection, because a U.S.S.G. § 5K2.13 downward departure is inappropriate if the defendant is not suffering from a significantly reduced mental capacity. See Sentencing MOO at 37. Fifth, the Court overrules Janzad's PSR ¶ 33, at 10, Objection, because Janzad's interactions with R.P. demonstrate a pattern of taking advantage of veterans. See Sentencing MOO at 41. Sixth, the Court sustains Janzad's Sophisticated-Means Enhancement Objection, because she does not use sophisticated means either to execute or to avoid detection of the offense. See Sentencing MOO at 42. Seventh, the Court overrules Janzad's Objection that she should receive a sentence reduction for accepting responsibility, because Janzad has not acted in a manner consistent with the acceptance of responsibility. See Sentencing MOO at 45. Eighth, the Court overrules Janzad's Monetary Loss Enhancement Objection, because T.H. suffers an actual loss when Janzad took over $163,000.00 from him. See Sentencing MOO at 48. Ninth, the Court overrules Janzad's Vulnerable Victim-Enhancement-Objection, because T.H.'s mental health diagnoses make him a vulnerable victim. See Sentencing MOO at 51. Tenth, the Court overrules Janzad's Position-of-Public-or-Private-Trust Enhancement Objection, because Janzad's fiduciary role places her in a position of private trust that significantly contributes to facilitating the commission or concealment of her offense. See Sentencing MOO at 54. The Court concludes that Janzad's applicable offense level is 20, the applicable criminal history category is I, and the United States Sentencing Guidelines establish an imprisonment range of 33 to 41 months.

On November 12, 2025, Janzad files her MTR asking the Court to reconsider three holdings in the Sentencing MOO. See MTR at 1. First, Janzad asks the Court to reconsider its conclusion that she is subject to a 10-level actual loss enhancement, relying on newly produced invoices that she argues show T.H. suffers no actual loss. See MTR at 2. She argues that there is no loss, because she takes $163,363.03 from T.H., but provides him $223,159.98 in healthcare services. See Thomas Louis Hubshman Final VILA Life Care Accounting, filed November 12, 2025 (Doc. 165-1)("VILA Invoices"). Second, she asks the Court to reconsider its conclusion that she is not entitled to a downward departure for a significantly reduced mental capacity, relying on Dr. Simone Viljoen's psychological evaluation. See MTR at 8. Third, she asks the Court to reconsider its conclusion that she is subject to a 2-level obstruction-of-justice enhancement, asserting that she never attempts to obstruct justice or to secure favorable testimony from E.G. See MTR at 13.

On November 12, 2025, the Court holds a hearing on the MTR. See Hearing Tr. at 1:1-16 (Court, Pena, Pori)("November 12, 2025, Tr.").[1] At the hearing, Janzad argues that the loss calculation is now more nuanced, because the invoices show that she provides T.H. $224,159.98 in services while taking $163,363.03 from him. See November 12, 2025, Tr. at 16:1-8 (Pori). She does not dispute that T.H. pays VILA monthly for his room and board out of his VA benefits; she disputes only whether those payments cover his full cost of care. See November 12, 2025, Tr. at 18:3-25 (Pori). The United States responds that T.H. suffers an actual loss of $163,363.03, because the invoices are not credible. See November 12, 2025, Tr. at 132:20-25 (Pena). Next, Janzad offers Dr. Viljoen's testimony to show that she cannot appreciate the wrongfulness of her actions. See November 12, 2025, Tr. at 151:16-20 (Pori, Viljoen). Dr. Viljoen testifies, however, that

---

[1] The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

"[Janzad] is aware that she is not above the law," November 12, 2025, Tr. at 194:19-20 (Viljoen), and that Janzad would lie to preserve her image, November 12, 2025, Tr. at 198:22-25 (Viljoen). Finally, Janzad urges the Court to reconsider the 2-level obstruction enhancement, but concedes she was making no new arguments. See November 12, 2025, Tr. at 266:15-20 (Pori). At the close of the hearing, the Court takes the issue of actual loss under advisement, see November 12, 2025, Tr. at 265:1-22 (Court), denies the MTR as to a downward departure, because her mental capacity falls within the heartland of the prison population, see November 12, 2025, Tr. at 266:1-14 (Court), and denies the MTR as to the obstruction enhancement, because she offers no new argument why the enhancement does not apply, see November 12, 2025, Tr. at 266:15-20 (Court).

## LAW REGARDING MOTIONS TO RECONSIDER

"Motions to reconsider are proper in criminal cases even though the Federal Rules of Criminal Procedure do not specifically provide for them." United States v. Christy, 739 F.3d 534, 539 (10th Cir. 2014). See United States v. Rollins, 607 F.3d 500, 502 (7th Cir. 2010)(Easterbrook, C.J.)("None of the Rules of Criminal Procedure authorizes a generic motion to reconsider; the criminal rules lack a counterpart to the motions authorized by Fed. R. Civ. P. 50(b), 52(b), or 59, though they do authorize some post-trial motions . . . that have features in common with motions under the civil rules."). The United States Court of Appeals for the Tenth Circuit holds that criminal motions to reconsider are proper, because a "district court should have the opportunity to correct alleged errors in its dispositions." United States v. Christy, 739 F.3d at 539. The authority to reconsider, according to the Tenth Circuit, "comes from the common law." United States v. Warren, 22 F.4th 917, 922 (10th Cir. 2022)(citing United States v. Rollins, 607 F.3d at 502).

This authority, however, is not without limits. A district court may grant a motion to reconsider "when the court has misapprehended the facts, a party's position, or the law." United

States v. Christy, 739 F.3d at 539 (citing Servants of Paraclete v. Does, 204 F.3d 1005, 1012 (10th Cir. 2000)).   Specific grounds for reconsideration include: "(1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice."   Servants of Paraclete v. Does, 204 F.3d at 1012.   Motions to reconsider, however, "should not be used to revisit issues already addressed or advance arguments that could have been raised earlier."   United States v. Christy, 739 F.3d at 539.

The Tenth Circuit applies the law regarding motions to reconsider in civil cases to the criminal context.   See United States v. Huff, 782 F.3d 1221, 1223-24 (10th Cir. 2015); United States v. Christy, 739 F.3d at 539-40.   "In the criminal context, courts ordinarily apply the same standards to motions to reconsider as those used in civil cases."   United States v. Christy, 810 F. Supp. 2d 1219, 1249 (D.N.M. 2011)(Browning, J.), aff'd, United States v. Christy, 739 F.3d at 534.   See United States v. Rollins, 607 F.3d at 502 (stating that the Supreme Court of the United States has "concluded that motions to reconsider in criminal prosecutions are proper and will be treated just like motions in civil suits"); United States v. Matlack, No. CR 09-0531, 2010 WL 2682110, at *1 (D. Colo. July 1, 2010)(Daniel, C.J.)(stating that other district courts in the Tenth Circuit rely on the standards for evaluating a motion to reconsider in the civil context when addressing motions to reconsider in the criminal context), declined to follow on other grounds by United States v. Games-Perez, 667 F.3d 1136 (10th Cir. 2012); United States v. West, No. 01-40122, 2002 WL 1334870, at *1 (D. Kan. May 9, 2002)(Crow, J.)("Rarely do parties in criminal proceedings file motions to reconsider rulings on pretrial motions.   This court believes that the standards for evaluating a motion to reconsider in the civil context are relevant for evaluating a

motion to reconsider in a criminal case."); <u>United States v. Ibarra</u>, 502 U.S. 1 (1991); <u>United States v. Dieter</u>, 429 U.S. 6 (1976); <u>United States v. Healy</u>, 376 U.S. 75 (1964).

Accordingly, the Tenth Circuit applies the civil standard, as it announces in <u>Servants of Paraclete v. Does</u>, 204 F.3d at 1012, in reconsidering a motion to suppress in the criminal context. In <u>United States v. Huff</u>, the Tenth Circuit explains:

> We have held that a motion to reconsider may be granted when the court has misapprehended the facts, a party's position, or the law. *Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000). Specific situations where circumstances may warrant reconsideration include "(1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice." *Id.* "A motion to reconsider is not a second chance for the losing party to make its strongest case or to dress up arguments that previously failed." *Voelkel v. Gen. Motors Corp.*, 846 F. Supp. 1482, 1483 (D. Kan. 1994). We have specifically held that "[a] motion to reconsider should not be used to revisit issues already addressed or advance arguments that could have been raised earlier." *United States v. Christy*, 739 F.3d 534, 539 (10th Cir. 2014).

<u>United States v. Huff</u>, 782 F.3d at 1224. The Court thus uses the same test that it has developed for motions to reconsider in the civil context for motions to reconsider in criminal cases. <u>See Anderson Living Trust v. WPX Energy Prod., LLC</u>, 312 F.R.D. 620, 642-49 (D.N.M. 2015)(Browning, J.).

### LAW REGARDING MOTIONS TO RECONSIDER INTERLOCUTORY ORDERS

Considerable confusion exists among the bar regarding the proper standard for a district court to apply when ruling on a motion to reconsider one of its prior "interlocutory" or "interim" orders, <u>i.e.</u>, an order that a district court issues while the case is ongoing, as distinguished from a final judgment. This confusion originates from the fact that the Federal Rules of Civil Procedure do not mention motions to reconsider, let alone set forth a specific procedure for filing them or a standard for analyzing them. A loose conflation in terminology in <u>Servants of the Paraclete v. Does</u>, which refers to rule 59(e) motions -- "motion[s] to alter or amend a judgment*"* -- as "motions

to reconsider," compounded that baseline confusion.  Fed. R. Civ. P. 59(e); <u>Servants of the Paraclete v. Does</u>, 204 F.3d at 1005.

Final judgments are different from interlocutory orders.  <u>See</u> Fed. R. Civ. P. 54(a) ("'Judgment' as used in these rules includes a decree and any order from which an appeal lies."). In addition to ripening the case for appeal, <u>see</u> 28 U.S.C. § 1291 ("The courts of appeals . . . shall have jurisdiction of appeals from all final decisions of the district courts . . . ."), the entry of final judgment narrows the district court's formerly plenary jurisdiction over the case in three ways. First, for the first twenty-eight days after the entry of judgment, when the court can entertain motions under rules 50(b), 52(b), 59, and 60, the district court's jurisdiction trumps that of the Court of Appeals.  <u>See</u> Fed. R. App. P. 4(a)(4)(B).  Even if a party files a notice of appeal, the Court of Appeals will wait until after the district court has ruled on the post-judgment motion to touch the case.  <u>See</u> Fed. R. App. P. 4(a)(4)(B).  Second, after twenty-eight days, when the court may consider motions under rule 60, if a party has filed a notice of appeal, the Court of Appeals' jurisdiction trumps the district court's, and the district court needs the Court of Appeals' permission even to grant a rule 60 motion.  Third, after twenty-eight days, if no party has filed a notice of appeal, district courts may consider motions under rule 60.

Final judgments implicate two important concerns militating against giving district courts free reign to reconsider their judgments.  First, when a case is not appealed, there is an interest in finality. The parties and the lawyers expect to go home, quit obsessing about the dispute, and put the case behind them, and the final judgment -- especially once the twenty-eight day window of robust district court review and the thirty-day window of appeal have both closed -- is the disposition upon which they are entitled to rely.  Second, when a case is appealed, there is the need for a clean jurisdictional handoff from the district court to the Court of Appeals.  "[A] federal

district court and a federal court of appeals should not attempt to assert jurisdiction over a case simultaneously," as doing so produces a "danger [that] a district court and a court of appeals w[ill] be simultaneously analyzing the same judgment." Griggs v. Provident Consumer Discount Co., 459 U.S. 56, 58-59 (1982).

The Court of Appeals needs a fixed record on which to base its decisions -- especially given the collaborative nature of appellate decisionmaking -- and working with a fixed record requires getting some elbow room from the district court's continued interference with the case. The "touchstone document" for this jurisdictional handoff is the notice of appeal, not the final judgment, see Griggs v. Provident Consumer Discount Co., 459 U.S. at 58 ("The filing of a notice of appeal is an event of jurisdictional significance -- it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." (citations omitted)); Garcia v. Burlington N. R.R. Co., 818 F.2d 713, 721 (10th Cir.1987)("Filing a timely notice of appeal pursuant to Fed. R. App. P. 3 transfers the matter from the district court to the court of appeals. The district court is thus divested of jurisdiction. Any subsequent action by it is null and void." (citations omitted)); Kirtland v. J. Ray McDermott & Co., 568 F.2d 1166, 1170 (5th Cir.1978)("[I]t is the filing of the appeal, not the entering of a final judgment, that divests the district court of jurisdiction." (citations omitted)), but, because the final judgment starts the parties' thirty-day clock for filing a timely notice of appeal, the Federal Rules and the Tenth Circuit have chosen to curtail the district court's jurisdiction over the case in the roughly month-long period of potentially overlapping trial- and appellate-court jurisdiction that immediately follows the entry of final judgment, see Servants of the Paraclete v. Does, 204 F.3d at 1009 (noting that

post-final judgment motions at the district court level are "not intended to be a substitute for direct appeal").

Basically, rather than suddenly divesting the district court of all jurisdiction over the case -- potentially resulting in the district court being unable to rectify easily fixable problems with the final judgment before the case goes to the Tenth Circuit, or even requiring appeal of a case that might otherwise not need to be appealed -- the Federal Rules set forth a jurisdiction phased de-escalation process, wherein the district court goes from pre-final judgment plenary jurisdiction, to limited review for the first twenty-eight days post-final judgment, and, finally, to solely rule 60 review after twenty-eight days. In defining the "limited review" that rule 59(e) allows a district court to conduct in the 28–day flux period, the Tenth Circuit, in Servants of the Paraclete v. Does, incorporated traditional law-of-the-case grounds -- the same grounds that inform whether a court should depart from an appellate court's prior decision in the same case -- into rule 59(e). See United States v. Alvarez, 142 F.3d 1243, 1247 (10th Cir.1998)(departing from the law of the case doctrine in three exceptionally narrow circumstances: "(1) when the evidence in a subsequent trial is substantially different; (2) when controlling authority has subsequently made a contrary decision of the law applicable to such issues; or (3) when the decision was clearly erroneous and would work a manifest injustice")(citation omitted); Servants of the Paraclete v. Does, 204 F.3d at 1012 (incorporating those grounds into rule 59(e)).

Neither of these concerns -- finality nor jurisdictional overlap -- is implicated when a district court reconsiders one of its own interlocutory orders. The Federal Rules do not specifically mention motions to reconsider interlocutory orders, but rule 54(b) makes the following open-ended proclamation about their mutability:

> When an action presents more than one claim for relief -- whether as a claim, counterclaim, crossclaim, or third-party claim -- or when multiple parties are

involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay. Otherwise, *any order or other decision,* however designated, *that adjudicates fewer than all the claims* or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and *may be revised at any time before the entry of a judgment* adjudicating all the claims and all the parties' rights and liabilities.

Fed. R. Civ. P. 54(b)(emphases added). Rule 54(b) thus (i) provides that a district court can freely reconsider its prior rulings; and (ii) puts no limit or governing standard on the district court's ability to do so, other than that it must do so "before the entry of judgment." Fed. R. Civ. P. 54(b).

The Tenth Circuit has not cabined district courts' discretion beyond what rule 54(b) provides: "[D]istrict courts generally remain free to reconsider their earlier interlocutory orders." Been v. O.K. Indus., 495 F.3d 1217, 1225 (10th Cir.2007). In the Tenth Circuit, "law of the case doctrine has *no* bearing on the revisiting of interlocutory orders, even when a case has been reassigned from one judge to another." Rimbert v. Eli Lilly & Co., 647 F.3d 1247, 1252 (10th Cir.2011)(emphasis added)(citing Been v. O.K. Indus., Inc., 495 F.3d at 1225). In this context, "the doctrine is merely a 'presumption, one whose strength varies with the circumstances.'" Been v. O.K. Indus., Inc., 495 F.3d at 1225 (quoting Avitia v. Metro. Club of Chi., Inc., 49 F.3d 1219, 1227 (7th Cir.1995)). In short, a district court can use whatever standard it wants to review a motion to reconsider an interlocutory order. It can review the earlier ruling de novo and essentially reanalyze the earlier motion from scratch, it can review the ruling de novo but limit its review, it can require parties to establish one of the law-of-the-case grounds, or it can refuse to entertain motions to reconsider altogether.

The best approach, in the Court's eyes, is to analyze motions to reconsider differently depending on three factors. Cf. Been v. O.K. Indus., Inc., 495 F.3d at 1225 ("[T]he doctrine is merely a 'presumption, one whose strength varies with the circumstances.'")(citation omitted).

First, the Court should restrict its review of a motion to reconsider a prior ruling in proportion to how thoroughly the earlier ruling addressed the specific findings or conclusions that the motion to reconsider challenges. How "thoroughly" a point was addressed depends both on the amount of time and energy the Court spent on it, and on the amount of time and energy the parties spent on it -- in briefing and orally arguing the issue, but especially if they developed evidence on the issue. A movant for reconsideration thus faces a steeper uphill challenge when the prior ruling was on a criminal suppression motion, class certification motion, or preliminary injunction, than when the prior ruling is, e.g., a short discovery ruling. The Court should also look, not to the overall thoroughness of the prior ruling, but to the thoroughness with which the Court addressed the exact point or points that the motion to reconsider challenges. A movant for reconsideration thus faces an easier task when he or she files a targeted, narrow-in-scope motion asking the Court to reconsider a small, discrete portion of its prior ruling than when he or she files a broad motion to reconsider that rehashes the same arguments from the first motion, and essentially asks the Court to grant the movant a mulligan on its earlier failure to present persuasive argument and evidence.

Second, the Court should consider the case's overall progress and posture, the motion for reconsideration's timeliness relative to the ruling it challenges, and any direct evidence the parties may produce, and use those factors to assess the degree of reasonable reliance the opposing party has placed in the Court's prior ruling. See 18B Charles Alan Wright, Arthur R. Miller, Edward H. Cooper, Vikram David Amar, Richard D. Freer, Helen Hershkoff, Joan E. Steinman & Catherine T. Struve, Federal Practice & Procedure § 4478.1 (2d ed.)("Stability becomes increasingly important as the proceeding nears final disposition. . . . Reopening should be permitted, however, only on terms that protect against reliance on the earlier ruling."). For example, if a defendant (i) spends tens of thousands of dollars removing legacy computer hardware from long-term storage;

then (ii) obtains a protective order in which the Court decides that the defendant need not produce the hardware in discovery; then (iii) returns the hardware to long-term storage, sustaining thousands more in expenses; and (iv) several months pass, then the plaintiffs should face a higher burden in moving the Court to reconsider its prior ruling that they faced in fighting the motion for protective order the first time.

Third, the Court should consider the Servants of the Paraclete v. Does grounds. The Court should be more inclined to grant motions for reconsideration if the movant presents (i) new controlling authority -- especially if the new authority overrules prior law or sets forth an entirely new analytical framework; (ii) new evidence -- especially if the movant has a good reason why the evidence was not presented the first time around; or (iii) a clear indication -- one that manifests itself without the need for in-depth analysis or review of the facts -- that the Court erred.

These three factors should influence the degree to which the Court restricts its review of a prior ruling, but they do not necessarily mean that the Court should always apply a deferential standard of review. The Court should pause before applying a standard of review to its own interlocutory orders that is more deferential than the standard that the Court of Appeals will apply to it, unless the Court concludes that the alleged error in the prior ruling was harmless, or the party moving for reconsideration waived their right to appeal the alleged error by not raising the appropriate argument. Even in circumstances where the Court concludes that it is insulated from reversal on appeal, there are principled reasons for applying a de novo standard. After all, if the Court was wrong in its earlier decision, then, generally speaking, it is unjust to maintain that result -- although the Court should weigh this injustice against any injustice that would result from

upending the parties' reliance on the earlier ruling, which is the balancing test that the three factors above represent.

What the Court means by "restricting its review" is less about applying a deferential standard of review -- although that may be appropriate in some circumstances -- and more about reducing (i) the depth of the Court's analysis the second time around -- thus conserving judicial resources; and (ii) the impositions that relitigation of the prior ruling will impose on the party opposing the motion for reconsideration. The Court should consider the time and expense that the party opposing reconsideration spent in winning the earlier ruling, and should try to prevent that party from having to bear the same impositions again. Basically, even if the Court ultimately analyzes a motion to reconsider under the same standard that it analyzed the motion that produces the earlier ruling, it should analyze the motion in a different way -- one focused on reducing the litigation burdens of the party opposing reconsideration. For example, when a party moves the Court for a preliminary injunction, standard practice is that the Court holds an evidentiary hearing as a matter of course, regardless whether it looks as if the party has a good chance of prevailing. If the party loses and the Court denies the injunction, however, and the party moves for reconsideration, the party should not be entitled to the presumption of an evidentiary hearing merely because he or she received that presumption the first time the Court considered the motion.

In light of these statements, it is perhaps better to characterize the increased burden that a movant for reconsideration faces as one of production, and not of persuasion. The Court analyzes motions to reconsider by picking up where it left off in the prior ruling -- not by starting anew. Parties opposing reconsideration can do the same, and they may stand on whatever evidence and argument they used to win the earlier ruling. Movants for reconsideration, on the other hand, carry the full burden of production: they must persuade the Court, using only the evidence and argument

they put before it, that it should change its prior ruling; they must do all of the legwork, and not rely on the Court to do any supplemental fact-finding or legal research; and they must convincingly refute both the counterarguments and evidence that the opposing party used to win the prior ruling and any new arguments and evidence that the opposing party produces while opposing the motion to reconsider.  Unlike the motion that produced the prior ruling, a motion to reconsider is not -- and is not supposed to be -- a fair fight procedurally.  The deck is stacked against a movant for reconsideration, and if such a movant hopes to prevail, he or she must have not only a winning legal position, but the work ethic and tenacity to single-handedly lead the Court to his or her way of thinking.

## LAW REGARDING THE MONETARY LOSS ENHANCEMENT

Section 2B1.1 of the United States Sentencing Guidelines guides a court when sentencing a defendant for "Larceny, Embezzlement, and other Forms of Theft; Offenses Involving Stolen Property; Property Damage or Destruction; Fraud and Deceit; Forgery; Offenses Involving Altered or Counterfeit Instruments Other than Counterfeit Bearer Obligations of the United States."  U.S.S.G. § 2B1.1.  Part of a court's duty when sentencing under § 2B1.1 is to determine whether the court should increase a defendant's base offense level, because of the amount of loss the offense causes.  See U.S.S.G. § 2B1.1(b)(1) ("If the loss exceeded $5,000, increase the offense level as follows. . . . ").  "The court need only make reasonable estimate of the loss."  U.S.S.G. § 2B1.1, Application Note 3(C).  The Sentencing Guidelines neither proscribe nor prohibit a methodology for a court to use when calculating the "reasonable estimate" of the loss a defendant's conduct causes.  United States v. Erpenbeck, 532 F.3d 423, 433 (6th Cir. 2008)(rejecting a defendant's argument that the court should use the entire value of collateral that he pledges for a legitimate loan to off-set his fraudulent transactions and holding that the court should reduce the

pro-rata collateral based upon the ratio of the fraudulent transactions to the underlying, legitimate loan).

Loss is "the greater of actual or intended loss."  U.S.S.G. § 2B1.1, Application Note 3(A). "'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.SG. § 2B1.1, Application Note 3(A)(i). "'Intended loss' . . . means the pecuniary harm that was intended to result from the offense."  U.S.S.G. § 2B1.1, Application Note 3(A)(ii).  "Offense" within the definition either of actual or of intended loss refers to a defendant's relevant conduct, as § 1B1.3 defines that loss.  United States v. Holbert, 285 F.3d 1257, 1261, 1261 n.3 (10th Cir. 2002)(explaining that the Sentencing Guidelines explicitly differentiate between the terms "offense of conviction," which "encompasses only facts immediately related to the specific offense for which the defendant was convicted," and "offense," which "'means offense of conviction and all relevant conduct,'" and that, "[w]hen the Sentencing Commission intends to limit the applicability of a victim-related enhancement" to the offense of conviction, "it does so explicitly") (quoting U.S.S.G. § 1B1.1, Application Note 1(H)); Robert W. Haines, Jr., Frank O. Bowman III, & Jennifer C. Woll, Federal Sentencing Guidelines Handbook § 2B1.1, § 5, at 335 (2012-13 ed.)("Guidelines Handbook")(explaining that the Commission intends for the meaning of "offense" to refer to a defendant's relevant conduct under U.S.S.G. § 1B1.3 and that the omission of a cross-reference to § 1B1.3 in the application notes to § 2B1.1 is of no "substantive significance," because "the drafters apparently felt that the cross-reference to § 1B1.3 was unnecessary because the relevant conduct rules apply to all offense types").  Additionally, "the Commission makes clear that a loss that 'resulted from' an offense is one that would not have occurred but for the occurrence of the offense," but a defendant's liability is limited to those losses "foreseeable to a reasonable person."   Guidelines Handbook § 5, at 334 (emphasis in

original)("The loss definition in 2B1.1 . . . insists, as a minimum, that the defendant's offense have been a cause-in-fact of the economic harm at issue.").

When the parties dispute the loss amount, the United States bears the burden of establishing its estimation of loss by a preponderance of the evidence. See Guidelines Handbook § 14, at 353. The Tenth Circuit has ruled, accordingly, that a district court cannot include losses in its calculation under § 2B1.1 until the "Government first . . . prove[s] by a preponderance of the evidence that the conduct giving rise to those losses (1) was a part of Defendant's ongoing scheme . . . and (2) constituted a criminal offense under a federal or state statute." United States v. Kieffer, 681 F.3d 1143, 1168 (10th Cir. 2012). Next, the United States must "prove the amount of loss (or a reasonable estimate thereof) associated with that conduct by a preponderance of the evidence." United States v. Kieffer, 681 F.3d at 1168 (citing United States v. Peterson, 312 F.3d 1300, 1302 (10th Cir. 2002)). For example, in United States v. Chapman, No. CR 11-0904 JB, 2012 WL 2574814 (D.N.M. June 22, 2012)(Browning, J.), the Court determines that an enhancement pursuant to § 2B1.1(b)(1) is not appropriate, because, although the United States contends that a New Mexico Corrections Department facilities manager awards $4,000,000.00 worth of State government contracts to a developer in exchange for bribes, the United States submits no evidence regarding the profit, if any, the developer receives from the contracts. See 2012 WL 2574814, at *1, 9-10. The Court notes that, without "evidence regarding the value of the benefit Moya received under these government contracts, the United States cannot establish by a preponderance of the evidence that an . . . enhancement is appropriate" under § 2B1.1(b)(1). 2012 WL 2574814, at *10.

The application notes to § 2B1.1 provide that a court shall reduce the loss by certain credits. First, the court reduces the loss by the "money returned, and the fair market value of the property returned and the services rendered by the defendant or other persons acting jointly with the

defendant, to the victim before the offense was detected." U.S.S.G. § 2B1.1, Application Note 3(E)(i). "[W]hen no actual sales price is available to calculate loss, the Guidelines permit a district court 'to *estimate* loss based on *available* information.'" United States v. Snow, 663 F.3d 1156, 1161 (10th Cir. 2011)(quoting United States v. James, 592 F.3d 1109, 1116 (10th Cir. 2010))(emphasis in United States Snow, but not in United States v. James). See United States v. Merriman, 647 F.3d 1002 (10th Cir. 2011)("[T]he Guidelines permit a reduction for restoring victims' losses prior to the onset of any government involvement, . . . not . . . when payments are not returned to the victims until after the crime has been discovered by the government and the defendant has . . . motivation to use his ill-gotten gains as leverage. . . ."). The application notes indicate that the court credits the value returned against the losses which the victim who receives the value suffers, and not against a lump sum of total losses where there are more than one victim: for example, in a case involving a Ponzi or other fraudulent investment scheme, value which one investor receives in excess of that investor's principal investment "shall not be used to offset the loss to another individual investor in the scheme." U.S.S.G. § 2B1.1, Application Note 3(F)(iv).

## LAW REGARDING DOWNWARD DEPARTURE BECAUSE OF REDUCED MENTAL CAPACITY

U.S.S.G. § 5K2.13 provides the following policy statement:

A downward departure may be warranted if (1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense. Similarly, if a departure is warranted under this policy statement, the extent of the departure should reflect the extent to which the reduced mental capacity contributed to the commission of the offense.

However, the court may not depart below the applicable guideline range if (1) the significantly reduced mental capacity was caused by the voluntary use of drugs or other intoxicants; (2) the facts and circumstances of the defendant's offense indicate a need to protect the public because the offense involved actual violence or a serious threat of violence; (3) the defendant's criminal history indicates a need to incarcerate the defendant to protect the public; or (4) the defendant has been

convicted of an offense under chapter 71, 109A, 110, or 117, of title 18, United States Code.

U.S.S.G. § 5K2.13.  Application note 1 to U.S.S.G. § 5K2.13 provides that, for purposes of this policy statement, "'significantly reduced mental capacity' means the defendant, although convicted, has a significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrongful." U.S.S.G. § 5K2.13 cmt n. 1.  Diminished capacity is an "encouraged" factor -- a specific factor that the Commission provides "'to aid the court by identifying some of the factors that the Commission has not been able to take into account fully in formulating the guidelines.'" United States v. Neal, 249 F.3d 1251, 1256 (10th Cir.2001)(citing U.S.S.G. § 5K2.0).  In the case of an encouraged factor, "the court is authorized to depart if the applicable Guideline does not already take it into account."  United States v. Neal, 249 F.3d at 1256.  Accord United States v. Trejo-Lara, No. CR 07-1456, 2008 WL 2397672, at *2 (D.N.M. Jan. 30, 2008)(Browning, J.).

### LAW REGARDING THE OBSTRUCTION-OF-JUSTICE ENHANCEMENT

U.S.S.G. § 3C1.1 states:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.

U.S.S.G. § 3C1.1.  The Application Notes state: "Obstructive conduct that occurred prior to the start of the investigation of the instant offense of conviction may be covered by this guideline if the conduct was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction."  U.S.S.G. § 3C1.1, Application Note 1.

The application notes to § 3C1.1 provide a non-exhaustive list of conduct that warrants the

upward adjustment.  <u>See</u> U.S.S.G. § 3C1.1, Application Note 4.

> 4.    Examples of Covered Conduct. -- The following is a non-exhaustive list of
> examples of the types of conduct to which this enhancement applies:
>
> (A)    threatening, intimidating, or otherwise unlawfully
> influencing a co-defendant, witness, or juror, directly or
> indirectly, or attempting to do so;
>
> (B)    committing, suborning, or attempting to suborn perjury,
> including during the course of a civil proceeding if such
> perjury pertains to conduct that forms the basis of the offense
> of conviction;
>
> (C)    producing or attempting to produce a false, altered, or
> counterfeit document or record during an official
> investigation or judicial proceeding;
>
> (D)    destroying or concealing or directing or procuring another
> person to destroy or conceal evidence that is material to an
> official investigation or judicial proceeding (e.g., shredding
> a document or destroying ledgers upon learning that an
> official investigation has commenced or is about to
> commence), or attempting to do so . . .
>
> (E)    escaping or attempting to escape from custody before trial or
> sentencing; or willfully failing to appear, as ordered, for a
> judicial proceeding;
>
> (F)    providing materially false information to a judge or
> magistrate judge;
>
> (G)    providing a materially false statement to a law enforcement
> officer that significantly obstructed or impeded the official
> investigation or prosecution of the instant offense;
>
> (H)    providing materially false information to a probation officer
> in respect to a presentence or other investigation for the
> court;
>
> (I)    other conduct prohibited by obstruction of justice provisions
> under Title 18, United States Code (e.g., 18 U.S.C. §§ 1510,
> 1511);

      (J)       failing to comply with a restraining order or injunction issued pursuant to 21 U.S.C. 853(e) or with an order to repatriate property issued pursuant to 21 U.S.C. 853(p);

      (K)      threatening the victim of the offense in an attempt to prevent the victim from reporting the conduct constituting the offense of conviction.

U.S.S.G. § 3C1.1 Application Note 4.

      The application note also lists a number of acts that ordinarily do not trigger the enhancement.

    5.      Examples of Conduct Ordinarily Not Covered. -- Some types of conduct ordinarily do not warrant application of this adjustment, but may warrant a greater sentence within the otherwise applicable guideline range or affect the determination of whether other guideline adjustments apply (<u>e.g.</u>, § 3E1.1 (Acceptance of Responsibility)). . . .

The following is a non-exhaustive list of examples of the types of conduct to which this application note applies:

      (A)      providing a false name or identification document at arrest, except where such conduct actually resulted in a significant hindrance to the investigation or prosecution of the instant offense;

      (B)      making false statements, not under oath, to law enforcement officers, unless Application Note 4(G) above applies;

      (C)      providing incomplete or misleading information, not amounting to a material falsehood, in respect to a presentence investigation;

      (D)      avoiding or fleeing from arrest (see, however, § 3C1.2) (Reckless Endangerment During Flight);

      (E)      lying to a probation or pretrial services officer about defendant's drug use while on pre-trial release, although such conduct may be a factor in determining whether to reduce the defendant's sentence under § 3E1.1 (Acceptance of Responsibility).

U.S.S.G. § 3C1.1 Application Note 5.

In <u>United States v. Farnsworth</u>, 92 F.3d 1001 (10th Cir. 1996), the Tenth Circuit recognizes that an attempt to influence a witness by instructing the witness to lie warrants an enhancement under § 3C1.1.  See <u>United States v. Farnsworth</u>, 92 F.3d at 1011.  The Tenth Circuit remands the case to the district court, however, because the district court does not make a specific finding as to the issue, instead doing no more than adopting "the analysis of the Probation Department as accurate and correct."  <u>United States v. Farnsworth</u>, 92 F.3d at 1011.  In <u>United States v. Yuselew</u>, No. CR 09-1035 JB, 2010 WL 3834418 (D.N.M. Aug. 5, 2010)(Browning, J.), the Court holds that, "to warrant application of the § 3C1.1 enhancement, the defendant must have deliberately -- not accidentally, incidentally, or mistakenly -- done some act with the specific purpose of thwarting the investigation and prosecution."  <u>United States v. Yuselew</u>, 2010 WL 3834418, at *12.  The Court also concludes that attempts to obstruct justice may be sufficient if the acts are of a kind that likely are to thwart the investigation and eventual prosecution.  See 2010 WL 3834418, at *13.

The enhancement applies even for attempted obstruction of justice if the United States demonstrates that the defendant intends to obstruct justice and that the defendant commits an act which constitutes a substantial step toward the obstruction of justice.  See <u>United States v. Fleming</u>, 667 F.3d at 1107.  Moreover, a "defendant's offense level is enhanced by two levels for attempted obstruction of justice when the Government demonstrates that the defendant: (1) intended to obstruct justice, and (2) committed an act that constitutes a substantial step toward the obstruction of justice."  <u>United States v. Fleming</u>, 667 F.3d at 1107 (citing <u>United States v. Washington</u>, 653 F.3d 1251, 1264 (10th Cir. 2011)).

> A substantial step must be something more than mere preparation, yet may be less than the last act necessary before the actual commission of the substantive crime. . . . Whether a defendant's actions amount to an attempt, and, in particular, whether his actions qualify as a substantial step, is a highly fact-specific inquiry.

United States v. Washington, 653 F.3d at 1264.

**ANALYSIS**

The Court denies Janzad's MTR.  First, upon reconsideration of the 10-level actual-loss enhancement, the Court concludes that it remains appropriate, because T.H. suffers an actual loss of $163,363.03 that is not subject to any offsets.  Second, upon reconsideration, Janzad still is not entitled to a downward departure for significantly reduced mental capacity, because her actions, her testimony, and Dr. Viljoen's testimony demonstrate that she understands her conduct's wrongfulness and is capable of controlling her behavior.  Third, reconsideration of the Court's conclusion that the 2-level obstruction enhancement is appropriate is unnecessary, because Janzad makes the same argument in the MTR that she makes in her Sentencing Objections.  The applicable offense level remains 20, the applicable criminal history category remains I, and the United States Sentencing Guidelines establish an imprisonment range of 33 to 41 months.

**I.    THE COURT RECONSIDERS ITS HOLDING REGARDING JANZAD'S ACTUAL LOSS ENHANCEMENT.**

The Tenth Circuit holds that criminal motions to reconsider are proper, because a "district court should have the opportunity to correct alleged errors in its dispositions."  United States v. Christy, 739 F.3d at 539.  This authority is not, however, without limits.  Specific grounds for reconsideration include: (i) an intervening change in the controlling law; (ii) new evidence previously unavailable; and (iii) the need to correct clear error or prevent manifest injustice.  Servants of Paraclete v. Does, 204 F.3d at 1012.  Here, the Court reconsiders the application of Janzad's 10-level actual loss enhancement in light of the new evidence she provides.

In her Sentencing Objections, Janzad contends that she provides T.H. with $220,000.00 worth of care in exchange for T.H.'s pledge of $163,363.03 for the remodel of the Holiday House. See Sentencing Objections at 18.  Based on this, she argues that she is entitled to a credit that

reduces the actual loss amount to zero.  See Sentencing Objections at 18.  Janzad does not acknowledge, however, and the United States notes in its Response, that T.H. uses his VA benefits to pay for his room and board at VILA each month after Janzad takes $163,363.03 from him.  See Sentencing Objections at 18.  Because T.H. continues to pay for his room and board, the Court determines that the United States proves, by a preponderance of the evidence, that T.H. suffers an actual loss of $163,363.03.  See Sentencing MOO at 51.

On the morning of sentencing, Janzad submits seventy-three pages of invoices that she argues demonstrates that she provides T.H. with $223,159.98 worth of services for which he never had to pay.  See VILA Invoices at 1.  Unlike her Sentencing Objections, which do not address the fact that T.H. uses his VA benefits to pay for his room and board, these invoices show both the money that T.H. pays to VILA each month, and the deficit between the amount T.H. pays and the services the VILA provides to him.  See generally VILA Invoices at 1.  Based on these new invoices, Janzad argues that there was no actual loss.  See MTR at 1-2.  Because the Court did not consider these invoices in its Sentencing MOO, it will now reconsider the issue of actual loss in light of this new evidence.

A.    **UPON RECONSIDERATION, JANZAD'S BASE OFFENSE LEVEL IS SUBJECT TO A 10-LEVEL LOSS ENHANCEMENT PURSUANT TO U.S.S.G. § 2B1.1(B)(1)(F).**

The Court concludes that a 10-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(1)(F) is appropriate, because T.H. suffers a loss of over $150,000.00.  Section 2B1.1 provides a sliding-scale offense level that increases with the offense's loss.  See U.S.S.G. § 2B1.1.  Loss is "the greater of actual or intended loss."  U.S.S.G. § 2B1.1, Application Note 3(A).  "Actual loss means the reasonably foreseeable pecuniary harm that resulted from the offense."  U.S.S.G. § 2B1.1, Application Note 3(A)(i).  "The Court need only make a reasonable estimate of the loss.  The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon

that evidence." Federal Sentencing Guidelines Handbook § 2B1.1, at 81 (2025 ed.)("Guidelines Handbook"). The Tenth Circuit holds that a district court cannot include losses in its calculation under § 2B1.1 until the "Government first . . . prove[s] by a preponderance of the evidence that the conduct giving rise to those losses (1) was a part of the Defendant's ongoing scheme . . . and (2) constituted a criminal offense under a federal or state statute." United States v. Kieffer, 681 F.3d 1143, 1168 (10th Cir. 2012). Next, the United States must "prove the amount of loss (or a reasonable estimate thereof) associated with that conduct by a preponderance of the evidence." United States v. Kieffer, 681 F.3d at 1186 (citing United States v. Peterson, 312 F.3d 1300, 1302 (10th Cir. 2002)). The Tenth Circuit holds, however, that the court may shift the burden to the defendant to prove loss offsets where it finds defendant's evidence too unreliable to credit. See United States v. Hess, 106 F.4th 1011, 1023 (10th Cir. 2024)("Hess").

**B.    T.H. SUFFERS AN ACTUAL LOSS OF $163,363.03.**

"Actual loss means the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1, Application Note 3(A)(i). The United States bears the initial burden of proving that T.H. suffers a "harm that is monetary or that otherwise is readily measurable in money." United States v. Hess, 106 F.4th at 1023. Here, the United States asserts that the actual loss to T.H. is $163,363.03. See Objections Response at 4. The record provides support for this conclusion.

First, the jury convicts Janzad of misappropriating $163,363.03 from T.H. See PSR ¶ 11, at 4. After Janzad became T.H.'s fiduciary, his prior fiduciary company sent Janzad the unspent benefits it accumulates on his behalf, totaling $163,363.03. See PSR ¶ 11, at 4. Contrary to her fiduciary duty, Janzad does not deposit these funds into T.H.'s designated account. See PSR ¶ 11, at 4. Instead, she deposits the checks into her VILA general operating account, thereby commingling T.H.'s funds with other assets. See PSR ¶ 11, at 4. A financial analysis reveals that,

once Janzad deposits the $163,363.03 into VILA's general operating account, Janzad distributes the funds as follows: (i) approximately $35,000.00 toward a mortgage; (ii) approximately $27,000.00 to unknown payees via cashier's checks; and (iii) the remainder to regular operating expenses, including employee wages.  See PSR ¶ 30, at 9.

In the MTR, Janzad offers no new argument disputing the actual loss; her argument centers solely on whether she should receive credit for services rendered -- a point the Court addresses below.  Accordingly, the Court only reiterates the arguments in the Sentencing MOO.  In her Sentencing Objections, Janzad insists there is no loss, arguing that the $163,363.03 is payment for T.H.'s "Life Care Contract," which allegedly guarantees him lifetime residency at VILA. Sentencing Objections at 16.  The Court concludes, however, that the United States proves, by a preponderance of the evidence, that Janzad does not receive T.H.'s money in exchange for a "Life Care Contract."  Sentencing Objections at 16.

First, the "Life Care Contract" is dated January 10, 2019, yet Janzad took T.H.'s money in March, 2018.  Objections Response at 3.  This discrepancy exposes the fallacy of her contention. Further, Janzad creates another document, bearing the same date as the "Life Care Contract," stating that T.H.'s funds are to improve one of VILA's facilities.  PSR ¶ 26, at 7-8.  Moreover, the financial analysis reveals that, rather than using the funds for T.H.'s care, as the "Life Care Contract" asserts, Janzad diverts the funds to cover unrelated VILA expenses, including employee wages.  PSR ¶ 30, at 9.  This evidence supports the finding that T.H. suffers an actual loss of $163,363.03.  Janzad's attempt to cloak her misconduct in the guise of a contractual arrangement

cannot obscure the truth -- that this is misappropriation.  The Court therefore holds that the United

States proves, by a preponderance of the evidence, that T.H. suffers an actual loss of $163,363.03.

## C.     THE CONDUCT GIVING RISE TO THE LOSS IS A PART OF JANZAD'S ONGOING SCHEME AND CONSTITUTES A CRIMINAL OFFENSE.

First, with respect to the conduct giving rise to actual loss, the United States must prove,

by a preponderance of the evidence, that the conduct leading to the loss: (i) is part of Janzad's

ongoing scheme; and (ii) constitutes a criminal offense.  See United States v. Kieffer, 681 F.3d

1143, 1168 (10th Cir. 2012).  The United States meets this burden: the USPO calculates the loss

at $163,363.03, and the jury convicts Janzad of fiduciary misappropriation of that same amount.

See PSR at 11.  Janzad raises no objection to this part of the test either in her Sentencing Objections

or in her MTR; her arguments focus solely on the issue of determining the offset amount.

## D.     THE COURT DOES NOT OFFSET T.H.'S ACTUAL LOSS OF $163,363.03, BECAUSE THE COURT FINDS THE VILA INVOICES UNRELIABLE.

When the United States meets its initial burden of proving relevant conduct, "it then ha[s]

to prove the amount of loss (or reasonable estimate thereof) associated with the conduct by a

preponderance of the evidence."  United States v. Kieffer, 681 F.3d at 1168.  Against actual loss,

"the sentencing court must credit the fair market value of the property returned and the services

rendered, by the defendant or other persons acting jointly with the defendant, to the victim before

the offense was detected."  Hess, 106 F.4th at 1023.  Thus, "loss equals loss (or intended loss)

minus credits against loss."  Hess, 106 F.4th at 1023.  For example, in United States v. Stochel,

901 F.3d 883 (7th Cir. 2018), the Seventh Circuit upholds the district court's sentencing

enhancement based on the defendant's depletion of $331,840.00 from a receivership,

notwithstanding his argument that he is entitled to more than $127,000.00 in offsets for services

he allegedly provides.  See 901 F.3d at 890.  The district court rejects that position, because the

defendant offers little more than his own proclamation of entitlement to the offset.  See 901 F.3d at 890.

The Tenth Circuit also cites approvingly to United States v. Miell, 661 F.3d 995 (8th Cir. 2011)("Miell"), for the principle that, when a defendant's "business dealings were . . . 'systematically tainted with fraud,' a court may decline to offset the loss calculation."  Hess, 106 F.4th at 1028 (quoting Miell, 661 F.3d at 1001).  Although Miell does not authorize a categorical refusal to credit legitimate services, it "does support the proposition that, where the evidence available to the prosecution of its initial loss calculations is systematically tainted with fraud such that estimating net loss is impossible, the burden then shifts to the defendant to prove loss offsets." Hess, 106 F.4th at 1027.  In Meill, the defendant, who pleads guilty to engaging in two mail fraud schemes, appeals the application of his actual loss enhancement for the loss his scheme exceeding one million dollars causes.  See Meill, 661 F.3d at 997.  The Eighth Circuit holds that the district court properly relies on approximations exceeding one million dollars, because the United States shows that the defendant's damage-deposit claims are "systematically tainted with fraud," making it "difficult, if not impossible," to disentangle legitimate from illegitimate charges.  Miell, 661 F.3d at 1001.  As the Tenth Circuit explains, this burden-shifting framework applies where the district court finds the defendant's evidence -- such as invoices -- too unreliable to credit.  See Hess, 106 F.4th at 1028 (citing Miell, 661 F.3d at 1001).

Here, Janzad asks the Court to reconsider its factual finding that T.H. suffers an actual loss of $163,363.03, relying on seventy-three pages of invoices that she hands to the Court on the morning of sentencing.  See MTR at 5.  She asserts that the invoices show that she provides $223,159.98 worth of services, and, therefore, because she takes $163,363.03, but supposedly provides more than that amount in care, the actual loss is zero.  See VILA Invoices at 1; See MTR

at 3.  Although the Guidelines' command that "loss shall be reduced" by the fair market value of services rendered is mandatory, <u>Hess</u>, 106 F.4th at 1029, the Court concludes that, as in <u>Miell</u>, the evidence that Janzad provides is so thoroughly "tainted with fraud" that the burden shifts to her to prove any offset -- and she has not carried that burden.  <u>Hess</u>, 106 F.4th at 1027.

Several facts show that the VILA Invoices are not authentic and are likely fraudulent.  First, the earliest invoice is dated October 1, 2017, and bears Invoice #1.  <u>See</u> VILA Invoices at 2.  The invoices then proceed sequentially before abruptly restarting their numbering on March 18, 2018. <u>See</u> VILA Invoices at 8.  Because T.H. had resided at VILA since 2011, it is implausible that an invoice dated October 1, 2017, would bear Invoice #1, an indicator of post hoc fabrication.  <u>See</u> VILA Invoices at 2; <u>see</u> PSR ¶ 8, at 4.  Second, every invoice -- including those from 2017 -- references a "VILA Life Care Account."  VILA Invoice at 2.  The "Life Care Contract" that supposedly funds these charges, however, is not signed until January 10, 2019.  PSR ¶ 24, at 7. The invoices therefore purport to show payments under a contract that does not exist yet, which is evidence of backdating and manipulation.

Third, the invoices contradict Janzad's VA-certified fiduciary accounting, which she signs under penalty of federal scrutiny.  <u>See</u> VA Fiduciary's Account Statement at 1.  That accounting states that T.H. pays $3,950.00 per month for "all-inclusive" room and board, and has $2,049.73 in assets at the end of the reporting period.  <u>See</u> VA Fiduciary's Account Statement at 1.  Yet the invoices now before the Court list room and board charges as high as $7,850.00 per month and reflect a purported deficit of $31,187.41 for that same period.  <u>See</u> VILA Invoices at 4-17.  When asked to explain this glaring mismatch, Janzad asserts that the VA form reflects only a "segregated" account that paid part of the bill.  November 12, 2025, Tr. 218:8-14 (Pori).  That explanation does not withstand scrutiny, because her remarks on the VA form state that the

$3,950.00 "all inclusive" room and board covers "all of his expenses and needs."  VA Fiduciary's Account Statement at 1.  An "all-inclusive" charge cannot, by definition, coexist with simultaneous additional charges totaling $7,850.00 per month for room and board, yet the March 18, 2018, invoice lists that amount.  See VILA Invoice at 8.

Fourth, the invoices inflate other charges.  The VA accounting lists two payments to "The Light Within" for an exorcist[2] totaling $2,000.00.  See VA Fiduciary's Account Statement at 1. The VILA Invoices, however, list $10,000.00 for the same exorcists instead titling it "Removal of Possessed Entity -- Spiritual Healing."  VILA Invoices at 8-9.  The bank statement corroborates the $2,000.00 figure.  See VA Fiduciary's Account Statement at 1.  When confronted with this discrepancy, Janzad asks the Court to "take that line-item off," because, even without it, she still provides over $163,363.03 worth of services to T.H.  See Tr. 249:1-25 (Pori).  In essence, her position is that even if you subtract every charge you have caught her falsifying, the loss is still zero.  The problem, however, is not that one line item is false, the problem is that every time one line-item collapses under scrutiny, it undermines the credibility of all the others.  A document with fabrications does not become trustworthy because the author is willing to discard whichever falsehoods the Court identifies.  Taken together, the discrepancies demonstrate fabrication. Considering these issues in their totality, the Court cannot find the VILA Invoices credible or

---

[2] Exorcism: an adjuration addressed to evil spirits to force them to abandon an object, place, or person; technically, a ceremony used in both Jewish and Christian traditions to expel demons from persons who have come under their power.  The rites and practices of preliterate people to ward off or to expel evil spirits are also a form of exorcism, though they are sometimes considered witchcraft.  Britannica, https://www.britannica.com/topic/exorcism (last visited, December 5, 2025).

reliable; instead, the evidence indicates that Janzad and/or her staff created the invoices after the fact to avoid incarceration.

Despite these defects, Janzad still seeks credit for the "higher level of care" in the invoices -- an additional $3,900.00 per month above the $3,950.00 room and board rate. See generally VILA Invoices 1-73; see November 12, 2025, Tr. 240:1-25 (Pori). To support this position, she provides two documents. First, she offers an October 29, 2020, letter from a nurse practitioner stating that T.H.'s health is deteriorating and recommending that he move to a higher level of care. See October 29, 2020, Letter at 1. Second, she provides a check from another resident payable to VILA for $7,850.00, which she contends reflects the cost of the higher level of care, because this resident is allegedly paying that amount. See Antonia Chavez Check at 1. These pieces of evidence do not persuade the Court that T.H.'s actual cost of room and board is $7,850.00, because Janzad's certified statements to the VA contradict that figure. See VA Fiduciary's Account Statement at 1. In her VA submission, she states that, when T.H. moves to a higher level of care, his all-inclusive room-and-board rate increases from $2,200.00 to $3,950.00 -- not $7,850.00:

> [T.H's] level of care increased upon discharge from the VA in March 18 2018, resulting in a 30 day respite stay with an admission fee of $300.00 and then an increase in his monthly room and board from $2,200.00 to $3,950.00 after being placed into a VILA group home. The $3,950.00 Room and Board is all inclusive, therefore the monthly personal use allowance is no longer needed as all of his expenses and needs are covered by his room and board.

See VA Fiduciary's Account Statement at 1. The email that she sends to a VA agent on November 7, 2018, concludes: "Upon [T.H.'s] hospital release, VILA moved him to a higher level of care, a 24/7 assisted living facility for evaluation. At his previous independent living apartment, he paid $2,200.00 monthly room and board, at the assisted living facility, he began to pay $3,950.00 base rate room and board." November 7, 2018 Email at 1. Given that the record shows T.H. receives nearly $4,000 per month in VA benefits to pay for his room and board, and given that Janzad's

certified statement to the VA affirms that the rate for his higher level of care is $3,950.00 and not $7,850.00, the Court does not credit Janzad for any purported "higher-level" charges reflected in the VILA Invoices.  See VA Fiduciary's Account Statement at 1.

In the end, Janzad asks the Court to disregard the documents that she certifies under penalty of federal review and instead accept a stack of invoices that collapse under scrutiny.  The invoices are inconsistent with one another, inconsistent with her sworn fiduciary accounting, and, in several instances, inconsistent with objective financial records.  They contain backdated references to a contract that did not yet exist, contradictory room-and-board figures, and inflated or fabricated charges.  Each time one falsehood is exposed, it casts doubt on every line that remains.

Taken as a whole, the irregularities are not minor defects; they are evidence of fabrication. For all the reasons discussed above, the Court finds the VILA Invoices unreliable as they do not outweigh the evidence to the contrary.  The facts on which the Court can responsibly credit are those reliable evidence established: (i) that Janzad took $163,363.03 from T.H.; and (ii) that, throughout the relevant period, T.H. continues to pay for his room and board with his VA benefits. Because Janzad has not provided credible basis to reduce the loss amount, she has not met her burden to show an offset.  The Court therefore concludes that T.H.'s actual loss is $163,363.03 and that no offsets apply.

## E.    EVEN TAKING JANZAD'S INVOICE AMOUNTS THAT THE UNITED STATES DOES NOT DISPROVE, THE OFFENSE LEVEL DOES NOT CHANGE.

First, when determining which invoices the Court considers, § 2B1.1 requires that the offset calculation begin "at the time of the fraud."  United States v. Janusz, 135 F.3d 1319, 1324 (10th Cir. 1998).  Here, the initial misappropriation occurs on March 21, 2018, when Janzad deposits

the checks into VILA's general operating account.  See PSR ¶ 11, at 4.  The Court therefore does not place any weight any invoice dated before March 21, 2018.

Under § 2B1.1, Janzad is entitled to offsets only as to the value of services rendered before the offense was detected.  The Guidelines make this explicit: "Loss shall be reduced by the following: . . . the fair market value of . . . the services rendered, by the defendant . . . to the victim before the offense was detected."  U.S.S.G. § 2B1.1 Application Note 3(D)(i).  Detection occurs at the earlier of: "(i) the time the offense was discovered by a victim or government agency; or (ii) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency."  U.S.S.G. § 2B1.1 Application Note 3(D)(i).  Thus, any services Janzad renders after the detection date cannot offset the loss amount.

The United States argues -- and the Court agrees -- that the offense is detected no later than November 7, 2018.  See Response at 10.  On that date, Janzad emails George Smith, a VA agent, acknowledging that VILA has "received two checks adding up to $163,363.03," that she deposits the funds into the VILA account, and that she "felt it best to secure his money via a recorded mortgage at 5% interest with a monthly payment of $1,291.86."  November 7, 2018, Email at 1. This communication reveals that the fiduciary funds are commingled and misappropriated, in violation of her fiduciary duties.  The VA therefore discovers the offense on November 7, 2018, and the Court will not credit any services rendered after that date as a proper offset.

Accordingly, the relevant invoices are those dated between March 21, 2018, and November 7, 2018.  See VILA Invoices at 7-16.  Despite several entries listing a $7,850.00 room-and-board charge, the Court takes Janzad at her word in her VA fiduciary submission: T.H.'s room and board cost $3,950.00 per month for higher level care.  See VA Fiduciary's Account Statement at 1.  Over the relevant period, this higher-level totals $35,330.00.  See VILA Invoices at 7-16.  T.H.'s VA

benefits during that period cover $33,300.00, leaving a $2,250.00 deficit. See VA Fiduciary's Account Statement at 1. Credit for the two "Removal of Possessed Entity -- Spiritual Healing" services is limited to the $2,000.00 documented in the VA fiduciary account, bringing the running deficit total to $4,250.00. See VA Fiduciary's Account Statement at 1. The VILA Invoices also reflect $524.00 for "Pet Care and Boarding" during this timeframe, increasing the offset to $4,774.00. See VILA Invoices at 7-16. Although the line item "Food for Special Diet and Energy Work by Healer" is false -- T.H.'s room and board is all-inclusive -- the Court, even giving every benefit of the doubt, credits the $3,500.00 claimed for the relevant period. See VILA Invoices at 7-16. This brings the maximum possible offset to $8,274.00.

Subtracting $8,274.00 from the $163,363.03 Janzad misappropriated leaves a total loss of $155,089.03. That loss still triggers the 10-level enhancement under § 2B1.1(b)(1)(F), which applies to any loss exceeding $150,000.00. Thus, even if the Court adopts Janzad's numbers -- which it will not, for the reasons already explained -- the offense level remains unchanged. Her request does not reduce the loss; it confirms the offense level. The Court therefore denies Janzad's MTR.

## II. THE COURT RECONSIDERS ITS HOLDING THAT JANZAD IS NOT ENTITLED TO A DOWNWARD DEPARTURE FOR HER ALLEGED GRANDIOSE DELUSIONAL DISORDER.

The Tenth Circuit holds that criminal motions to reconsider are proper, because a "district court should have the opportunity to correct alleged errors in its dispositions." United States v. Christy, 739 F.3d at 539. This authority, however, is not without limits. Specific grounds for reconsideration include: (i) an intervening change in the controlling law; (ii) new evidence previously unavailable; and (iii) the need to correct clear error or prevent manifest injustice. See Servants of Paraclete v. Does, 204 F.3d at 1012. Here, the Court reexamines its conclusion that Janzad is not entitled to a downward departure based on her alleged grandiose delusional disorder.

In her Sentencing Objections, Janzad contends that § 5K2.13 warrants a downward departure, because she purportedly cannot appreciate the wrongfulness of her conduct or conform her behavior to the law.  See Sentencing Objections at 25.  She attributes this inability to an asserted grandiose delusional disorder.  See Sentencing Objections at 25-26.  Based on Janzad's trial testimony and her creation of conflicting contracts -- conduct that reflects conscious wrongdoing and not impaired capacity -- the Court concludes that a departure for significantly reduced mental capacity is not appropriate.  See Sentencing MOO at 37-39.

In her MTR, Janzad asks the Court to revisit that determination in light of the psychological report that Dr. Viljoen prepares, which Dr. Viljoen completed after Janzad filed her Sentencing Memorandum.  See MTR at 8.  Because the Court does not consider this report in its prior ruling, it reconsiders the issue of a § 5K2.13 departure in light of this newly presented evidence.

U.S.S.G. § 5K2.13 provides: "A downward departure may be warranted if (1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense." U.S.S.G. § 5K2.13.  Significantly reduced mental capacity means that the defendant has a significantly impaired ability to: (i) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (ii) control behavior that the defendant knows is wrongful.  See U.S.S.G. § 5K2.13.  The Court finds that Janzad is able to understands the wrongfulness of her behavior and control this wrongful behavior.  Like the Court concludes in the Sentencing MOO, the most persuasive evidence of her mental state is Janzad's admissions.  See August 2, 2024, Tr. at 127:7-24 (Pena, Janzad).  From a review of the transcript, the Court concludes that Janzad understands right from wrong and is able to conform her behavior to that standard:

Q.    Do you agree that you have to follow regular law?

A.    Absolutely.  If the law is presented to me, I have no other choice except to follow it.

Q.    Well, the same laws apply to you as they do to everyone else. And I'm talking about regular laws.

A.    Yeah, stop sign, and getting a driver's license, yeah.

Q.    Just like everybody else, you have to tell the truth?

A.    Of course you have to tell the truth.

Q.    Just like everybody else, you have to keep your promises?

A.    Have to keep your promises, yes.

Q.    Do you agree to be held to the same standards that apply to everybody?

A.     If you say so.

August 2, 2024, Tr. at 127:7-24 (Pena, Janzad).  Janzad's conduct further shows that she knows her actions are wrongful.  Her inconsistent explanations how she uses T.H's unspent benefits reinforce this conclusion.  See PSR ¶ 29, at 8.  For example, on the same day, she executes two contracts: (i) the "Life Care Contract," which states that T.H.'s money will be used for his care; and (ii) another contract states that the money will fund improvements to the VILA housing facility.  See PSR ¶ 29, at 8.  Creating two conflicting contracts on the same date is not the act of someone who believes her conduct is innocent.  Further, her long-standing operation of VILA underscores her ability to plan, organize, and control her actions -- the faculties that § 5K2.13 examines.

In her MTR, Janzad relies on Dr. Viljoen's psychological report to argue that she is entitled to a downward departure.[3]  See MTR at 8.  Specifically, she relies on Dr. Viljoen's conclusions that: (i) Janzad presents "peculiar and self aggrandizing spiritual beliefs and made grandiose statements about her work helping disabled veterans that bordered on delusion"; (ii) Janzad has "poor insight into her interpersonal functioning and several psychosocial problems"; and (iii) "Janzad presented significant psychosocial concerning contributing to her current legal involvement."  MTR at 8.  Although the Court is sympathetic to the mental health issues that Dr. Viljoen identifies, the report's statements do not persuade the Court that her mental health issues affect her ability to understand the wrongfulness of her actions or control her actions.  Dr. Viljoen confirms that Janzad "is aware she is not above the law," November 12, 2025, Tr. at 193:17-20 (Dr. Viljoen), and lies to preserve her image, November 12, 2025, Tr. at 198:22-25 (Dr. Viljoen).

The Court therefore denies Janzad's request for a downward departure.  The Court concludes that the Guidelines authorize a § 5K2.13 departure in federal criminal cases, but the Court is having a difficult time squaring her allegation of low mental capacity with her high IQ

---

[3] Although the general rule is that a sentencing court applies the version of the Guidelines in effect at the time of sentencing, if the later version imposes harsher punishment and implicates the Ex Post Facto Clause, the Court applies the guidelines in effect at the time of the defendant's offense.  United States v. Anderson, 85 F. Supp. 2d 1084, 1110 (D. Kan. 1999)(Citing United States v. Nichols, 169 F.3d 1255, 1270 n. 3 (10th Cir. 1999).  Starting November 1, 2025, Amendment 836 simplified what was formerly the three-step Guidelines process.  See Federal Sentencing Guidelines Handbook Amendment 836, (Appendix C) at 338 (2025 ed.)("2025 Guidelines Handbook").  Under Amendment 836, § 5K2.13 is deleted as a departure.  See 2025 Guidelines Handbook at 445.  Instead, the Guidelines Manual now provides a two-step process whereby the sentencing court must first correctly calculate the applicable guideline range as the starting point and initial benchmark and then must determine an appropriate sentence upon consideration of all the factors set forth in 18 U.S.C. 3553(a).  Because a § 5K2.13 departure was previously available as a departure and is no longer available as a departure after November 1, 2025, the Court determines that a later version of the Guidelines could present a harsher sentence on Janzad.  As a result, the Court applies the version of the Guidelines that were in effect at the time of Janzad's offense, a version that recognizes § 5K2.13 as a sentencing departure.

and the sophistication of the crime she commits.  In any case, the Court chooses not to depart, because the Court concludes that a departure is not warranted under the facts and circumstances here.  Unfortunately, the nation's prisons contain many who have some diminished capacity. As the Court observes at the hearing, Janzad's mental health issues fall within the heartland of cases that federal courts routinely see.  See November 12, 2025, Tr. at 266:1-14 (Court).  For these reasons -- her admissions, her creation of conflicting contracts, and her ability to operate VILA -- Janzad's request for a downward departure lacks a sound basis in the relevant guidelines and in the applicable law.  The Court therefore overrules the request and denies the MTR.

### III.    THE COURT DOES NOT RECONSIDER ITS HOLDING THAT JANZAD'S BASE OFFENSE LEVEL IS SUBJECT TO A 2-LEVEL OBSTRUCTION ENHANCEMENT.

The Tenth Circuit holds that criminal motions to reconsider are proper, because a "district court should have the opportunity to correct alleged errors in its dispositions."  United States v. Christy, 739 F.3d at 539.  This authority, however, is not without limits.  Specific grounds for reconsideration include: (i) an intervening change in the controlling law; (ii) new evidence previously unavailable; and (iii) the need to correct clear error or prevent manifest injustice.  See Servants of Paraclete v. Does, 204 F.3d at 1012.  Motions to reconsider, however, "should not be used to revisit issues already addressed or advance arguments that could have been raised earlier."  United States v. Christy, 739 F.3d at 539.  The Court does not reconsider its obstruction-enhancement application, because Janzad admits: "I'm not making any new arguments."  November 12, 2025, Tr. at 266:19-20 (Pori).  The Court therefore holds that a 2-level obstruction enhancement applies and denies Janzad's MTR.

IT IS ORDERED that: (i) Defendant's Opposed Motion to Reconsider Three Parts of the Court's Memorandum Opinion Overruling Defendant's Objections to the Pre-Sentence Report, filed November 12, 2025 (Doc. 164), is denied; (ii) the applicable offense level is 20; (iii) the

applicable criminal history category is I; and (iv) the United States Sentencing Guidelines establish

an imprisonment range of 33 to 41 months.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Ryan Ellison
  Acting United States Attorney
Frederick T. Mendenhall, III
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

*Attorneys for the Plaintiff*

Brian A Pori
Albuquerque, New Mexico

*Attorney for the Defendant*